Isaac M. Gradman (243344)
gradman@perrylaw.net
E. Page Allinson (287040)
allinson@perrylaw.net
Michael E. Tracht (345914)
tracht@perrylaw.net
Alexander A. Wiegel (319813)
wiegel@perrylaw.net
PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ, LLP
438 1st Street, 4th Floor
Santa Rosa, California 95401
Telephone: (707) 525-8800
Facsimile: (707) 545-8242

*Attorneys for all Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

River Canyon Total Return Bond Fund, Canyon NZ-DOF Investing L.P., Canyon Distressed TX (A) LLC, Canyon Distressed TX (B) LLC, Canyon-EDOF (Master) L.P., and Canyon Distressed Opportunity Master Fund III, L.P.,

Plaintiffs,

v.

Credit Suisse Securities (USA) LLC,

Defendant.

/

Case No. 2:24-cv-3993

**COMPLAINT FOR SECURITIES FRAUD AND INTENTIONAL AND NEGLIGENT MISREPRESENTATION**

**DEMAND FOR JURY TRIAL**

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action:

a. under 28 U.S.C. § 1331, because it seeks relief under the laws of the United States;

b. under 15 U.S.C. § 78aa, because it seeks to enforce liabilities and duties created by the Securities Exchange Act of 1934 or rules or regulations thereunder; and

c. under 28 U.S.C. § 1367, because the claims not arising under federal law are so related to the federal-law claims that they form the same case or controversy under Article III of the United States Constitution.

2. This Court has personal jurisdiction over Defendant because, *inter alia*:

a. Defendant is present within, or has minimum contacts with, the State of California and this judicial district;

b. Defendant has purposefully availed itself of the privileges of conducting business in the State of California and in this judicial district; and

c. each of Plaintiffs' causes of action arises directly from Defendant's business contacts or other activities in the State of California and in this judicial district.

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, including the solicitation of Plaintiffs by Defendant regarding the purchase of the at-issue

securities, and the acceptance by Plaintiffs of the offer to purchase these securities, occurred in this district.

4. Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant is an entity that is subject to this Court's personal jurisdiction with respect to this action, and is therefore considered to reside in this district under 28 U.S.C. § 1391(c)(2).

## PRELIMINARY STATEMENT

1. This action seeks (a) the rescission of the sale to Plaintiffs by Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") of securities (the "Notes") issued by the U.S. Auto Funding Trust Series 2022-1 Trust ("USAF 2022-1" or the "Trust"), or, in the alternative, (b) damages from Credit Suisse for Plaintiffs' lost value in the Notes purchased by Plaintiffs from Defendant (the "Subject Notes"), based upon, *inter alia*, misrepresentations in the offering documents for the Notes regarding critical aspects of the transaction and the operations of key transaction parties. In particular, Defendant failed to disclose that at the time the Notes were offered, the Sponsor/Seller of the Trust and its affiliates were in serious financial trouble, were unable to meet their payment obligations when they came due, and had been failing for months to fund and place into force Trust assets that formed a material portion of the Trust's collateral and served to protect much of the remainder of the Trust's collateral from loss. Plaintiffs also seek exemplary damages on the basis of Defendant's fraud, oppression, malice, and/or gross negligence.

2. In 2022, Credit Suisse and Wells Fargo Securities, LLC ("Wells Fargo") acted as the underwriters of the Trust, a securitization trust that pooled used-automobile loans and related receivables issued by various affiliates of USASF Holdco, LLC (collectively, "U.S. Auto"). In this role, Credit Suisse participated in the drafting of, approved, and issued the Offering Memorandum that it provided to Plaintiffs and their investment managers to solicit the sale of the Notes issued by the Trust. Defendant also participated in the drafting of, approved, and issued additional marketing materials, including, but not limited to, the Investor Presentation (as defined below), which was provided to Plaintiffs and their investment managers in the course of Defendant's solicitation of Plaintiffs' purchase of Notes.

3. In the course of its due diligence in its role as underwriter of the Trust and issuer of the Offering Memorandum and other materials, if not earlier, Credit Suisse became intimately familiar with the operations and financial condition of the various U.S. Auto entities, including the entities that originated and serviced the collateral for the deal. Nevertheless, Credit Suisse made numerous misrepresentations in the Offering Memorandum and other materials it provided to investors, and omitted to state material facts necessary to make its statements and descriptions not misleading, including regarding the operations and financial condition of the U.S. Auto entities and the status and condition of the deal's collateral.

4. Unbeknownst to Plaintiffs and their investment managers, U.S. Auto was experiencing severe financial trouble for months before the Trust closed. The Trust turned out to be the last securitization sponsored by U.S. Auto and most, if

not all, U.S. Auto entities are now insolvent, with several having filed for bankruptcy. As lead underwriter, Credit Suisse had access to the books and records of U.S. Auto that would have revealed its dire financial condition and the fact that it had insufficient capital to meet its financial obligations as they came due. Most notably, Credit Suisse concealed and failed to disclose to Plaintiffs that, since late 2021 or earlier, U.S. Auto had been failing to fund borrower-purchased warranties known as vehicle service contracts ("VSCs"), which formed a substantial part of the Trust's collateral and constituted a meaningful driver of the performance of the Trust and the Notes. This meant that borrower warranties, including those to be securitized as collateral of the Trust, never went into effect and/or were subject to cancellation at the time the Trust closed. As such, Credit Suisse misrepresented the status of, and failed to disclose to investors that, a substantial portion of the Trust's collateral—consisting of the Trust's VSCs—was effectively worthless. Credit Suisse thus also concealed from, and failed to disclose to, investors that the valuable and material protection the VSCs were intended to provide for the Trust's auto-loan receivables was non-existent.

5. Credit Suisse further failed to disclose U.S. Auto's deteriorating financial condition and the fact that U.S. Auto's financial distress exposed the Trust's assets and cash flows to significant additional risk. Indeed, these issues ultimately culminated in U.S. Auto "robbing Peter to pay Paul"—misappropriating for its own use Trust assets in the form of collections U.S. Auto had received in its role as servicer with respect to the underlying auto loans. Despite being obligated under the Trust's governing agreements to pay the net

amount of any such collections—consisting largely of borrower payments on their auto loans and loan rebates—into the Trust's collection account, U.S. Auto embezzled the funds.

6. As a result, on or about April 18, 2023, the Trust's remittance report disclosed a shocking "shortfall" of millions of dollars in cash missing from the Trust. It was not until that date, at the earliest, that investors could have learned of U.S. Auto's significant debt and liquidity issues.

7. Days later, news broke of the closure of U.S. Auto's dealerships and its loss of financing for its business. As more details regarding U.S. Auto's financial situation continued to emerge, it became apparent that the shortfall was the result of U.S. Auto's effort to pay its other obligations and/or cover up its deteriorating financial condition by siphoning funds that belonged to the Trust.

8. Unbeknownst to Plaintiffs, these financial issues were present well before the Trust closed, as it turns out that U.S. Auto had not been funding its VSCs for months before the marketing and issuance of the Notes. Credit Suisse was aware of or should have been aware of these issues in the exercise of ordinary due diligence with respect to the Notes and the Trust, as it had access to books and records of U.S. Auto revealing indicia of severe financial distress. In addition, on information and belief, Credit Suisse (and/or its affiliated entities) had an extensive lending relationship with U.S. Auto for years prior to the offering of the Notes, including underwriting U.S. Auto's auto loan receivables like the ones that collateralized the Trust. As such, Credit Suisse was intimately familiar with U.S. Auto's business, operations and financial condition at the time it offered the Notes. The non-funding of VSCs by U.S. Auto would have been

obvious from U.S. Auto's financial statements, as well as the Trust's collateral files, which Defendant had in its possession at that time.

9. Despite its actual or constructive awareness of U.S. Auto's declining financial condition and failure to fund the VSCs, Defendant misrepresented the status of the VSCs and U.S. Auto's financial condition in the Offering Memorandum, other materials it prepared and circulated to investors to market the Notes, and its other communications with investors, and failed to otherwise disclose the true facts about the VSCs and U.S. Auto's mounting financial struggles to potential investors, including Plaintiffs.

10. These misrepresentations and omissions were material to Plaintiffs, and they would have been material to any investor, as the true facts would have revealed enormous risks that the Notes would underperform and/or that U.S. Auto would fail to meet, or have the wherewithal to stand behind, its obligations.

11. Indeed, now that such risks have come to pass, investors, including Plaintiffs, have suffered devastating consequences: the original principal balances of most of the Subject Notes have been written down to zero, meaning that the Subject Notes will not receive any of the principal cash flows to which they would have been entitled according to their seniority, causing substantial losses to Plaintiffs.

12. Had Defendant accurately described U.S. Auto's financial condition, U.S. Auto's failure to fund the VSCs, or U.S. Auto's inability to meet its payment obligations when they came due, Plaintiffs would not have purchased the Subject Notes at all, let alone at the price they did. Accordingly, Defendant's

misrepresentations and omissions are material, warranting rescission, or, in the alternative, compensation for the diminished value of the Subject Notes.

13. Based on the foregoing, Credit Suisse is obligated to refund to Plaintiffs the full purchase price of the Subject Notes with interest, minus any cashflows ultimately paid to Plaintiffs on the Subject Notes, and retake the Subject Notes; in the alternative, Defendant must pay Plaintiffs compensatory damages for the diminution in the value of the Subject Notes.

14. Plaintiffs are also entitled to exemplary damages due to Credit Suisse's fraud, oppression, malice, and/or gross negligence in marketing the Notes with conscious and/or reckless disregard of the rights of, and heightened risks to, Plaintiffs in light of the information of which Defendant had in its possession, as well as the information Defendant should have acquired in the course of reasonable due diligence with respect to the Trust.

## PARTIES

15. Plaintiffs are investment funds managed by either Canyon Capital Advisors LLC or River Canyon Fund Management LLC (Canyon Capital Advisors LLC, River Canyon Fund Management LLC, and their subsidiaries and affiliated entities are collectively referred to hereinafter as "Canyon"). Canyon Capital Advisors LLC is a limited liability company formed under the laws of Delaware, with its principal office in Dallas, Texas. River Canyon Fund Management LLC is a limited liability company formed under the laws of Delaware, with its principal office in Dallas, Texas. Canyon also has offices in Los Angeles, California, among other locations.

16. Plaintiff River Canyon Total Return Bond Fund is an investment fund issued by Advisers Investment Trust, a Delaware statutory trust, which is an open-end investment company.

17. Plaintiff Canyon NZ-DOF Investing L.P. is a limited partnership formed under the laws of Delaware and operating as a private investment fund.

18. Plaintiff Canyon Distressed TX (A) LLC is a limited liability company formed under the laws of Delaware and operating as a private investment fund.

19. Plaintiff Canyon Distressed TX (B) LLC is a limited liability company formed under the laws of Delaware and operating as a private investment fund.

20. Plaintiff Canyon-EDOF (Master) L.P. is a limited partnership formed under the laws of the Cayman Islands and operating as a private investment fund.

21. Plaintiff Canyon Distressed Opportunity Master Fund III, L.P. is a limited partnership formed under the laws of the Cayman Islands and operating as a private investment fund.

22. Adam J. Rizkalla, an employee of Canyon, had primary responsibility for evaluating the offered Notes and for recommending to his supervisors whether Canyon should cause Plaintiffs to buy Notes; his supervisors had the ultimate authority to approve such a purchase. Declaration of Adam J. Rizkalla ("Rizkalla Decl.") ¶ 3, attached as **Exhibit 1** hereto.

23. At the time Canyon was first solicited to purchase Notes in the Trust, Mr. Rizkalla was working in Los Angeles, California, where Canyon has offices. Rizkalla Dec. ¶ 4.

24. Other individuals at Canyon who were involved in the purchase of the Subject Notes or the decision to purchase the Subject Notes were working in Dallas, Texas from the time Canyon was first solicited to purchase Notes in the Trust to the time that Plaintiffs purchased the Subject Notes (the "Relevant Period"), and Canyon's principal office is in Dallas, Texas. Rizkalla Decl. ¶ 5.

25. Defendant Credit Suisse Securities (USA) LLC is a limited liability company formed under the laws of Delaware. It is a registered broker-dealer, is registered as an investment adviser, and is regulated by both the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA). As of 2023, Credit Suisse Securities (USA) LLC is an indirect wholly-owned subsidiary of UBS Group AG.

26. Michael Angelides, an individual, was, on information and belief, a Credit Suisse employee during the Relevant Period. Mr. Angelides participated in the solicitation of Canyon to purchase Notes and communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. On information and belief, throughout the Relevant Period, Mr. Angelides was working in Los Angeles, California. Rizkalla Decl. ¶ 6.

27. Thomas Pai, an individual, was, on information and belief, a Credit Suisse employee during the Relevant Period, and is now registered as an employee of Apollo Global Securities, LLC. Mr. Pai participated in the

solicitation of Canyon to purchase Notes and communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. On information and belief, throughout the Relevant Period, Mr. Pai was working in New York, New York. Rizkalla Decl. ¶ 7.

28. Ryan Jok, an individual, was, on information and belief, a Credit Suisse employee during the Relevant Period, and is now an employee of Apollo Global Securities, LLC. Mr. Jok participated in the solicitation of Canyon to purchase Notes and communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. On information and belief, throughout the Relevant Period, Mr. Jok was working in New York, New York. Rizkalla Decl. ¶ 7.

29. Michael Angelides, Thomas Pai, and Ryan Jok are sometimes referred to herein, collectively, as the "Known Individuals."

30. Non-party Wells Fargo Securities, LLC, which was the secondary underwriter of the Trust and, together with Credit Suisse, one of the Trust's two Initial Purchasers and Joint Bookrunners, is a limited liability company formed under the laws of Delaware.

31. Michael Abamonte, an individual, was, on information and belief, a Wells Fargo employee during the Relevant Period, and continues to be a Wells Fargo employee. Rizkalla Decl. ¶ 9. Mr. Abamonte communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. *Id.* On information and belief, throughout the Relevant Period, Mr. Abamonte was working in Los Angeles, California. *Id.*

32. At this time, the identity of additional individuals who were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein constitutes information that is not available to Plaintiffs, but, on information and belief, is within the knowledge of Defendant.

33. On information and belief, each of the Known Individuals, as well other individuals not known to Plaintiffs but within the knowledge of Defendant, was aware of or recklessly disregarded the fact that false and misleading statements were being issued by Credit Suisse concerning the Trust, the Notes, and/or U.S. Auto, and approved, ratified, or permitted the issuance of these statements in violation of federal and state law. On information and belief, each of the Known Individuals, as well as other individuals not known to Plaintiffs but within the knowledge of Defendant, also:

a. directly participated in the management of Credit Suisse;

b. was directly involved in the day-to-day operations of Credit Suisse at its highest levels;

c. was privy to books, records, and confidential information concerning U.S. Auto and its business and operations, auto loans and VSCs originated by U.S. Auto, and the securities issued by U.S. Auto, including the Notes;

d. was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

e. had authority from Credit Suisse to act and make representations on its behalf, as alleged herein; and/or

f. was directly or indirectly involved in the oversight or implementation of Credit Suisse's internal controls, including Credit Suisse's due diligence prior to selling a newly-issued security.

34. Credit Suisse is liable for the acts of the Known Individuals, and those of its other officers, employees, and other agents, under the doctrine of *respondeat superior* and under common law principles of agency, as they were officers, employees, or other agents of Credit Suisse during the Relevant Period, and all of their wrongful acts complained of herein were carried out within their respective scopes of employment or agency.

35. The scienter of Known Individuals, and that of Defendant's officers, employees, and other agents, is similarly imputed to Credit Suisse under *respondeat superior* and agency principles.

## FACTUAL ALLEGATIONS

### A. The Trust

36. The Trust is an asset-backed securitization trust that closed on June 28, 2022. It is formed as a Delaware statutory trust.

37. Like other asset-backed securitization ("ABS") trusts, the Trust is an entity that takes title to a pool of receivable assets that forms the Trust's collateral, then issues securities (often known as notes or certificates) entitling their beneficial holders to portions of the cashflows generated by this collateral. Like most ABS trusts, the Trust issued several different classes or tranches of

notes or certificates, each with different priorities, with the higher classes generally receiving payments of principal before the lower classes, and the lower classes generally having losses allocated to them before the higher classes. This tiered distribution and loss allocation scheme is generally referred to as the Trust's "waterfall."

**1. The Marketing of the Notes**

38. To market the Trust's Notes, Credit Suisse, together with Wells Fargo and U.S. Auto personnel, prepared an Offering Memorandum, dated as of June 16, 2022, a copy of which is included as **Exhibit 2** hereto (the "Offering Memorandum"). Similarly, Credit Suisse contributed to the preparation of, and provided prospective investors with, an investor presentation, dated June 2022, titled "USAUT 2022-1 Investor Presentation," a copy of which is included as **Exhibit 3** hereto (the "Investor Presentation"), for the purpose of soliciting the purchase of Notes. Among other things, the Offering Memorandum and Investor Presentation described the roles of the various entities involved in the Trust; the auto loans, VSCs, and other receivables that would form the collateral for the Trust (the "Receivables"); and the operation of the Trust's waterfall and other provisions of its governing agreements. The Offering Memorandum and Investor Presentation also contained various representations regarding the quality and characteristics of the Receivables, as well as the status and condition of the securitization parties.

39. The Investor Presentation further extolled the "industry-leading management" of the originator of the Receivables, U.S. Auto Sales, Inc. ("U.S. Auto Sales"), and represented that the performance of U.S. Auto Sales' loans was

improving with time as U.S. Auto Sales expanded its operations to new states. Investor Presentation at 14, 18, 33–35. The Investor Presentation also disclosed that the Trust used a third party, Dealer Owned Warranty Co., to administer the "30-day/1,000 mile limited warranty and vehicle service contracts" included in the Receivables. *Id.* at 27.

40. Despite being framed as a presentation by U.S. Auto Sales, the Investor Presentation's metadata demonstrates that it was prepared, at least in part, by Credit Suisse. Credit Suisse also provided the Investor Presentation to Canyon and hosted a telephone conference with Canyon and U.S. Auto in which it walked Canyon through the Investor Presentation; made numerous other representations regarding the Trust, the Notes, the Receivables, and the deal parties to Canyon; and answered questions from Canyon regarding these matters.

41. As discussed herein, on information and belief, the Known Individuals, as well as other officers, employees, or other agents of Defendant not known to Plaintiffs, were directly involved in the marketing of the Trust's Notes to prospective investors, including to Canyon, and were intimately familiar with the information and representations included in the Offering Memorandum and Investor Presentation and the absence of any disclosure in those documents regarding U.S. Auto's deteriorating financial condition. As further discussed herein, the actions of the Known Individuals, as well as other officers, employees, or other agents of Defendant not known to Plaintiffs, were undertaken for the purpose of inducing Plaintiffs, their investment managers, and other prospective investors to purchase the Notes issued by the Trust.

**2. The Trust's Assets, Parties, and Structure**

42. The Receivables consist of "motor vehicle retail installment sale contracts that are secured by a combination of used automobiles, light-duty trucks and vans," Offering Memorandum at 55, which were originated by U.S. Auto Sales, *id.* at 2. These installment sale contracts, and thus the Trust's Receivables, included both the borrowers' loan agreements and the limited warranties on the vehicles, which covered a minimum warranty period of 30 days/1,000 miles, but which could be extended by purchasers for various terms up to a 36-month/36,000-mile warranty period. Offering Memorandum at 51. (The term "VSCs," as used herein, includes both the limited and the extended warranties that were included in the Receivables.)

43. At the time the Offering Memorandum was issued, U.S. Auto Sales operated 39 dealerships across Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee. Offering Memorandum at 49–50.

44. "[I]mmediately after" U.S. Auto Sales executed these installment sale contracts, they were "acquired" by U.S. Auto Finance, Inc. ("U.S. Auto Finance"), "pursuant to a standing purchase agreement between U.S. Auto Finance and U.S. Auto Sales." Offering Memorandum at 49.

45. Under the Trust's governing agreements, U.S. Auto Finance serves in the roles of Administrator and Sponsor/Seller. Offering Memorandum at 1–2. As Administrator, U.S. Auto Finance is required to perform the duties assigned under the governing agreements to the Trust itself or to the Grantor Trust Trustee (discussed further below). As Sponsor/Seller, U.S. Auto Finance sponsored the creation of the Trust and the Receivables and organized the issuance by the Trust

of the Notes. *Id.* At 1–2, 45. As Sponsor/Seller, U.S. Auto Finance also sold the Receivables to another affiliated entity, U.S. Auto Receivables Financing LLC, which is the Depositor under the Trust's governing agreements. *Id.* at ix, 1, 44–45.

46. The Depositor, in turn, conveyed the Receivables to the Trust in exchange for the Notes and Certificates issued by the Trust. *Id.* at ix.

47. Computershare Trust Company, N.A. ("Computershare") is the Indenture Trustee of the Trust and its Backup Servicer, while BNY Mellon Trust of Delaware is the Owner Trustee of the Trust. *Id.* at 1–2.

48. The Trust itself then conveyed the Receivables to the U.S. Auto Funding Grantor Trust 2022-1 (the "Grantor Trust") in exchange for the Grantor Trust Certificate. *Id.* at ix. The Grantor Trust is now the legal holder of the Receivables, and the Trust's main asset is its 100% beneficial interest in the Grantor Trust. *Id.* at 40. Separate from its role as Owner Trustee for the Trust, BNY Mellon Trust of Delaware is also the Grantor Trust Trustee. *Id.* at 2. Though the Grantor Trust is the legal owner of the Receivables, Computershare, in its capacity as Custodian, is in possession of the receivable files themselves. *Id.* at 44.

49. After receiving the Notes and Certificates from the Trust, the Depositor sold the Notes to the Trust's underwriters, Credit Suisse and Wells Fargo, who are described in the Offering Memorandum as the "Initial Purchasers and Joint Bookrunners," and who then sold the Notes to investors like Plaintiffs. *See id.* at 127–28 (section titled "Plan of Distribution"). Defendant, through the Known Individuals, among others, participated in the drafting of, approved, and

issued the Offering Memorandum that they then provided to investors to solicit the sale of the Notes issued by the Trust. *See* Rizkalla Decl. ¶¶ 7, 10–11.

50. The installment sale contracts forming a portion of the Receivables were initially serviced by USASF Servicing LLC ("USASF Servicing"), *e.g.*, Offering Memorandum at 52, and are now serviced by Westlake Portfolio Management, LLC ("Westlake"). The transfer of servicing is discussed in paragraphs 96–101, *infra*.

51. The Servicer's "activities consist primarily of collecting and posting all payments, responding to obligor inquiries, investigating delinquencies, providing invoices or payment coupons … to obligors, administering the filing of claims under the insurance policies and GAP coverage, reporting any required tax information to obligors, accounting for collections and furnishing monthly and annual statements to the indenture trustee with respect to distributions." Offering Memorandum at 52.

52. The payments received by the Servicer pursuant to the installment sale contracts are distributed to investors, net of contractually-specified fees paid to deal parties. Offering Memorandum at 8.

*[Remainder of page left intentionally blank]*

53. Page ix of the Offering Memorandum includes a structural diagram of the Trust, showing the flow of funds, receivables, notes, and certificates:




### 3. The Vehicle Service Contracts

54. The Offering Memorandum represented that U.S. Auto would perform all of the warranty and service obligations required under the VSCs and remit proceeds from same to the Trust.

55. The Offering Memorandum provided that, "U.S. Auto Sales retains sole responsibility for performing warranty and service obligations," and, "[u]nless required by law to be remitted to the obligor [i.e. the purchaser of the vehicle], the [Trust's] servicer will deposit into the [Trust's] collection account any amounts received as a rebate due to cancellation of [a] [VSC] that was financed by a [Trust] receivable." Offering Memorandum at 51.

56. In short, U.S. Auto, through U.S. Auto Sales, was responsible for ensuring that the VSC obligations would be performed, including by paying the VSCs' administrator to put the VSCs, for which U.S. Auto had already been paid, into effect. Further, if there were any rebates or refunds due from the VSC administrator, which typically arose if a borrower prepaid or defaulted on its loan, U.S. Auto, through USASF Servicing, was obligated to pay those rebates or refunds, if not due by law to be paid back to the borrower, back to the Trust.

57. Yet, according to the administrator of the VSCs, U.S. Auto had, since September 2021, if not earlier, failed to pay the administrator its contractual fees for administering VSCs across U.S. Auto's portfolio. *DOWC* Complaint (defined below) ¶ 52.

58. This non-payment, on information and belief, was significant in scale—as discussed below, the VSC administrator has since sued U.S. Auto for failure to pay approximately $18 million with respect to thousands of vehicle service contracts, meaning those contracts, including VSCs in the Trust's Receivables, were subject to cancellation or were never placed into force.

59. Accordingly, at the time the Offering Memorandum and Investor Presentation were sent to potential investors, U.S. Auto Sales had not paid for or

rendered effective most, if not all, of the VSCs, meaning that borrowers would not receive the benefit of the warranty services for which they paid.

60. This non-payment also exposed the Trust and its Receivables to material, undisclosed additional risk. Used vehicle warranties, like the VSCs, are critically important to preserving the value of subprime auto loans, as they help to suppress default rates and preserve the value of the underlying vehicle. *See, e.g.*, Offering Memorandum at 51 ("In an effort to keep financed vehicles running properly and incentivize obligors to remain current on their installment payments, the terms of each receivable provide for a free, 30 day/1,000 mile limited warranty").

61. With respect to default rates, used vehicle warranties help keep borrowers' vehicles in drivable condition by paying for repairs that borrowers might not otherwise be able to afford, allowing borrowers to regain the use of their vehicles more quickly. This, in turn, ensures that borrowers maintain transportation to and from their place of employment, allowing them to continue to earn the funds necessary to make timely monthly payments on their auto loans. Thus, the existence of in-force VSCs helps to suppress the risk that borrowers will default on their loan payments if their vehicles require repairs, particularly as used vehicles typically require more frequent repairs than new vehicles.

62. With respect to preservation of collateral value, because used vehicle warranties ensure that borrowers' vehicles remain in better condition by

covering repairs, they tend to mitigate losses on the auto loans in the event of a default, by preserving the value of the collateral that can be recovered if repossession is necessary. Without a warranty, borrowers' vehicles are more likely to fall into disrepair and depreciate in value, thereby decreasing recovery rates.

63. In addition, where, as here, a subprime auto-loan borrower purchases a VSC, but the borrower is unable to obtain warranty services under that contract because it is canceled or never placed into force, the value of the loan is impaired. Namely, borrowers who are denied warranty coverage despite purchasing VSCs may strategically default on their entire auto loans, understandably refusing to pay further amounts where they are not receiving the services for which they paid and which they require to keep their vehicles operational. Further, these borrowers would have additional defenses to any attempts to repossess their vehicles for non-payment of their auto loans, due to U.S. Auto Sales's breach of its contractual obligation to perform warranty and service obligations in respect to financed vehicles. *See* Offering Memorandum at 51.

64. U.S. Auto Sales's failure to pay the VSCs' administrator also decreased the likelihood of the Trust receiving any of the rebate amounts to which it was entitled upon the default or early payment of the underlying auto loans, as the VSC administrator would be unlikely to remit such amounts to USASF Servicing when it was owed larger amounts by U.S. Auto on its remaining VSCs.

65. In sum, U.S. Auto's failure to pay the VSC administrator caused substantial damage to the Notes and the Receivables backing those Notes, and exposed those Notes and Receivables to higher risk, because, *inter alia*, it (1) increased the risk of default on the Receivables by diminishing the borrowers' ability to keep the vehicles in good repair and maintain transportation to their places of employment; (2) decreased the recovery value of the collateral because the collateral would be less likely to be kept in good working condition absent warranty repair services; (3) increased the risk that borrowers would strategically default when they were denied warranty coverage on VSCs for which they paid; (4) gave rise to claims or defenses preventing repossession of the Receivables' collateral; and (5) decreased the likelihood of the Trust receiving VSC rebates on auto loans that prepaid or defaulted.

66. By stating in the Offering Memorandum that, *inter alia*, "U.S. Auto Sales retains sole responsibility for performing warranty and service obligations," Offering Memorandum at 51; that as of the Cut-off Date, each Receivable "contained customary and enforceable provisions (except as such enforceability may be limited by debtor relief laws and general principles of equity whether considered in a suit at law or in equity) such that the rights and remedies of the holder thereof are adequate for realization against the collateral of the benefits of the security," *id.* at 83; and that each Receivable complied with applicable law and "the records of the servicer do not reflect any facts which would give rise to any right of rescission, offset, claim, counterclaim or defense with respect to such receivable or the same being asserted or threatened with respect to such receivable," *id.* at 83–84; but not disclosing that U.S. Auto had

been failing to pay the VSC administrator to fulfil those obligations since at least September 2021; Defendant materially misrepresented the nature and risk of the Trust's collateral.

67. As it turned out, the problems caused to the Trust and its Receivables by U.S. Auto's underpayment were not limited to the above-enumerated items. To wit, U.S. Auto was in such dire financial condition that it was unable to cure its underpayment of the VSCs using its own funds. Instead, on information and belief, U.S. Auto began misappropriating Trust cashflows it had collected on the Receivables in its capacity as Servicer, and which it was duty bound to remit to the Trust.

**B. Credit Suisse's Due Diligence**

68. The Offering Memorandum lists, on its cover page, "Credit Suisse and Wells Fargo Securities" as "INITIAL PURCHASERS AND JOINT BOOKRUNNERS." The Offering Memorandum also states that the Notes are being offered by Credit Suisse and Wells Fargo in compliance with SEC Rule 144A. Offering Memorandum at 12–13.

69. Credit Suisse was the lead underwriter of the deal. Rizkalla Decl. ¶ 8. In such role, Credit Suisse personnel were obligated to conduct extensive due diligence regarding U.S. Auto, the Trust, the Receivables, the Notes, the Offering Memorandum, and other marketing materials provided to prospective investors. On information and belief, this due diligence included review of U.S. Auto's general books and records and loan-level files related to the Trust's Receivables.

70. For example, in or around May 2022, Deloitte & Touche LLP ("Deloitte") prepared for Credit Suisse's benefit, as part of Credit Suisse's due diligence, a report based on Deloitte's review of loan-level data, including servicing files, for a selection of the Trust's auto loans.[1] This demonstrates that Defendant, and/or Defendant's agents, had possession of or access to data before the issuance of the Offering Memorandum that would have revealed U.S. Auto's financial issues. Indeed, shortly after servicing was transferred from USASF to Westlake (as discussed further below), Adam Rizkalla had a phone call with Westlake, wherein Westlake informed Mr. Rizkalla that upon taking over servicing, Westlake had immediately been able to identify that U.S. Auto had not been funding the VSCs since well before the Trust closed.. Rizkalla Decl. ¶ 14. On information and belief, this was based on Westlake's review of USASF's books and records, including servicing files like the ones reviewed by Deloitte, which it obtained when it took over the Trust's servicing obligations.

71. On information and belief, Credit Suisse's due diligence also included investigating the truth of those matters being investigated by the Consumer Financial Protection Bureau (CFPB), which investigation was disclosed to Credit Suisse by U.S. Auto and referenced on pages 31–32 of the Offering Memorandum and page 45 of the Investor Presentation.

72. On information and belief, the books and records of U.S. Auto reviewed by Credit Suisse, or its agents, as part of its due diligence, would have

---

[1] Deloitte & Touche LLP, Independent Accounts' Report on Applying Agreed-Upon Procedures (June 2, 2022), https://www.sec.gov/Archives/edgar/data/1768297/000110465922067681/tm2217291d1_ex99-1.htm (last accessed May. 10, 2024).

disclosed that U.S. Auto owed affiliates of Dealer Owned Warranty Company,[2] the third-party administrator of the VSCs, in excess of $10,000,000 months before the close of the Trust, because U.S. Auto had not been fully funding the Trust's (and other U.S. Auto) VSCs since September 2021, if not earlier.

73. Investors in Rule 144A securitizations are prevented from conducting due diligence beyond the information provided to them by underwriters like Defendant. *See* Rizkalla Decl. ¶ 12. Instead, pursuant to industry custom and practice, underwriters are responsible for conducting due diligence on the Rule 144A ABS securities they are offering for sale to investors, and investors are thus reliant on such underwriters to perform that due diligence and to faithfully represent material facts about the ABS. *Id.* As such, the information provided to prospective investors by underwriters in Rule 144A ABS securitizations is typically limited, as it was here, to a prospectus like the Offering Memorandum and an investor presentation or meeting with the company responsible for originating the securitization. *Id.* While ABS investors may conduct their own analysis of the information they are provided, they typically have limited to no access to the underlying financial information regarding the ABS trust's deal parties or receivables, and are reliant on underwriters like Defendant to investigate and verify that the information being provided to prospective investors is complete, accurate, and does not omit to state any material facts. *Id.*

---

[2] On information and belief, the VSCs were administered by the following affiliated companies: DOWC Provider Services, LLC; Assured Providers Services, Inc.; Guaranteed Providers Services, Inc.; Secure Provider Services, Inc., and DOWC Administration Services, LLC (collectively, "DOWC").

**C. Defendant's Materially False Marketing and Plaintiffs' Purchase of the Subject Notes**

74. As noted above, Canyon includes the investment managers for several investment funds, including all Plaintiffs.

75. Plaintiffs' investment managers make all investment decisions on behalf of the Plaintiffs; have the authority to cause Plaintiffs to enter into securities transactions; and caused Plaintiffs to purchase the Subject Notes.

76. On June 8, 2022, Known Individual Michael (Mike) Angelides, who was then, on information and belief, a Credit Suisse employee (and is now registered with FINRA as working for Apollo Global Securities, LLC[3]) had an in-person meeting with Canyon employee Adam Rizkalla in Los Angeles, California, during which Mr. Angelides first informed Mr. Rizkalla of the Trust and solicited Canyon's purchase of Notes to be issued by the Trust. Rizkalla Decl. ¶ 6. That same day, Mr. Angelides sent Mr. Rizkalla the Investor Presentation, and a preliminary version of the Offering Memorandum, via email. *Id.*

77. All representations from the Offering Memorandum that are discussed or otherwise identified in this Complaint are identical in this preliminary version and in the final, June 16, 2022, version of the Offering Memorandum that is included as Exhibit 2 to this Complaint.

---

[3] MICHAEL PETER ANGELIDES, BrokerCheck by FINRA, https://brokercheck.finra.org/individual/summary/6098592 (last visited May. 10, 2024) (listing, under "Previous Registration(s)," for "9/21/2012 – 02/14/2023," "CREDIT SUISSE SECURITIES (USA) LLC" in "Los Angeles, CA."

78. On June 9, 2022, Credit Suisse, through Known Individuals Thomas Pai, Ryan Jok, and Mike Angelides, along with U.S. Auto Sales's CEO, Colin Bachinsky, and its CFO, Christian Rudolph, held a conference call with Adam Rizkalla to solicit Canyon's purchase of Notes and discuss U.S. Auto Sales's prior performance, current business health, the nature and risk of the Trust's collateral, and the Investor Presentation in detail. Rizkalla Decl. ¶ 7. On that call, Credit Suisse and U.S. Auto provided a glowing assessment of U.S. Auto Sales's business—echoing similar statements in the Investor Presentation—and represented that the performance of U.S. Auto Sales's loans was improving with time. *Id.* Neither Credit Suisse nor U.S. Auto disclosed that U.S. Auto was in financial trouble, that it had not paid amounts due on the VSCs to put them in force, or that the Receivables were subject to increased credit risk and lower collateral recoveries due to VSCs not being in effect or being subject to cancellation. *Id.*

79. During Canyon's evaluation of a potential investment in the Notes, Mr. Rizkalla also asked for and received information about the offering from Michael (Mike) Abamonte, an employee of Wells Fargo who, on information and belief, was working in the Los Angeles area during the Relevant Period. Rizkalla Decl. ¶ 9.

80. The statements made by Defendant in the Offering Memorandum and Investor Presentation, as well as in oral communications, were of critical importance to Canyon, since they provided the most detailed information available concerning the offering of the Notes. Had the information in the Offering Memorandum, Investor Presentation, and/or other communications

disclosed the declining performance of U.S. Auto or its loans, the cancellation or ineffectiveness of the VSCs, or the additional risks associated therewith as a result of U.S. Auto's failure to pay its obligations when due, Canyon would not have caused Plaintiffs to purchase the Subject Notes, let alone at the prices they did. Rizkalla Decl. ¶ 10.

81. Instead, as detailed below, numerous statements and descriptions made in the Offering Memorandum, in the Investor Presentation, and/or in other communications between Canyon and Defendant were materially false or misleading, or omitted to state material facts necessary to make such statements and descriptions not misleading.

82. Each of the following statements and descriptions in the Offering Memorandum, among others, was materially false or misleading and was material to Canyon's decision to cause Plaintiffs to purchase the Subject Notes:

a. that "[a]s of the date of this offering memorandum, no asset-backed securities transaction sponsored by U.S. Auto Finance has defaulted or experienced an early amortization triggering event. The sponsor has never taken any action out of the ordinary to prevent such an occurrence," Offering Memorandum at 45;

b. that U.S. Auto Sales retained "sole responsibility for performing warranty and service obligations in respect to the related financed vehicle," *id.* at 51;

c. that "[u]nless required by law to be remitted to the obligor, the servicer will deposit into the collection account any amounts received

as a rebate due to cancellation of an extended service contract that was financed by a receivable," *id.*;

d. that "USASF Servicing services all receivables that U.S. Auto Finance acquires in accordance with USASF Servicing's servicing policies as described [in the Offering Memorandum]," *id.* at 52, and the related description of USASF Servicing's platform and practices, *id.* at 53–55 (section titled "Servicing by USASF Servicing");

e. that "U.S. Auto Sales uses a third-party to manage all warranty obligations," *id.* at 51;

f. that U.S. Auto Finance will represent and warrant that, as of the Cut-off Date, each Receivable "contained customary and enforceable provisions (except as such enforceability may be limited by debtor relief laws and general principles of equity whether considered in a suit at law or in equity) such that the rights and remedies of the holder thereof are adequate for realization against the collateral of the benefits of the security," *id.* at 83;

g. that U.S. Auto Finance will represent and warrant that each Receivable "complied at the time it was originated or made in all material respects with all requirements of applicable federal, state and local laws, and regulations thereunder," *id.* at 83;

h. that U.S. Auto Finance will represent and warrant that each Receivable "has not been satisfied, subordinated or rescinded nor has the related financed vehicle been released from the lien of such receivable in whole or in part," *id.*;

i. that U.S. Auto Finance will represent and warrant for each Receivable that "the records of the servicer do not reflect any facts which would give rise to any right of rescission, offset, claim, counterclaim or defense with respect to such receivable or the same being asserted or threatened with respect to such receivable," *id.* at 84; and

j. that "[i]f any payments on the receivables are paid to a segregated account of the servicer, the servicer will deposit (or cause to be deposited) an amount equal to all Collections … within two Business Days after identification," *id.* at 87, where "Collections" are defined to include "(i) any monthly payment by or on behalf of the obligors thereunder or any other amounts which, in accordance with the customary servicing practices, would customarily be applied to the payment of accrued interest or to reduce the principal balance of a receivable, [and] (ii) rebates of premiums with respect to the cancelation or termination of any insurance policy, extended warranty or service contract that was financed by such Receivable," *id.* at 135.

83. Similarly, statements and descriptions made by Defendant to Canyon orally, in the Investor Presentation, or in other communications, were materially false and misleading and material to Canyon's decision to cause Plaintiffs to purchase the Subject Notes, including, without limitation, that U.S. Auto Sales had "industry-leading management" and "industry leading customer satisfaction," and that the performance of its receivables was improving over time, including with respect to certain, specified metrics. *See, e.g.,* Investor Presentation at 14, 18, 33–35.

84. In addition, Defendant's omission of certain material facts and risk factors was material to Canyon's decision. For example, at no point in the Offering Memorandum, Investor Presentation, or other communications referenced herein was Canyon ever informed that U.S. Auto, or certain of its subsidiary entities, had been for months unable to pay their financial obligations as they came due, that Receivables were subject to cancellation and/or rescission, or that numerous U.S. Auto entities involved in the Trust were on the verge of bankruptcy. Instead, Defendant, who had responsibility for structuring the transaction, described the Trust's Receivables as consistent with similar assets in the industry and likely to perform in a similar manner, and did not provide any indication of these deeper issues with the VSCs or U.S. Auto's performance or business. Rizkalla Decl. ¶ 11.

**D. Plaintiffs' Purchase of the Subject Notes**

85. On June 16, 2022, Plaintiffs purchased the following Subject Notes from Credit Suisse, which they continue to hold as of the date of this Complaint:

| **Plaintiff** | **CUSIP, Class and Maturity** | **Original Principal Amount of Note** | **Purchase Price** |
|---|---|---|---|
| River Canyon Total Return Bond Fund | 90355FAA6: Class A, due Apr. 15, 2025 | $5,000,000 | $4,951,540.50 |
| River Canyon Total Return Bond Fund | 90355FAE8: Class E, due June 15, 2029 | $5,000,000 | $4,632,145.00 |
| Canyon NZ-DOF Investing L.P. | 90355FAE8: Class E, due June 15, 2029 | $2,551,000 | $2,363,320.38 |

| Plaintiff | CUSIP, Class and Maturity | Original Principal Amount of Note | Purchase Price |
|---|---|---|---|
| Canyon Distressed TX (A) LLC | 90355FAE8: Class E, due June 15, 2029 | $1,041,000 | $964,412.59 |
| Canyon Distressed TX (B) LLC | 90355FAE8: Class E, due June 15, 2029 | $791,000 | $732,805.34 |
| Canyon-EDOF (Master) L.P. | 90355FAE8: Class E, due June 15, 2029 | $1,020,000 | $944,957.58 |
| Canyon Distressed Opportunity Master Fund III, L.P. | 90355FAE8: Class E, due June 15, 2029 | $14,886,000 | $13,790,822.09 |
| **TOTAL** | | **$30,289,000** | **$28,380,003.48** |

## E. U.S. Auto's Financial Issues Come to Light

### 1. The Collection Account Shortfall

86. Canyon's first indication of serious issues with respect to the Trust and U.S. Auto's financial condition appeared with the extraordinary disclosure by the Trust's Servicer, USASF Servicing, of a "shortfall" in available funds with respect to the Trust.

87. Under the terms of the Trust's governing agreements, the Servicer is required to provide a monthly "Servicer's Certificate" to various Trust parties and rating agencies in the form attached to the governing agreements.

88. In the Servicer's Certificate dated April 18, 2023, attached as **Exhibit 4** hereto, USASF Servicing reported a "Shortfall in Available Funds on deposit in Collection Account" in the amount of negative $2,238,093.07 (the "Shortfall"). Ex. 4 at 1. Though USASF Servicing had collected $7.8 million

from borrowers during that reporting period, it had made only $5.6 million available for distribution. *Id.* at 1–2. This disclosure was highly unusual in the auto loan ABS industry, and indicated issues, not with the performance of the underlying collateral, but with the performance and operations of the Trust's Servicer. Rizkalla Decl. ¶ 13.

89. In the weeks after the Shortfall was reported, media reports revealed that U.S. Auto was in severe financial trouble. On or about April 17, 2023, U.S. Auto Sales announced a temporary closure of its dealerships, which it ultimately extended indefinitely when it was unable to reach a deal with its private-equity owner and lenders to allow the dealerships to remain open.

**2. The Indenture Trustee's Notification of a Potential Event of Default and Servicer Replacement Event**

90. Around the same time, the Indenture Trustee notified noteholders of additional indicia of serious issues with U.S. Auto through notification of a potential Event of Default and Servicer Replacement Event. Under section 5.1(c) of the Trust's Indenture (one of the governing agreements for the Trust), an "Event of Default" occurs if the Trust fails to "duly observe or perform in any respect any of its covenants or agreements made in [the] Indenture (other than a covenant or agreement, a default in the observance or performance of which is elsewhere in this section specifically dealt with), which failure materially and adversely affects the rights of the Noteholders," provided that sufficient time passes after notice is given by the Trust or by noteholders with a sufficiently large share of the "Note Balance of Outstanding Notes."

91. Under section 3.12 of the Indenture, the Trust, through the Administrator (U.S. Auto Finance, Inc.), is required to "promptly deliver to the Indenture Trustee, the Owner Trustee and each Rating Agency written notice … of (i) an Event of Default or any event which with the giving of notice, the lapse of time or both would become an Event of Default, its status and what action the [Trust] is taking or proposes to take with respect thereto and (ii) the occurrence of a Servicer Replacement Event or any event which with the giving of notice, the lapse of time or both would become a Servicer Replacement Event."

92. On April 26, 2023, Computershare, as Indenture Trustee, sent a notice to Trust Noteholders informing them that Computershare had received "a notice from the Servicer," USASF Servicing, "pursuant to Section 3.9(b) of the Sale and Servicing Agreement dated April 20, 2023" (another of the Trust's governing agreements, hereinafter referred to as the "SSA"), and a notice from the "Administrator," U.S. Auto Finance, "pursuant to Section 3.12 of the Indenture dated April 20, 2013" (emphasis removed). April 26, 2023 Notice to Trust Certificateholders from Computershare (the "April 26 Computershare Notice," a copy of which is attached as **Exhibit 5** hereto) at 310. The April 26 Computershare Notice attached copies of these referenced notices from USASF Servicing and U.S. Auto Finance. *Id.* at 313-318.

93. The notice from USASF Servicing disclosed that it "ha[d] failed to deposit all Collections received on the Receivables into the Collection Account within two Business Days after identification as required under Section 4.2 of the [SSA], which, following the applicable grace period, would constitute a Servicer Replacement Event." April 26 Computershare Notice, Ex. A at 1.

94. Similarly, the notice from U.S. Auto Finance, "as Administrator on behalf of" the Trust, disclosed that "(i) it ha[d] failed to cause [USASF Servicing] to deposit all Collections received on the Receivables into the Collection Account before the related Payment Date as required under Section 3.2 of the Indenture, which, with the giving of notice to the Issuer and following the applicable grace period, would constitute an Event of Default, and (ii) the Servicer's failure to deposit such Collections would, following the applicable grace period, constitute a Servicer Replacement Event." April 26 Computershare Notice, Ex. B at 1.

95. The notice from U.S. Auto Finance further indicated that it "ha[d] been informed that [USASF Servicing] ha[d] engaged financial advisors to formulate a plan to cure the failure by [USASF Servicing] to deposit Collections within two Business Days of Identification." *Id.*

**3. The May 25 Computershare Notice of Servicer Succession**

96. Following the Shortfall and April 26 Computershare Notice, Canyon, through counsel, requested on or about May 19, 2023 that Computershare disclose all information in its possession related to the Shortfall. In response, on or about May 26, 2023, counsel for Computershare directed counsel for Canyon to a new notice, dated May 25, 2023, in which Computershare gave notice to Noteholders of an "Omnibus Amendment, Assignment, Assumption & Consent Agreement, dated as of May 22, 2023 (as amended, restated, supplemented or otherwise modified through the date hereof…)," pursuant to which "and at the direction of and with the consent of the Noteholders evidencing not less than a majority of the Note Balance of the

Controlling Class…, [USASF Servicing] transferred and assigned to" Westlake "and [Westlake] accepted and assumed all rights and obligations of [USASF Servicing] as 'Servicer' under the [SSA] and any other Transaction Document as of May 22, 2023." May 25, 2023 Notice of Servicer Succession from Computershare (the "May 25 Computershare Notice," a copy of which is attached as **Exhibit 6** hereto) at 321.

97. The May 25 Computershare Notice attached a copy of the Omnibus Amendment, Assignment, Assumption & Consent Agreement referenced therein (the "Omnibus Amendment"). *Id.* at 323-336. In the Omnibus Amendment, the parties acknowledged that:

> *[USASF Servicing] has partially ceased operations and will be unable to continue servicing the motor vehicle receivables and the related property soon after the Effective Date* and therefore desires to transfer, and assign to [Westlake] and [Westlake] wishes to accept and assume all rights and obligations of [USASF Servicing] as "Servicer" under the [SSA, as amended by the Omnibus Amendment], and the Majority Noteholders and the Majority Certificateholders have determined that the assignment, assumption, and amendments provided for herein are necessary and desirable for the preservation of [the Trust's] Collateral.

*Id.* at 325 (emphasis added).

98. The Omnibus Agreement revealed that, at the time it was signed, U.S. Auto Receivables Financing LLC, the "Seller" under the Omnibus

Agreement, *id.* at 324, continued to be the majority holder of the Certificates issued by the Grantor Trust, *id.* § 12.

99. The Omnibus Agreement also noted that, via majority Noteholder consent, "the assignment and assumption of the servicing obligations hereunder shall be deemed to cure any non-compliance by the [Trust] and [USASF Servicing] referenced in those certain notices dated April 20, 2023 from each of the [Trust] and [USASF Servicing]." *Id.* § 20.

100. Later, on June 8, 2023, counsel for Computershare spoke with counsel for Canyon and Plaintiffs. During this call, counsel for Computershare confirmed the facts underlying the above-quoted recitation from the Omnibus Agreement, and conveyed that representatives from USASF Servicing had informed Computershare that USASF Servicing was failing and needed to have servicing transferred. Declaration of Isaac M. Gradman ¶¶ 4–5, attached as **Exhibit 7** hereto.

101. During that same phone call, counsel for Computershare confirmed to counsel for Canyon and Plaintiffs that, during the discussion between USASF Servicing and Computershare regarding the need to transfer servicing, USASF Servicing informed Computershare that USASF Servicing's financial troubles had existed well before the Shortfall, and that USASF Servicing was in sufficiently poor financial health prior to the Shortfall that it could not make payroll. *Id.* ¶ 6.

### 4. DOWC Confirms U.S. Auto's Long-Running Nonpayment of VSCs in Communications to Canyon and in a Lawsuit Against U.S. Auto

102. As detailed further below, statements made by DOWC regarding U.S. Auto's non-payments, and the resulting failure to put VSCs into force, establish that several of the material statements made by Credit Suisse in the Offering Memorandum, Investor Presentation, in oral communications, or otherwise to Plaintiffs, were false at the time those statements were made, and would have been apparent to Credit Susse from the information it had in its possession.

103. On or about July 5 and July 11, 2023, Mr. Rizkalla from Canyon had conversations with the CEO, CFO, and Senior Counsel from DOWC, whose affiliated entities contracted with U.S. Auto Sales to administer the VSCs, which role included making warranty repair payments under the VSCs. Rizkalla Decl. ¶ 15.

104. During these calls, DOWC confirmed to Canyon that U.S. Auto Sales had become delinquent on the payment to DOWC of the premiums associated with the VSCs starting no later than September 2021, months before the Trust closed and the Notes were marketed and sold. DOWC further confirmed that this underpayment only increased over time. *Id.* ¶ 16.

105. DOWC also informed Canyon that despite U.S. Auto Sales failing to fund borrowers' extended warranty VSCs, the auto loans created and sold by U.S. Auto Sales to the Trust expressly itemized the amount borrowers paid to purchase those extended warranty VSCs. *Id.* ¶ 17.

106. Based on the foregoing, U.S. Auto Sales appears to have been charging borrowers itemized amounts for services that were not actually financed by U.S. Auto Sales, in violation of the Truth in Lending Act, *e.g.*, 12 C.F.R. § 1026.18(c)(iii), and other applicable federal and state lending laws. On information and belief, these violations rendered the underlying auto loans, and not just the VSCs, defective and subject to claims and defenses to repayment from borrowers.

107. DOWC further confirmed to Canyon that while U.S. Auto Sales had stopped making payments to DOWC on the VSCs prior to the date the Trust closed, DOWC had continued administering certain of the VSCs based on promises from U.S. Auto Sales to make "catch-up" payments. Rizkalla Decl. ¶ 18. Neither U.S. Auto nor Defendant disclosed in the Offering Memorandum that U.S. Auto, through U.S. Auto Sales, had been failing to make payments to DOWC with respect to the VSCs; that U.S. Auto was not immediately able to make good on the payments its entities owed; or that U.S. Auto Sales owed "catch-up" payments to DOWC. All of these issues placed the performance of the VSCs, the underlying auto loans, and the entire Trust at risk.

108. DOWC further confirmed to Canyon that U.S. Auto Sales had resumed making some partial payments on the VSCs after the Trust closed, but that the amount it owed DOWC was never fully paid. *Id.* ¶ 19. DOWC also informed Canyon that it believed U.S. Auto Sales had been making these partial or "catch-up" payments to DOWC on the VSCs by taking funds either from funds U.S. Auto received in connection with the securitization of the Receivables or from borrower payments on the Receivables. *Id.* ¶ 20. This information

indicated that U.S. Auto was operating a form of pyramid or "Ponzi" scheme in which it was only able to pay its prior obligations by creating new obligations or misappropriating funds from the sale of same.

109. This type of scheme reveals that another representation in the Offering Memorandum was false, specifically that that "the sponsor has never taken any action out of the ordinary to prevent" a prior U.S. Auto-sponsored securitization from defaulting or experiencing an early amortization triggering event. Offering Memorandum at 45. The Trust was the sixth such securitization by U.S. Auto, *id.*, and the third in a three-year period, *see* Investor Presentation at 10. On information and belief, VSCs were included in prior trusts' collateral as well, and (1) failing to pay DOWC at the outset to place those VSCs "in force," (2) entering into delayed or installment payment plans with DOWC, and (3) funding those delayed or installment payment plans by creating new receivables or by using funds belonging to other receivables, were not "ordinary" actions consistent with industry customs and practices. Instead, U.S. Auto's failure to pay DOWC for VSCs, when due, and its subsequent efforts to cover up that failure, both of which had, on information and belief, occurred prior to the issuance of the Offering Memorandum, represented potential defaults or early amortization triggering events for U.S. Auto's prior securitizations and/or "action[s] out of the ordinary to prevent such an occurrence," constituting violations of this representation. *See* Offering Memorandum at 45.

110. Neither U.S. Auto nor Defendant disclosed in the Offering Memorandum, Investor Presentation, or in any other communications that U.S. Auto was operating this sort of Ponzi scheme or that there was a risk that

Trust cash flows could be impacted or diverted as a result of U.S. Auto's prior failure to make payments to DOWC with respect to certain VSCs.

111. At the time of its July 2023 calls with Canyon, DOWC represented that U.S. Auto owed DOWC approximately $18 million on the VSCs. Rizkalla Decl. ¶ 21. DOWC also confirmed that it had, at some point, stopped honoring borrowers' VSCs in light of the lack of payment from U.S. Auto Sales. *Id.*

112. Later that month, on July 24, 2023, DOWC filed suit against U.S. Auto Sales, U.S. Auto Finance, Inc., and other parties in the United States District Court for the District of New Jersey for breach of contract and other causes related to the failure to pay amounts owed on the VSCs. Verified Complaint and Jury Demand, *DOWC Provider Servs., LLC v. U.S. Auto Sales, Inc.*, No. 2:23-cv-03947 (D.N.J. July 24, 2023) (ECF No. 1) (the "*DOWC* Complaint"), *superseded by* First Amended Complaint & Jury Demand, *DOWC Provider Servs., LLC v. U.S. Auto Sales, Inc.*, No. 2:23-cv-03947 (D.N.J. Sept. 7, 2023) (ECF No. 10) (the "*DOWC* Amended Complaint").[4] Copies of the *DOWC* Complaint and the *DOWC* Amended Complaint are attached hereto as **Exhibits 8** and **9**, respectively

113. Confirming and expanding on the disclosures made to Mr. Rizkalla in his conversations with DOWC, DOWC alleged in the *DOWC* Complaint, which was verified by DOWC's Chief Executive Officer, *id.* at ECF PageID 32, that "[b]eginning in or around September 2021, [U.S. Auto Sales and U.S. Auto

[4] The *DOWC* Complaint and *DOWC* Amended Complaint have identical allegations, except that affiliates of Milestone Partners, LP were added as defendants in the *DOWC* Amended Complaint. *See DOWC* Amended Complaint ¶ 14.

Finance] short paid the monthly invoices for DOWC Products sold, consumer claims and refunds, and other fees," *id.* ¶ 52. In other words, U.S. Auto had not been properly funding VSCs for approximately nine months before the Trust closed.

114. DOWC alleges that, based on this failure to pay its monthly invoices, U.S. Auto Sales was aware that it had collected funds for the sale of DOWC warranties but was not paying DOWC for those products. *Id.* ¶ 54. DOWC further alleges that, under its agreements with U.S. Auto and its various entities, and per the plain terms of the consumer contracts for the DOWC warranties, the warranties were not "in effect" for the consumers until U.S. Auto Sales paid DOWC. *Id.* ¶ 55. Thus, at the time the Subject Notes were sold by Credit Suisse to Canyon, U.S. Auto Sales had not placed into effect numerous of its VSCs including, on information and belief, VSCs sold to and securitized in the Trust, as set forth in further detail below.

115. DOWC alleges that, at some point after September 2021, it and U.S. Auto Sales and U.S. Auto Finance entered into an arrangement under which DOWC would receive a fixed weekly payment to satisfy consumer claims and pay for fees and reserves "associated with the administration of the claims," and then, "if a positive balance existed at the end of each month," "the funds would be used to put *a portion of the consumer contracts sold that month* in force." *Id.* ¶ 56 (emphasis added).

116. DOWC alleges that this arrangement continued through the fourth quarter of 2021, at which point DOWC informed U.S. Auto Sales that the balance must be brought current. *Id.* ¶ 62. In response, DOWC alleges it was

advised by U.S. Auto Sales that the balance would be brought current once U.S. Auto Sales completed the securitization of some of its auto loans into ABS. *Id.* ¶ 63.

117. U.S. Auto "represented to DOWC" that this ABS securitization would close in "the Spring of 2022," *id.* ¶ 74, but "the balance due continued to grow until the Summer of 2022 when [U.S. Auto Sales] made a larger than normal monthly payment," *id.* ¶ 76. Even then, U.S. Auto Sales "had a significant balance due." *Id.* ¶ 77. DOWC alleges that U.S. Auto Sales was aware at this time, even after making this larger than normal monthly payment, that it had not paid DOWC for the VSCs U.S. Auto Sales had sold over the past year, and thus these VSCs were not "in force." *See id.* ¶ 79. On information and belief, this would have included all or nearly all of the VSCs in the Trust, as, according to the Offering Memorandum, the weighted average seasoning of the loans securitized in the Trust (*i.e.* the amount of time since those loans were made), as of April 30, 2022, was four months. Offering Memorandum at 56. DOWC alleges that U.S. Auto Sales never fully paid its debts to DOWC, and by the time DOWC filed suit, U.S. Auto Sales allegedly caused $17,891,519.00 in damages to DOWC. *DOWC* Complaint ¶ 111.

118. Based on the timing of securitization described in the *DOWC* Complaint, Plaintiffs are informed and believe that the Trust is the ABS securitization referred to in the *DOWC* Complaint, as the Trust is, on information and belief, the only U.S. Auto securitization to have closed in mid-2022, and the last securitization completed by U.S. Auto before its collapse.

119. The disclosures in the *DOWC* Complaint thus reveal that U.S. Auto was relying on the sale to the Trust of new auto loans and VSCs to fund the administration of those VSCs and VSCs it had previously sold, despite having already received payment from consumers for all such VSCs. They also reveal that most, if not all, of the VSCs U.S. Auto Sales sold and securitized in the Trust were not actually in force at the time the Notes were offered, as most of these VSCs were not in effect even *after* the Trust securitization closed and U.S. Auto Sales made a large catch-up payment to DOWC.

120. Further, as noted above, the facts recited in the *DOWC* Complaint reveal that the Offering Memorandum's representation that "the sponsor has never taken any action out of the ordinary to prevent" a prior U.S. Auto-sponsored securitization from defaulting or experiencing an early amortization triggering event, Offering Memorandum at 45, were untrue at the time the Notes were offered. On information and belief, U.S. Auto Sales's failure to pay DOWC for VSCs would have affected loans in one or more of these prior securitizations, as some of those securitizations had occurred within the three years prior to the Trust's closing (i.e., within the three-year duration of the auto loans). Thus, those prior securitizations would have included VSCs that were impacted by U.S. Auto's failure to make payments to DOWC starting, at latest, in September 2021, several months before the Notes were offered. This failure would have jeopardized the effectiveness of the VSCs, leading to a potential default or amortization trigger event. Thus, the actions taken by U.S. Auto to pay DOWC over time and/or to pay DOWC by redirecting funds otherwise owed to these other ABS trusts or creditors, like the actions U.S. Auto took with respect to the

Trust and its Receivables, constituted extraordinary actions to prevent the occurrence of potential defaults or amortization trigger events, in violation of this representation.

121. As discussed, Defendant, through its due diligence during the formation and marketing of the Notes issued by the Trust, if not sooner, was or should have become aware that U.S. Auto Sales owed large sums of money to DOWC related to VSCs for which it had already been paid, and that it was using or planning to use the proceeds from selling the Receivables, or from servicing the Receivables, to repay its debts to DOWC. This knowledge rendered the material statements referenced in the preceding paragraphs untrue at the time they were made.

122. Had Canyon been informed that U.S. Auto was operating this sort of pyramid scheme, it never would have had its managed funds invest in the Trust.

**F. The CFPB Suit Against USASF Servicing and the Bankruptcy of U.S. Auto**

123. In the months following the servicing transition to Westlake, the full extent of U.S. Auto's legal and financial troubles became more apparent.

124. *First*, on August 2, 2023, the CFPB filed suit against USASF Servicing in the United States District Court for the Northern District of Georgia. Complaint, *Consumer Fin. Prot. Bureau v. USASF Servicing, LLC*, No. 1:23-cv-03433-VMC (N.D. Ga. Aug. 2, 2023) (the "*CFPB* Complaint," a copy of which is attached as **Exhibit 10** hereto).

125. The *CFPB* Complaint alleges that "[s]ince 2016, USASF [Servicing] acted unfairly by: wrongfully activating starter-interruption devices

to disable consumers' vehicles and activate warning alerts; failing to provide millions of dollars in refunds of add-on premiums that consumers were entitled to; charging consumers twice for collateral-protection insurance each billing cycle, sometimes for over a year; misapplying consumer payments such that consumers accrued over $1,000,000 in additional interest and fees; and wrongfully repossessing dozens of consumers' vehicles." *CFPB* Complaint ¶ 3. Information regarding this misconduct would have been material to any reasonable investor in auto loan ABS that were being serviced by USASF Servicing, as the misconduct would materially adversely impact borrowers' ability and willingness to make payments on their auto loans, as well as give rise to claims and/or defenses against the enforcement of those same loans.

126. While the Offering Memorandum and Investor Presentation notified investors that USASF Servicing had received a civil investigative demand from CFPB for certain information about "various servicing activities," Offering Memorandum at 31; Investor Presentation at 45, neither document disclosed that U.S. Auto had engaged in any misconduct with respect to these activities, that the CFPB had determined or alleged the same, or that a lawsuit related to such investigation was likely or imminent.

127. Instead, the Offering Memorandum downplayed the CFPB's investigation, couching it as just one of a number of "periodic examinations of licensees" permitted under state licensing laws and part of the "extensive regulation at the state and federal level" to which U.S. Auto is subject as a "'larger participant' in the auto finance industry." Offering Memorandum at 31.

128. The Investor Presentation did not provide any further disclosure regarding the scope or seriousness of the CFPB's investigation. Instead, it minimized such investigation as part of U.S. Auto's business-as-usual, noting that U.S. Auto's "finance company" and "servicing company" were both "subject to direct supervision and exam" by the CFPB. Investor Presentation at 45.

129. *Second,* on August 25, 2023, less than a month after the CFPB filed its suit, numerous U.S. Auto entities filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Delaware. Trust parties now subject to bankruptcy proceedings include:

a. U.S. Auto Sales, the Trust's Originator: *In re U.S. Auto Sales, Inc.*, No. 23-bk-11251 (Bankr. D. Del., filed Aug. 25, 2023);

b. U.S. Auto Finance, the Trust's Administrator/Sponsor/Seller: *In re U.S. Auto Finance, Inc.*, No. 23-bk-11252 (Bankr. D. Del., filed Aug. 25, 2023);

c. U.S. Auto Receivables, the Trust's Depositor: *In re U.S. Auto Receivables Financing, LLC*, No. 23-bk-11253 (Bankr. D. Del., filed Aug. 25, 2023); and

d. USASF Servicing, the Trust's original Servicer: *In re USASF Servicing, LLC*, No. 23-bk-11256 (Bankr. D. Del., filed Aug. 25, 2023).

130. In the schedules filed with the U.S. Auto entities' bankruptcy petitions, U.S. Auto Sales disclosed an unsecured claim of $10,247,835.54 owed to "Dealer Owned Warranty Company." Chapter 7 Cases Schedules and [Statements of Financial Affairs] Global Notes at ECF Page 27, *In re U.S. Auto Sales, Inc.*, No. 23-bk-11251 (Bankr. D. Del. Aug. 25, 2023) (ECF No. 3).

131. According to these schedules, DOWC was by far the largest unsecured creditor of U.S. Auto Sales.

**G. Credit Suisse's Knowledge**

132. Credit Suisse, in its role as Trust underwriter, was obligated to conduct extensive due diligence regarding U.S. Auto, the Trust, and its collateral. On information and belief, during its due diligence for the Trust, and in connection with its drafting, approval, and issuance of the Offering Memorandum and Investor Presentation, Credit Suisse, through the Known Individuals and other employees, officers, and other agents, had access to and reviewed detailed information regarding U.S. Auto's financial condition and operations. This information included the servicing files for the Receivables.

133. As discussed above, Deloitte & Touche LLP reviewed loan-level data for at least a portion of the Receivables in May 2022, including the servicing files for such Receivables, demonstrating that Credit Suisse either had such documents and information in its possession, or had access to the same, as part of its due diligence, well before the Trust closed.

134. On information and belief, the servicing files in possession of, reviewed by, and known to Defendant and/or its agents clearly disclosed that the Trust's VSCs had not been funded and that U.S. Auto had not been funding VSCs for many months prior to the close of the Trust. This information would have revealed to Defendant U.S. Auto's poor financial condition and solvency issues prior to Defendant having made its various representations regarding same in the Offering Memorandum, Investor Presentation, and elsewhere.

135. Defendant was also aware of the civil investigation being conducted by the CFPB, which related to, among other things, how U.S. Auto was billing for and applying payments, fees and add-on product refunds. Offering Memorandum at 31–32. Though Defendant downplayed such investigation as part of ordinary oversight in the Offering Memorandum and Investor Presentation, and never disclosed to prospective investors that such investigation related to any misconduct by U.S. Auto or could result in liability to U.S. Auto in connection with these activities, Defendant had access to nonpublic information about U.S. Auto's business and the Receivables that would have revealed otherwise. Defendant's knowledge of the CFPB investigation and its access to this information—evidence to which prospective investors lacked access—informed Defendant of, or at minimum should have led Defendant to investigate further and uncover evidence of U.S. Auto's improper practices and cover-up of its deteriorating financial condition in the course of its due diligence.

136. In addition, on information and belief, Credit Suisse had an extensive lending relationship with U.S. Auto for years prior to the offering of the Notes, including underwriting U.S. Auto's auto loan receivables and conducting due diligence associated with extending credit to U.S. Auto, which would have revealed details regarding U.S. Auto's operations and financial condition that were not available to prospective investors in the Trust. As a result of these relationships, Credit Suisse personnel, including the Known Individuals, possessed, had access to, and, on information and belief, reviewed, extensive information regarding U.S. Auto's financial condition and operations that was not available to prospective investors in the Trust.

137. On information and belief, this information reviewed by Credit Suisse personnel in connection with its lending relationships with U.S. Auto revealed that U.S. Auto was in poor financial condition and had not been funding VSCs for months prior to the close of the Trust.

138. On information and belief, the Known Individuals were also privy to this information that revealed both U.S. Auto's poor financial condition and the fact that U.S. Auto had not been funding the VSCs for months prior to the close of the Trust.

139. Defendant's failure to disclose these issues constituted omissions of material fact necessary to make Defendant's other statements, in light of the circumstances in which they were made, not misleading. In light of Defendant's knowledge and/or the information in its possession, this failure constituted a highly unreasonable omission, in extreme departure from the ordinary standards of care applicable to underwriters of subprime auto loan asset-backed securities, presenting a danger of misleading buyers, such as Plaintiffs, that was so obvious that Defendant must have been aware of it. Nevertheless, Defendant recklessly or willfully ignored that danger when issuing the Offering Memorandum, the Investor Presentation, and its oral communications to Canyon in connection with its sale of the Notes.

**H. Defendant's Misrepresentations and Omissions**

140. In summary, based on the foregoing allegations, at the time Credit Suisse sold the Subject Notes to Plaintiffs, the Offering Memorandum, Investor Presentation, and/or the oral representations by Defendant contained at least the following untrue statements of material fact and/or omissions of material facts

necessary to make such statements, in light of the circumstances in which they were made, not misleading:

a. that "no asset-backed securities transaction sponsored by U.S. Auto Finance has defaulted or experienced an early amortization triggering event. The sponsor has never taken any action out of the ordinary to prevent such an occurrence," Offering Memorandum at 45;

b. that "U.S. Auto Sales retains sole responsibility for performing warranty and service obligations in respect to the related financed vehicle," *id*. at 51;

c. that "USASF Servicing services all receivables that U.S. Auto Finance acquires in accordance with USASF Servicing's servicing policies as described [in the Offering Memorandum]," *id.* at 52;

d. that U.S. Auto Sales' receivables had a certain, specified rate of historical losses, which rate purportedly was improving over time, when, on information and belief, such receivables in reality had incurred losses at a higher-than-represented rate, Investor Presentation at 33–35;

e. that USASF Servicing would deposit refunds received as a rebate due to cancellation of VSCs into the Trust's collection account, *id.* at 51;

f. that as of the Cut-off Date, each Receivable "contained customary and enforceable provisions (except as such enforceability may be limited by debtor relief laws and general principles of equity whether considered in a suit at law or in equity) such that the rights and remedies of

the holder thereof are adequate for realization against the collateral of the benefits of the security," *id.* at 83;

g. that each Receivable "complied at the time it was originated or made in all material respects with all requirements of applicable federal, state and local laws, and regulations thereunder, " *id.* at 83;

h. that each Receivable "has not been satisfied, subordinated or rescinded nor has the related financed vehicle been released from the lien of such receivable in whole or in part," *id.*;

i. that for each Receivable, "the records of the servicer do not reflect any facts which would give rise to any right of rescission, offset, claim, counterclaim or defense with respect to such receivable or the same being asserted or threatened with respect to such receivable," *id.* at 84; and

j. that "[i]f any payments on the receivables are paid to a segregated account of the servicer, the servicer will deposit (or cause to be deposited) an amount equal to all Collections … within two Business Days after identification," *id*. at 87, where "Collections" are defined to include "(i) any monthly payment by or on behalf of the obligors thereunder or any other amounts which, in accordance with the customary servicing practices, would customarily be applied to the payment of accrued interest or to reduce the principal balance of a receivable, [and] (ii) rebates of premiums with respect to the cancelation or termination of any insurance policy, extended warranty or service contract that was financed by such Receivable," *id.* at 135.

141. Further, in summary, based on the foregoing allegations, Credit Suisse and the Known Individuals concealed, failed to disclose, and/or negligently, recklessly or willfully ignored each of the following material facts, among others, existing at the time it sold the Subject Notes to Plaintiffs, each of which Defendant was required to disclose to investors in order to make Defendant's other statements not misleading:

a. that U.S. Auto Sales did not fund the Trust's VSCs;

b. that U.S. Auto Sales had not been funding VSCs in full since at least September 2021, several months before the Trust closed, placing the performance of the VSCs, the underlying auto loans, and the entire Trust at risk;

c. that U.S. Auto owed "catch-up" payments to the VSCs' administrator based on its underfunding of the VSCs, and that U.S. Auto was not immediately able to make good on the payments owed to the VSCs' administrator, indicating that U.S. Auto was having significant issues meeting its obligations as they came due;

d. that "[s]ince 2016, USASF [Servicing] [had] acted unfairly by: wrongfully activating starter-interruption devices to disable consumers' vehicles and activate warning alerts; failing to provide millions of dollars in refunds of add-on premiums to which consumers were entitled; charging consumers twice for collateral-protection insurance each billing cycle, sometimes for over a year; misapplying consumer payments such that consumers accrued over $1,000,000 in additional interest and

fees; and wrongfully repossessing dozens of consumers' vehicles," *CFPB* Complaint ¶ 3;

e. that VSCs and the auto loans to which they related, both those securitized in this Trust and otherwise, were not effective or "in force," and/or were voidable or unenforceable, due to U.S. Auto's failure to fund the administration or performance of the VSCs;

f. that, in fact, the VSCs' administrator had stopped honoring borrowers' VSCs or paying rebates to U.S. Auto in light of the lack of payment from U.S. Auto;

g. that numerous U.S. Auto entities were on the verge of insolvency, and in fact had not been able to meet their financial obligations as they came due since at least September 2021;

h. that U.S. Auto was planning to, and/or promising DOWC that it would, fund the administration of VSCs from prior auto loans, for which U.S. Auto had already collected payment, through the proceeds from its sale to the Trust of new or more recent auto loans and VSCs, and/or from the proceeds of such auto loans and VSCs, as part of an unlawful pyramid or Ponzi scheme; and

i. that U.S. Auto was charging borrowers itemized amounts for services that were not actually financed by U.S. Auto, in violation of the Truth in Lending Act, *e.g.*, 12 C.F.R. § 1026.18(c)(iii), and other applicable federal and state lending laws, rendering the underlying auto loans, and the VSCs, defective and subject to claims, including rescission,

and defenses to repayment of the loan and/or defenses against repossession of the underlying collateral.

**I. Plaintiffs Tender the Subject Notes for Rescission**

142. In light of the above-discussed misrepresentations and omissions, on March 13, 2024, Plaintiffs' counsel, on behalf of Plaintiffs' investment managers, contacted Credit Suisse to tender the Subject Notes. Therein, Plaintiffs' counsel requested that Credit Suisse reverse the sales of the Subject Notes, refunding their purchase price, with interest thereon, less those amounts Plaintiffs had received from the Subject Notes, in exchange for retaking each of the Subject Notes.

143. On May 9, 2024, Credit Suisse rejected the rescission request via letter correspondence.

144. As of the date of this Complaint, Credit Suisse has not repurchased, nor made any offer to repurchase, any of the Subject Notes.

## CAUSES OF ACTION

### First Cause of Action

### (Securities Act of 1933 § 12(a)(2), 15 U.S.C. § 77l(a)(2))

### (By All Plaintiffs)

145. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

146. This claim is brought by Plaintiffs against Credit Suisse pursuant to section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), as Plaintiffs

purchased Notes in the Trust from Credit Suisse pursuant to the Offering Memorandum.

147. The Offering Memorandum is a prospectus within the meaning of the Securities Act of 1933. Namely, the Offering Memorandum is a communication, notice, circular, advertisement, or letter describing an offering of securities (the Notes) by an issuer or controlling shareholder that was widely disseminated in an unsolicited manner to at least 50–100 members of the public, including Canyon, for the purpose of soliciting the purchase of those securities. The members of the public who were solicited to purchase the Notes, including Canyon, were not provided with, and did not have access to, all documents relevant to the investment, including all documents relevant to the Trust's formation, its collateral, and its sponsor/seller, and they did not have a pre-existing relationship with any of the Trust's deal parties that would have enabled them to command access to such information.

148. Credit Suisse offered the Notes for sale, sold such Notes, and distributed such Notes by the use of means or instruments of transportation and communication in interstate commerce, as Credit Suisse offered, solicited the sale of, sold, and distributed such Notes by means of the internet and electronic communications, among other methods.

149. Credit Suisse reviewed, participated in the drafting of, and approved, the Offering Memorandum; is prominently identified in the Offering Memorandum; and is one of the issuers of the Offering Memorandum.

150. Credit Suisse solicited Plaintiffs' purchase of the Notes generally, and the Subject Notes in particular, both by means of the Offering Memorandum

and by means of direct oral communications with Canyon, including those oral communications between Canyon and the Known Individuals. On information and belief, Credit Suisse obtained substantial commissions, markup, and/or profit from its sale of the Notes, including from the sale of the Subject Notes to Plaintiffs.

151. Credit Suisse participated in the preparation of the Offering Memorandum; distributed the Offering Memorandum; offered the Notes to members of the public by way of the Offering Memorandum, oral presentations to investors, and other means; and actively solicited the sale of the Notes, all for Credit Suisse's own benefit.

152. On information and belief, Credit Suisse earned an underwriting fee and other substantial fees and benefits from the sale of any Notes, and earned even larger benefits from achieving a fully subscribed securitization, in which all Notes offered for sale were able to be sold. In addition to garnering larger fees, a fully subscribed securitization also benefited Credit Suisse by eliminating the risk of holding Notes on its balance sheet and improving its ability to underwrite, market, and sell future securitizations.

153. Plaintiffs' claim is predicated on, *inter alia*, the Offering Memorandum's material omissions and misstatements of material facts in existence as of the date of the Offering Memorandum and the date of Plaintiffs' purchase, and Defendant's negligence, recklessness, and/or willful misconduct with respect to these facts. In addition, this claim is based upon material omissions and misstatements of those same material facts contained in Defendant's oral communications to Plaintiffs. Credit Suisse engaged in

negligence, recklessness and/or willful misconduct with respect to these facts. In particular, the Offering Memorandum and Defendant's oral communications contained untrue statements of material fact and omitted to state material facts necessary to make those statements, in light of the circumstances which they were made, not misleading, including those misstatements and omissions enumerated in Factual Allegations section H, *supra*.

154. The facts misstated in, and omitted from, the Offering Memorandum and Defendant's oral communications with Canyon would have been material to any reasonable investor reviewing the Offering Memorandum and deciding whether to purchase the Notes. A reasonable investor would have attached importance to knowing the facts misstated and misleadingly omitted in the Offering Memorandum and Defendant's oral communications in determining whether or not to purchase the Notes. The materiality of the facts misstated and omitted is evidenced, for example, by the fact that said misstatements and omissions caused U.S. Auto to misappropriate funds from the Trust to cover the failing financial condition of its various entities and the underfunding of the VSCs, which then eviscerated the value of the Subject Notes and that of several other Classes of Notes in the Trust.

155. Credit Suisse owed Canyon, as well as all others who Credit Suisse solicited or to whom they sold Notes, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Memorandum and in its oral communications to investors, to ensure that such statements were true, and to ensure that there was no omission of material fact required to be stated in order to make its statements not misleading. Credit Suisse failed to exercise such

reasonable care. Credit Suisse, in the exercise of reasonable care, would have or should have known that the Offering Memorandum and its oral presentations to investors contained untrue statements of material fact and omissions of material fact as of the date it issued the Offering Memorandum and/or made such statements to the investing public.

156. Canyon did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Memorandum or the oral communications and presentations by Credit Suisse at the time Plaintiffs purchased the Subject Notes. If Canyon had known of the untruths and omissions contained in the Offering Memorandum or the oral communications and presentations by Credit Suisse, Plaintiffs would not have purchased the Subject Notes, let alone purchased them at the price it did. Canyon could not have known the untruths and omissions contained in the Offering Memorandum or the oral communications and presentations by Credit Suisse until, at the earliest, on or about April 18, 2023, when the Trust's remittance report revealed the Shortfall. Even then, no explanation was provided by U.S. Auto or Defendant about the cause of the Shortfall, and it was not until months later that Canyon learned about U.S. Auto's dire financial condition and its non-payment of the VSCs.

157. Plaintiffs purchased the Subject Notes directly from Credit Suisse during Defendant's initial offering of the Notes to the public. Canyon had no communications with Credit Suisse regarding the Trust or the Notes, nor had Canyon previously solicited any such information from Credit Suisse, before

Credit Suisse solicited Plaintiffs' purchase of Notes in the Trust by delivering the Offering Memorandum and Investor Presentation to Canyon.

158. While Plaintiffs purchased the Subject Notes as part of the initial offering of the Notes to the public, the Notes in general are still actively traded on the secondary market. The Notes belong to a type of ABS security that is regularly sold by Credit Suisse in compliance with SEC Rule 144A and regularly traded on the secondary market. On information and belief, over 90% of auto-loan ABS securities are sold to the public pursuant to SEC Rule 144A.

159. Plaintiffs sustained substantial damages in connection with its purchase of the Subject Notes and has the right to rescind its purchase and recover the consideration paid for the Subject Notes, with interest thereon.

160. Plaintiffs timely bring this action less than one year after discovery of the untrue statements and omissions in the Offering Memorandum and the oral communications and presentations by Credit Suisse, or after such discovery could have been made by the exercise of reasonable diligence, and less than three years after Plaintiffs' purchase of the Subject Notes.

161. By reason of the foregoing, Credit Suisse has violated section 12(a)(2) of the Securities Act of 1933 and is liable to Plaintiffs for rescission of Plaintiffs' purchase of the Subject Notes.

**Second Cause of Action**

**(Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5)**

**(By All Plaintiffs)**

162. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

163. This claim is brought by Plaintiffs pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the Securities and Exchange Commission.

164. Defendant directly and indirectly made, disseminated, and approved the omissions and misstatements of material fact specified in this Complaint.

165. Defendant, through its employees, officers, and other agents, including the Known Individuals, as applicable, specifically knew the omissions and misstatements of material fact specified in this Complaint were false or misleading, in that, in the course of conducting due diligence regarding the Trust or Notes and/or in offering the Notes for sale, it was aware or became aware of the misrepresentations of material fact in the Offering Memorandum, the Investor Presentation, and its communications with investors, and/or of the failure of these documents and communications to disclose the material facts necessary to make its statements, in light of the circumstances under which they were made, not misleading.

166. Defendant was furthermore in possession of, and, through its employees, officers, and other agents, including the Known Individuals,

reviewed in the course of ordinary due diligence, information indicative of the omissions and misstatements of material fact specified in this Complaint, and chose to approve the Offering Memorandum and Investor Presentation, issue both documents, make communications to investors, and sell the Notes pursuant to those documents and communications, in reckless indifference to the truthfulness of the statements contained therein.

167. Defendant violated section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5, in that it:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with its purchase of the Subject Notes.

168. Defendant acted with scienter in that it knew that the statements disseminated in the name of Credit Suisse, as specified in this Complaint, including those enumerated in Factual Allegations section H, *supra*, were materially false and misleading and/or the danger of misleading buyers was so obvious that Defendant knew of it or must have been aware of it. Nevertheless, Defendant recklessly or willfully ignored that danger in an extreme departure from the standards of care. Defendant further knew that such statements would be disseminated to investing members of the public and it knowingly and/or recklessly substantially participated in the issuance and dissemination of such

misstatements and omissions, in violation of section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5.

169. Further, in its role as underwriter and Initial Purchaser of Notes, Credit Suisse, on information and belief, had a clear motive to market the Notes in such a way as to entice investors, like Plaintiffs, to purchase the Notes initially held by Credit Suisse. Among other things, Credit Suisse had the incentive to sell Notes in order to clear the risk of such Notes from its balance sheet, to recoup the funding it provided as an underwriter for the deal, and to earn a profit by selling the Notes at a greater amount than Credit Suisse had spent as an Initial Purchaser.

170. Credit Suisse's risk-mitigation incentive was even stronger here than in other sales of securities, given that Credit Suisse either knew or must have learned, but for its recklessly insufficient due diligence, that the Notes were of higher risk and lower value than represented, as any cursory review of the documents and information within Credit Suisse's access or possession would have shown. In particular, both the information in Credit Suisse's possession or constructive possession specifically related to the Trust and to other business between Credit Suisse and U.S. Auto (such as earlier lending arrangements or securitizations) would have clearly revealed U.S. Auto's precarious financial condition and that the Notes were at risk of material impairment due to the failure of U.S. Auto, as discussed herein, to fund VSCs.

171. Defendant participated in the fraudulent scheme alleged herein, by virtue of: (1) Defendant's receipt and review of information reflecting the true facts regarding U.S. Auto, the Trust, the Notes, and the Receivables including the VSCs, and/or the other material misrepresentations or omissions in the Offering

Memorandum and Defendant's communications with the public; (2) Defendant's control over, and/or receipt of, and/or modification of, the materially false and misleading statements and omissions in the Offering Memorandum and its communications with the public; (3) Defendant's control over, and/or receipt of, and/or modification of, the materially false and misleading statements and omissions in the Investor Presentation; and/or (4) Defendant's associations with U.S. Auto, which made it privy to confidential proprietary information concerning U.S. Auto, the Trust, the Notes, the VSCs, and/or the other material misrepresentations or omissions specified in this Complaint.

172. On information and belief, Defendant, through the knowledge of the Known Individuals and other of its employees, officers, and other agents, had actual knowledge of the materially false and misleading statements set forth in this Complaint, and intended to deceive Plaintiffs and other investors; or, in the alternative, Defendant acted with reckless disregard for the truth when each Known Individual, and other of Defendant's employees, officers, and other agents, failed to disclose the true facts to investors, including Canyon, in the Offering Memorandum, the Investor Presentation, or in its other communications with Canyon, in an extreme departure from the standards of ordinary care.

173. Furthermore, the materially false and misleading statements disseminated by Credit Suisse in the Offering Memorandum, the Investor Presentation, and Defendant's other communications are so important and dramatically false that at least some corporate officials and/or directors must have known of, or recklessly disregarded, their falsity upon publication. On information and belief, Credit Suisse personnel, including the Known Individuals

and other of Defendant's agents, received and reviewed U.S. Auto's servicing files and other documents as part of its due diligence prior to approving the Offering Memorandum, which information clearly disclosed the materially false and misleading statements in the Offering Memorandum, Investor Presentation, and Defendant's other communications with investors. According to ABS industry custom and practice, the review of such information is part of an ABS underwriter's ordinary standard of care to investors in Rule 144A transactions, as investors have limited to no access to a given transaction's underlying financial information and are reliant on underwriters to investigate and verify that the information provided is complete, accurate, and does not omit to state any material facts. *See* Rizkalla Decl. ¶ 12.

174. In particular, on information and belief, this information disclosed that U.S. Auto had not funded the VSCs and, thus, a material percentage of the Receivables was voidable or subject to cancellation, and that the performance of U.S. Auto Sales' loans was worse than represented in the Investor Presentation, among other material issues covered in this Complaint. This information also, on information and belief, contained indications that U.S. Auto had not been funding VSCs for months prior to the date of the Offering Memorandum, as well as other indications of serious financial and/or solvency issues at U.S. Auto.

175. As such, at least some of Credit Suisse's corporate officials and/or directors, in addition to the employees or other agents initially responsible for due diligence related to the Trust, must have been sufficiently knowledgeable about the financial issues of U.S. Auto and/or the enforceability issues with the Receivables to know that the Offering Memorandum, the Investor Presentation,

and/or Defendant's other communications to investors contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, prior to Credit Suisse approving of, issuing, and selling Notes pursuant to, the Offering Memorandum, the Investor Presentation, and other communications.

176. As a result of the foregoing, the market price of the Subject Notes was artificially inflated when the Subject Notes were sold to Plaintiffs. In ignorance of the falsity of the Defendant's statements, Canyon relied on the Offering Memorandum, Investor Presentation, and Defendant's other communications in purchasing the Subject Notes at prices that were artificially inflated as a result of Defendant's false and misleading statements.

177. Had Canyon been aware that the market price of the Subject Notes had been artificially and falsely inflated by the Defendant's misleading statements and by the material adverse information which the Defendant did not disclose, Canyon would not have caused Plaintiffs to purchase the Subject Notes at the artificially inflated prices that they did, or at all.

178. As a result of the wrongful conduct alleged herein, Plaintiffs has suffered damages in an amount to be established at trial.

179. By reason of the foregoing, Defendant violated section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder, and is liable to Plaintiffs for rescission or, in the alternative, substantial damages, which Plaintiffs suffered in connection with its purchase of the Subject Notes.

**Third Cause of Action**

**(California Corporations Code §§ 25401, 25501)**

**(By All Plaintiffs)**

180. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

181. Under the California Corporate Securities Law of 1968, "[i]t is unlawful for any person to offer or sell a security in [California] … by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Cal. Corp. Code § 25401.

182. The Subject Notes were offered and sold in California because the offer to purchase them was made in and received in California, and because the offer to purchase the Subject Notes was accepted in California. Credit Suisse's main salesperson, specifically Michael Angelides, was working in Los Angeles at the time the Notes were marketed and sold; Canyon's main decisionmaker on the purchase of the Subject Notes, Adam Rizkalla, was working in Los Angeles at the time of the sale, as well; and Mr. Rizkalla also communicated with Wells Fargo employee, Michael Abamonte, who was also working in Los Angeles during this same time period.

183. The Subject Notes were sold to Plaintiffs by means of a written Offering Memorandum, by means of the Investor Presentation, and by means of other written and oral statements made by Credit Suisse.

184. The statements and omissions identified in this Complaint, including in Factual Allegations section H, *supra*, are material untrue statements and omissions because disclosure of the true facts underlying these matters would have affected Canyon's decision as to whether to cause Plaintiffs to purchase the Subject Notes and/or the price at which to purchase the Subject Notes.

185. Under section 25501 of the California Corporations Code:

> Any person who violates Section 25401 [of the California Corporations Code] shall be liable to the person who purchases a security from … that person, who may sue … for rescission. … Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security.

186. As discussed in this Complaint, Credit Suisse made untrue statements of material fact in the Offering Memorandum, Investor Presentation, in oral communications, or otherwise, and omitted from the Offering Memorandum, Investor Presentation, and other communications, material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading. These misstatements and omissions include, but are not limited to, the untrue statements and omissions listed in Factual Allegations section H, *supra*.

187. Plaintiffs still own the Subject Notes.

188. Credit Suisse must therefore repay to Plaintiffs the consideration paid for the Subject Notes, plus interest, in exchange for retaking the Subject Notes, less the amount of income Plaintiffs have received on the Subject Notes at the time of that rescission.

189. Credit Suisse must also pay Plaintiffs' reasonable attorney's fees and costs. Cal. Corp. Code § 25501.

190. Credit Suisse is also liable to Plaintiffs for exemplary damages, as this cause of action does not arise from an obligation arising from contract, and Credit Suisse's conduct constitutes "oppression, fraud, or malice" to Plaintiffs. Cal. Civ. Code. § 3294.

**Fourth Cause of Action**

**(Texas Government Code § 4008.052)**

**(By All Plaintiffs)**

191. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

192. Under the Texas Securities Act, "[e]xcept as provided by [Tex. Gov. Code § 4008.052(c)], a person who offers or sells a security and from whom another person buys the security is liable to the buyer of the security, … if the person offers or sells the security by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Tex. Gov. Code § 4008.052(a).

193. As discussed in this Complaint, Credit Suisse made untrue statements of material fact to Canyon, including to Plaintiffs' investment

managers, in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, and omitted from the Offering Memorandum, Investor Presentation, and other communications, material facts necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading. These misstatements and omissions include, but are not limited to, the untrue statements and omissions listed in Factual Allegations section H, *supra*.

194. Plaintiffs still own the Subject Notes, all of which Plaintiffs purchased from Credit Suisse.

195. Plaintiffs have not received any rescission offer meeting the requirements of Texas Government Code section 4008.058.

196. Credit Suisse must therefore repay to Plaintiffs the consideration paid for the Subject Notes, plus interest, in exchange for retaking the Subject Notes, less the amount of income Plaintiffs have received on the Subject Notes at the time of that rescission. Tex. Gov. Code § 4008.056.

197. Credit Suisse must also pay Plaintiffs' costs, and, if the Court finds recovery to be equitable under the circumstances, Plaintiffs' reasonable attorney's fees. Tex. Gov. Code § 4008.060.

198. Credit Suisse is also liable to Plaintiffs for exemplary damages, as Plaintiffs' harm for which they seek recovery resulted from Credit Suisse's fraud, malice, and/or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003.

**Fifth Cause of Action**

**(Deceit by Intentional Misrepresentation,**

**California Civil Code §§ 1709, 1710(1), 1710(3))**

**(By All Plaintiffs)**

199. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

200. Under California law, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709.

201. Such a "deceit" under section 1709 includes "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true." Cal. Civ. Code § 1710(1).

202. Such a "deceit" under section 1709 also includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3).

203. Credit Suisse, by marketing the Notes to Plaintiffs, intended to induce Plaintiffs to purchase the Subject Notes, at Plaintiffs' sole economic risk that the Notes would perform poorly.

204. On information and belief, Credit Suisse earned an underwriting fee and other substantial fees and benefits from the sale of any Notes, and earned even larger benefits from achieving a fully subscribed securitization, in which all Notes offered for sale were able to be sold. In addition to garnering larger fees, a fully subscribed securitization also benefited Credit Suisse by eliminating the

risk of holding Notes on its balance sheet and improving its ability to underwrite, market, and sell future securitizations.

205. As discussed in this Complaint, Credit Suisse, through its agents, made untrue statements of material fact in the Offering Memorandum, Investor Presentation, and/or in other communications, and omitted from the Offering Memorandum, Investor Presentation, and other communications, facts that were likely to mislead for want of communication of those facts. These misstatements and omissions include, but are not necessarily limited to, the untrue statements and omissions listed in Factual Allegations section H, *supra*.

206. Credit Suisse, through its due diligence for the Trust and its other business relationships with U.S. Auto, was aware of the true facts and thus did not believe the misrepresentations set forth in this Complaint to be true. Defendant also suppressed facts that it was bound to disclose in the Offering Memorandum, Investor Presentation, or other communications, and gave information of other facts in the Offering Memorandum and Investor Presentation that were likely to mislead for want of communication of the suppressed facts, including those material omissions set forth in this Complaint.

207. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

208. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, and otherwise by Credit Suisse.

209. Credit Suisse is therefore liable to Plaintiffs for their damages suffered as a result of Defendant's deceit.

210. Credit Suisse is also liable to Plaintiffs for exemplary damages, as this cause of action does not arise from an obligation arising from contract, and Credit Suisse's conduct constitutes "oppression, fraud, or malice" to Plaintiffs. Cal. Civ. Code. § 3294.

**Sixth Cause of Action**

**(Deceit by Negligent Misrepresentation,**

**California Civil Code §§ 1709, 1710(2))**

**(By All Plaintiffs)**

211. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

212. Under California law, as set forth above, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709.

213. Such a "deceit" under section 1709 includes "[t]he assertion, as a fact, that which is not true, by one who has no reasonable ground for believing it to be true." Cal. Civ. Code § 1710(2).

214. In other words, under California law, "[n]egligent misrepresentation is a separate and distinct tort, a species of the tort of deceit. 'Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, [the defendant] may be liable for negligent misrepresentation, a form of deceit.'" *Bly v. Arthur Young & Co.*, 3 Cal. 4th 370, 407–08 (1992) (quoting 5 B.E. Witkin *et al.*, Summary of Cal. Law § 720 (9th ed. 1988), and citing, *inter alia*, Cal. Civ. Code § 1710(2)); *accord* 5 B.E. Witkin

*et al.*, Summary of Cal. Law § 941 (11th ed. 2023) ("By statutory definition, negligent misrepresentation is a form of deceit.").

215. Though the statutory tort of deceit requires that a defendant have "willfully deceiv[ed]" the plaintiff, Cal Civ. Code § 1709, a claim for deceit by negligent misrepresentation under California law "does not require scienter or intent to defraud," *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173 (2003).

216. As discussed in this Complaint, Credit Suisse made untrue statements of material fact in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, including, but not limited to, the untrue statements listed in Factual Allegations section H, *supra*.

217. Credit Suisse made these statements with the intent that investors, including Plaintiffs, would purchase Notes based, at least in part, on those statements.

218. Credit Suisse, based on its due diligence for the Trust and its other business relationships with U.S. Auto, had no reasonable ground for believing these statements to be true.

219. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

220. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, and other communications by Credit Suisse.

221. Credit Suisse is therefore liable to Plaintiffs for their damages suffered as a result of Plaintiffs' deceit by negligent misrepresentation.

**Seventh Cause of Action**

**(Fraud Under Texas Common Law)**

**(By All Plaintiffs)**

222. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

223. Under Texas law, to state a claim for fraud, a plaintiff must show that "(1) the defendant made a false, material representation; (2) the defendant 'knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;' (3) 'the defendant intended to induce the plaintiff to act upon the representation;' and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019) (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018)).

224. As discussed in this Complaint, Credit Suisse, through its employees, officers, and/or other agents, made untrue statements of material fact in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, and omitted from the Offering Memorandum, Investor Presentation, and other communications, facts that were likely to mislead for want of communication of those facts. These misstatements and omissions include, but are not necessarily limited to, the untrue statements and omissions listed in Factual Allegations section H, *supra*.

225. Credit Suisse, as discussed in this Complaint, either knew of these material untrue facts and materially misleading omissions, or recklessly did not learn these facts.

226. Credit Suisse intended to induce Plaintiffs to act upon these representations or omissions.

227. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

228. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, oral communications, or otherwise by Credit Suisse.

229. Through Canyon's reliance on Credit Suisse's statements, Plaintiffs were harmed by purchasing Notes that were much riskier than advertised, and suffered losses when those risks came to pass and the Subject Notes lost value.

230. Credit Suisse is therefore liable to Plaintiffs for compensatory damages caused by their purchase of the Subject Notes.

231. Credit Suisse is also liable to Plaintiffs for exemplary damages, as Plaintiffs' harm for which they seek recovery resulted from Credit Suisse's fraud, malice, and/or gross negligence. Tex. Civ. Prac. & Rem. § 41.003.

**Eighth Cause of Action**

**(Negligent Misrepresentation Under Texas Common Law)**

**(By All Plaintiffs)**

232. Plaintiffs reallege and incorporate by reference herein the allegations in Paragraphs 1–144.

233. Under Texas law, to state a claim for negligent misrepresentation, "the plaintiff must establish (1) the representation is made by a defendant in the course of his business; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable

care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the misrepresentation." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)). "The 'false information' supplied must be a misrepresentation of a 'material fact.'" *Morris*, 236 F.3d at 1061 (citing *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999)).

234. Credit Suisse made the statements in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, as discussed in this Complaint, and supplied the Offering Memorandum and Investor Presentation to Canyon, as manager for Plaintiffs, in the course of Credit Suisse's business in selling and soliciting the sale of Notes, as Credit Suisse regularly participates in the underwriting, solicitation, and sale of securities, including auto loan asset-backed securities.

235. Further, these statements were made in the course of Defendant's business because, on information and belief, Credit Suisse earned an underwriting fee and other substantial fees and benefits from the sale of any Notes, and earned even larger benefits from achieving a fully subscribed securitization, in which all Notes offered for sale were able to be sold. In addition to garnering larger fees, a fully subscribed securitization also benefited Credit Suisse by eliminating the risk of holding Notes on its balance sheet and improving its ability to underwrite, market, and sell future securitizations.

236. As discussed in this Complaint, Credit Suisse made untrue statements of material fact in the Offering Memorandum, Investor Presentation,

in oral communications, or otherwise, including, but not limited to, the untrue statements listed in Factual Allegations section H, *supra*.

237. Credit Suisse did not exercise reasonable care or competence in obtaining or communicating this information, the untruth of which would have been revealed by Defendant's due diligence, its other business relationships with U.S. Auto, and/or the other information in its possession.

238. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

239. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, and other communications made by Credit Suisse.

240. Credit Suisse is therefore liable to Plaintiffs for compensatory damages caused by their purchase of the Subject Notes.

241. Credit Suisse is also liable to Plaintiffs for exemplary damages, as Plaintiffs' harm for which they seek recovery resulted from Credit Suisse's fraud, malice, and/or gross negligence. Tex. Civ. Prac. & Rem. § 41.003.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an Order:

a. granting judgment in favor of Plaintiffs on all causes of action; and

b. in the alternative, either

   i. ordering Defendant to retake the Subject Notes from Plaintiffs and to refund the purchase price for each Subject Note (plus statutory

and pre- and post-judgment interest), minus the amounts already distributed to each Plaintiff under each Subject Note; or

ii. ordering Defendant to pay Plaintiffs damages in an amount to be determined by the Court; and

c. ordering Defendant to pay Plaintiffs exemplary damages in an amount to be determined by the Court based on Defendant's fraud, oppression, malice, and/or gross negligence in marketing the Notes; and

d. awarding pre- and post-judgment interest on all applicable damages; and

e. awarding Plaintiffs their reasonable attorney's fees and costs; and

f. granting all other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all claims so triable, including, but not limited to, questions of compensatory and exemplary damages.

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ, LLP

May 13, 2024

By: */s/ Isaac M. Gradman*
Isaac M. Gradman
E. Page Allinson
Michael E. Tracht
Alexander A. Wiegel

*Attorneys for Plaintiffs*
*River Canyon Total Return Bond Fund, Canyon NZ-DOF Investing L.P., Canyon Distressed TX (A) LLC, Canyon Distressed TX (B) LLC, Canyon-EDOF (Master) L.P., and Canyon Distressed Opportunity Master Fund III, L.P.*