Isaac M. Gradman (243344)
gradman@perrylaw.net
E. Page Allinson (287040)
allinson@perrylaw.net
Michael E. Tracht (345914)
tracht@perrylaw.net
Alexander A. Wiegel (319813)
wiegel@perrylaw.net
PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ, LLP
438 1st Street, 4th Floor
Santa Rosa, California 95401
Telephone: (707) 525-8800
Facsimile: (707) 545-8242

*Attorneys for all Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

River Canyon Total Return Bond Fund, Canyon NZ-DOF Investing L.P., Canyon Distressed TX (A) LLC, Canyon Distressed TX (B) LLC, Canyon-EDOF (Master) L.P., and Canyon Distressed Opportunity Master Fund III, L.P.,

Plaintiffs,

v.

Credit Suisse Securities (USA) LLC,

Defendant.

/

Case No. 2:24-cv-03993 (GW) (Ex)

**AMENDED COMPLAINT FOR SECURITIES FRAUD AND INTENTIONAL AND NEGLIGENT MISREPRESENTATION**

**DEMAND FOR JURY TRIAL**

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action:

a. under 28 U.S.C. § 1331, because it seeks relief under the laws of the United States;

b. under 15 U.S.C. § 78aa, because it seeks to enforce liabilities and duties created by the Securities Exchange Act of 1934 or rules or regulations thereunder; and

c. under 28 U.S.C. § 1367, because the claims not arising under federal law are so related to the federal-law claims that they form the same case or controversy under Article III of the United States Constitution.

2. This Court has personal jurisdiction over Defendant because, *inter alia*:

a. Defendant is present within, or has minimum contacts with, the State of California and this judicial district;

b. Defendant has purposefully availed itself of the privileges of conducting business in the State of California and in this judicial district; and

c. each of Plaintiffs' causes of action arises directly from Defendant's business contacts or other activities in the State of California and in this judicial district.

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, including the solicitation of Plaintiffs by Defendant regarding the purchase of the at-issue

securities, and the acceptance by Plaintiffs of the offer to purchase these securities, occurred in this district.

4. Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant is an entity that is subject to this Court's personal jurisdiction with respect to this action, and is therefore considered to reside in this district under 28 U.S.C. § 1391(c)(2).

## PRELIMINARY STATEMENT

5. This action seeks (a) the rescission of the sale to Plaintiffs by Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") of securities (the "Notes") issued by the U.S. Auto Funding Trust Series 2022-1 Trust ("USAF 2022-1" or the "Trust"), or, in the alternative, (b) damages from Credit Suisse for Plaintiffs' lost value in the Notes purchased by Plaintiffs from Defendant (the "Subject Notes"), based upon, *inter alia*, misrepresentations and omissions in the offering documents for the Notes regarding critical aspects of the transaction and the operations of key transaction parties. As detailed herein, Defendant failed to disclose that at the time the Notes were offered, and these statements in the offering documents were made, the Sponsor/Seller of the Trust and its affiliates were in serious financial trouble, were unable to meet their payment obligations when they came due, and had been failing for months to fund and place into force Trust assets that formed a material portion of the Trust's collateral and served to protect much of the remainder of the Trust's collateral from loss. Plaintiffs also seek exemplary damages on the basis of Defendant's fraud, oppression, malice, and/or gross negligence.

6. In 2022, Credit Suisse and Wells Fargo Securities, LLC ("Wells Fargo") acted as the underwriters of the Trust, a securitization trust that pooled used-automobile loans and related receivables issued by various affiliates of USASF Holdco, LLC (collectively, "U.S. Auto"). In this role, Credit Suisse participated in the drafting of, approved, and issued the Offering Memorandum that it provided to Plaintiffs and their investment managers to solicit the sale of the Notes issued by the Trust. Defendant also participated in the drafting of, approved, and issued additional marketing materials, including, but not limited to, the Investor Presentation (as defined below), which was provided to Plaintiffs and their investment managers in the course of Defendant's solicitation of Plaintiffs' purchase of Notes.

7. In the course of its due diligence in its role as underwriter of the Trust and issuer of the Offering Memorandum and other materials, if not earlier, Credit Suisse became intimately familiar with the operations and financial condition of the various U.S. Auto entities, including the entities that originated and serviced the collateral for the deal. Nevertheless, Credit Suisse made numerous misrepresentations and omissions in the Offering Memorandum and other materials it provided to investors, including by misrepresenting material facts and omitting to state material facts necessary to make its statements and descriptions not misleading. In particular, Credit Suisse misrepresented and/or omitted material facts regarding the operations and financial condition of the U.S. Auto entities and the status and condition of the deal's collateral.

8. Unbeknownst to Plaintiffs and their investment managers, U.S. Auto was experiencing severe financial trouble for months before the Trust closed. The

Trust turned out to be the last securitization sponsored by U.S. Auto and most, if not all, U.S. Auto entities are now insolvent, with several having filed for bankruptcy. But U.S. Auto's dire financial condition would have been apparent from a review of its books and records long before these bankruptcy filings. As detailed herein, since at least late 2021, U.S. Auto had been failing to fund borrower-purchased warranties known as vehicle service contracts ("VSCs"), which formed a substantial part of the Trust's collateral and constituted a meaningful driver of the performance of the Trust and the Notes. This meant that borrower warranties, including those to be securitized as collateral of the Trust, never went into effect and/or were subject to cancellation at the time the Trust closed. As such, Credit Suisse misrepresented the status of a substantial portion of the Trust's collateral and failed to disclose that this collateral—consisting of the Trust's VSCs—was effectively worthless. Credit Suisse thus also misrepresented to investors that the valuable and material protection the VSCs were intended to provide for the Trust's auto-loan receivables actually existed.

9. Credit Suisse further misrepresented U.S. Auto's deteriorating financial condition, omitting that U.S. Auto's financial distress exposed the Trust's assets and cash flows to significant additional risk. Indeed, these issues ultimately culminated in U.S. Auto "robbing Peter to pay Paul"—misappropriating for its own use Trust assets in the form of collections U.S. Auto had received in its role as servicer with respect to the underlying auto loans. Despite being obligated under the Trust's governing agreements to pay the net amount of any such collections—consisting largely of borrower payments on

their auto loans and loan rebates—into the Trust's collection account, U.S. Auto embezzled the funds.

10. As a result, on or about April 18, 2023, the Trust's remittance report disclosed a shocking "shortfall" of millions of dollars in cash missing from the Trust. It was not until that date, at the earliest, that investors could have learned of U.S. Auto's significant debt and liquidity issues.

11. Days later, news broke of the closure of U.S. Auto's dealerships and its loss of financing for its business. As more details regarding U.S. Auto's financial situation continued to emerge, it became apparent that the shortfall was the result of U.S. Auto's effort to pay its other obligations and/or cover up its deteriorating financial condition by siphoning funds that belonged to the Trust.

12. Unbeknownst to Plaintiffs, these financial issues were present well before the Trust closed, as it turns out that U.S. Auto had not been funding its VSCs for months before the marketing and issuance of the Notes.

13. As detailed herein, Defendant misrepresented the status of the VSCs and U.S. Auto's financial condition in the Offering Memorandum, other materials it prepared and circulated to investors to market the Notes, and its other communications with investors, and failed to otherwise disclose the true facts about the VSCs and U.S. Auto's mounting financial struggles to potential investors, including Plaintiffs.

14. These misrepresentations and omissions were material to Plaintiffs, and they would have been material to any investor, as the true facts would have revealed enormous risks that the Notes would underperform and/or that

U.S. Auto would fail to meet, or have the wherewithal to stand behind, its obligations.

15. Indeed, now that such risks have come to pass, investors, including Plaintiffs, have suffered devastating consequences: the original principal balances of most of the Subject Notes have been written down to zero, meaning that the Subject Notes will not receive any of the principal cash flows to which they would have been entitled according to their seniority, causing substantial losses to Plaintiffs.

16. Had Defendant accurately described U.S. Auto's financial condition, U.S. Auto's failure to fund the VSCs, or U.S. Auto's inability to meet its payment obligations when they came due, Plaintiffs would not have purchased the Subject Notes at all, let alone at the price they did. Accordingly, Defendant's misrepresentations and omissions are material, warranting rescission or, in the alternative, compensation for the diminished value of the Subject Notes.

17. Based on the foregoing, Credit Suisse is obligated to refund to Plaintiffs the full purchase price of the Subject Notes with interest, minus any cashflows ultimately paid to Plaintiffs on the Subject Notes, and retake the Subject Notes; in the alternative, Defendant must pay Plaintiffs compensatory damages for the diminution in the value of the Subject Notes.

18. Plaintiffs are also entitled to exemplary damages due to Credit Suisse's fraud, oppression, malice, and/or gross negligence in marketing the Notes.

## PARTIES

19. Plaintiffs are investment funds managed by either Canyon Capital Advisors LLC or River Canyon Fund Management LLC (Canyon Capital Advisors LLC, River Canyon Fund Management LLC, and their subsidiaries and affiliated entities are collectively referred to hereinafter as "Canyon"). Canyon Capital Advisors LLC is a limited liability company formed under the laws of Delaware, with its principal office in Dallas, Texas. River Canyon Fund Management LLC is a limited liability company formed under the laws of Delaware, with its principal office in Dallas, Texas. Canyon also has offices in Los Angeles, California, among other locations.

20. Plaintiff River Canyon Total Return Bond Fund is an investment fund issued by Advisers Investment Trust, a Delaware statutory trust, which is an open-end investment company.

21. Plaintiff Canyon NZ-DOF Investing L.P. is a limited partnership formed under the laws of Delaware and operating as a private investment fund.

22. Plaintiff Canyon Distressed TX (A) LLC is a limited liability company formed under the laws of Delaware and operating as a private investment fund.

23. Plaintiff Canyon Distressed TX (B) LLC is a limited liability company formed under the laws of Delaware and operating as a private investment fund.

24. Plaintiff Canyon-EDOF (Master) L.P. is a limited partnership formed under the laws of the Cayman Islands and operating as a private investment fund.

25. Plaintiff Canyon Distressed Opportunity Master Fund III, L.P. is a limited partnership formed under the laws of the Cayman Islands and operating as a private investment fund.

26. Adam J. Rizkalla, an employee of Canyon, had primary responsibility for evaluating the offered Notes and for recommending to his supervisors whether Canyon should cause Plaintiffs to buy Notes; his supervisors had the ultimate authority to approve such a purchase. Declaration of Adam J. Rizkalla ("Rizkalla Decl.") ¶ 3, attached as **Exhibit 1** hereto.

27. At the time Canyon was first solicited to purchase Notes in the Trust, Mr. Rizkalla was working in Los Angeles, California, where Canyon has offices. Rizkalla Dec. ¶ 4.

28. Other individuals at Canyon who were involved in the purchase of the Subject Notes or the decision to purchase the Subject Notes were working in Dallas, Texas from the time Canyon was first solicited to purchase Notes in the Trust to the time that Plaintiffs purchased the Subject Notes (the "Relevant Period"), and Canyon's principal office is in Dallas, Texas. Rizkalla Decl. ¶ 5.

29. Defendant Credit Suisse Securities (USA) LLC is a limited liability company formed under the laws of Delaware. It is a registered broker-dealer, is registered as an investment adviser, and is regulated by both the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA). As of 2023, Credit Suisse Securities (USA) LLC is an indirect wholly-owned subsidiary of UBS Group AG.

30. Michael Angelides, an individual, was, on information and belief, a Credit Suisse employee during the Relevant Period. Mr. Angelides participated in

the solicitation of Canyon to purchase Notes and communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. On information and belief, throughout the Relevant Period, Mr. Angelides was working in Los Angeles, California. Rizkalla Decl. ¶ 6.

31. Thomas Pai, an individual, was, on information and belief, a Credit Suisse employee during the Relevant Period, and is now registered as an employee of Apollo Global Securities, LLC. Mr. Pai participated in the solicitation of Canyon to purchase Notes and communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. On information and belief, throughout the Relevant Period, Mr. Pai was working in New York, New York. Rizkalla Decl. ¶ 7.

32. Ryan Jok, an individual, was, on information and belief, a Credit Suisse employee during the Relevant Period, and is now an employee of Apollo Global Securities, LLC. Mr. Jok participated in the solicitation of Canyon to purchase Notes and communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. On information and belief, throughout the Relevant Period, Mr. Jok was working in New York, New York. Rizkalla Decl. ¶ 7.

33. Michael Angelides, Thomas Pai, and Ryan Jok are sometimes referred to herein, collectively, as the "Known Individuals."

34. Non-party Wells Fargo Securities, LLC, which was the secondary underwriter of the Trust and, together with Credit Suisse, one of the Trust's two

Initial Purchasers and Joint Bookrunners, is a limited liability company formed under the laws of Delaware.

35. Michael Abamonte, an individual, was, on information and belief, a Wells Fargo employee during the Relevant Period. Rizkalla Decl. ¶ 9. Mr. Abamonte communicated with Canyon during the Relevant Period in connection with Canyon's evaluation of its potential investment in the Notes. *Id.* On information and belief, throughout the Relevant Period, Mr. Abamonte was working in Los Angeles, California. *Id*.

36. At this time, the identity of additional individuals who were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the misrepresentations and omissions alleged herein constitutes information that is not available to Plaintiffs, but, on information and belief, is within the knowledge of Defendant.

## FACTUAL ALLEGATIONS

### A. The Trust

37. The Trust is an asset-backed securitization trust that closed on June 28, 2022. It is formed as a Delaware statutory trust.

38. Like other asset-backed securitization ("ABS") trusts, the Trust is an entity that takes title to a pool of receivable assets that forms the Trust's collateral, then issues securities (often known as notes or certificates) entitling their beneficial holders to portions of the cashflows generated by this collateral. Like most ABS trusts, the Trust issued several different classes or tranches of notes or certificates, each with different priorities, with the higher classes

generally receiving payments of principal before the lower classes, and the lower classes generally having losses allocated to them before the higher classes. This tiered distribution and loss allocation scheme is generally referred to as the Trust's "waterfall."

**1. The Marketing of the Notes**

39. To market the Trust's Notes, Credit Suisse, together with Wells Fargo and U.S. Auto personnel, prepared an Offering Memorandum, dated as of June 16, 2022, a copy of which is included as **Exhibit 2** hereto (the "Offering Memorandum"). Similarly, Credit Suisse contributed to the preparation of, and provided prospective investors with, an investor presentation, dated June 2022, titled "USAUT 2022-1 Investor Presentation," a copy of which is included as **Exhibit 3** hereto (the "Investor Presentation"), for the purpose of soliciting the purchase of Notes. Among other things, the Offering Memorandum and Investor Presentation described the roles of the various entities involved in the Trust; the auto loans, VSCs, and other receivables that would form the collateral for the Trust (the "Receivables"); and the operation of the Trust's waterfall and other provisions of its governing agreements. The Offering Memorandum and Investor Presentation also contained various representations regarding the quality and characteristics of the Receivables, as well as the status and condition of the securitization parties.

40. The Investor Presentation extolled the "[i]ndustry-leading customer satisfaction" of the originator of the Receivables, U.S. Auto Sales, Inc. ("U.S. Auto Sales"), Investor Presentation at 14, and disclosed that the Trust used a third party, Dealer Owned Warranty Co., to administer the "30-day/1,000 mile

limited warranty and vehicle service contracts" included in the Receivables. *Id.* at 27.

41. Despite being framed as a presentation by U.S. Auto Sales, the Investor Presentation's metadata demonstrates that Credit Suisse participated in the preparation and drafting of the Investor Presentation. Credit Suisse also provided the Investor Presentation to Canyon and hosted a telephone conference with Canyon and U.S. Auto in which it walked Canyon through the Investor Presentation; made numerous other representations to Canyon regarding the Trust, the Notes, the Receivables, and the deal parties; and answered questions from Canyon regarding these matters. *See* Rizkalla Decl. ¶¶ 6–7.

**2. The Trust's Assets, Parties, and Structure**

42. The Receivables consist of "motor vehicle retail installment sale contracts that are secured by a combination of used automobiles, light-duty trucks and vans," Offering Memorandum at 55, which were originated by U.S. Auto Sales, *id.* at 2. These installment sale contracts, and thus the Trust's Receivables, included both the borrowers' loan agreements and the limited warranties on the vehicles, which covered a minimum warranty period of 30 days/1,000 miles, but which could be extended by purchasers for various terms up to a 36-month/36,000-mile warranty period. Offering Memorandum at 51. (The term "VSCs," as used herein, includes both the limited and the extended warranties that were included in the Receivables.)

43. At the time the Offering Memorandum was issued, U.S. Auto Sales operated 39 dealerships across Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee. Offering Memorandum at 49–50.

44. "[I]mmediately after" U.S. Auto Sales executed these installment sale contracts, they were "acquired" by U.S. Auto Finance, Inc. ("U.S. Auto Finance"), "pursuant to a standing purchase agreement between U.S. Auto Finance and U.S. Auto Sales." Offering Memorandum at 49.

45. Under the Trust's governing agreements, U.S. Auto Finance serves in the roles of Administrator and Sponsor/Seller. Offering Memorandum at 1–2. As Administrator, U.S. Auto Finance is required to perform the duties assigned under the governing agreements to the Trust itself or to the Grantor Trust Trustee (discussed further below). As Sponsor/Seller, U.S. Auto Finance sponsored the creation of the Trust and the Receivables and organized the issuance by the Trust of the Notes. *Id.* At 1–2, 45. As Sponsor/Seller, U.S. Auto Finance also sold the Receivables to another affiliated entity, U.S. Auto Receivables Financing LLC, which is the Depositor under the Trust's governing agreements. *Id.* at ix, 1, 44–45.

46. The Depositor, in turn, conveyed the Receivables to the Trust in exchange for the Notes and Certificates issued by the Trust. *Id.* at ix.

47. Computershare Trust Company, N.A. ("Computershare") is the Indenture Trustee of the Trust and its Backup Servicer, while BNY Mellon Trust of Delaware is the Owner Trustee of the Trust. *Id.* at 1–2.

48. The Trust itself then conveyed the Receivables to the U.S. Auto Funding Grantor Trust 2022-1 (the "Grantor Trust") in exchange for the Grantor Trust Certificate. *Id.* at ix. The Grantor Trust is now the legal holder of the Receivables, and the Trust's main asset is its 100% beneficial interest in the Grantor Trust. *Id.* at 40. Separate from its role as Owner Trustee for the Trust,

BNY Mellon Trust of Delaware is also the Grantor Trust Trustee. *Id.* at 2. Though the Grantor Trust is the legal owner of the Receivables, Computershare, in its capacity as Custodian, is in possession of the receivable files themselves. *Id.* at 44.

49. After receiving the Notes and Certificates from the Trust, the Depositor sold the Notes to the Trust's underwriters, Credit Suisse and Wells Fargo, who are described in the Offering Memorandum as the "Initial Purchasers and Joint Bookrunners," and who then sold the Notes to investors like Plaintiffs. *See id.* at 127–28 (section titled "Plan of Distribution"). Defendant, through the Known Individuals, among others, participated in the drafting of, approved, and issued the Offering Memorandum that they then provided to investors to solicit the sale of the Notes issued by the Trust. *See* Rizkalla Decl. ¶¶ 6–7, 10–11.

50. The installment sale contracts forming a portion of the Receivables were initially serviced by USASF Servicing LLC ("USASF Servicing"), *e.g.*, Offering Memorandum at 52, and are now serviced by Westlake Portfolio Management, LLC ("Westlake"). The transfer of servicing is discussed *infra* in paragraphs 91–96.

51. The Servicer's "activities consist primarily of collecting and posting all payments, responding to obligor inquiries, investigating delinquencies, providing invoices or payment coupons … to obligors, administering the filing of claims under the insurance policies and GAP coverage, reporting any required tax information to obligors, accounting for collections and furnishing monthly and annual statements to the indenture trustee with respect to distributions." Offering Memorandum at 52.

52. The payments received by the Servicer pursuant to the installment sale contracts are distributed to investors, net of contractually-specified fees paid to deal parties. Offering Memorandum at 8.

53. Page ix of the Offering Memorandum includes a structural diagram of the Trust, showing the flow of funds, receivables, notes, and certificates:



**3. The Vehicle Service Contracts**

54. The Offering Memorandum represented that U.S. Auto would perform all of the warranty and service obligations required under the VSCs and remit proceeds from same to the Trust.

55. The Offering Memorandum provided that, "the terms of each receivable provide for a free, 30 day/1,000 mile limited warranty that covers items such as the engine, electrical systems, transmission and drive train of the related financed vehicle. Obligors also have the option to purchase an extended service contract (covering items similar to the limited warranty)." Offering Memorandum at 51. In other words, each auto loan Receivable includes a VSC covering, at minimum, a 30-day period, if not longer.

56. The Offering Memorandum further provided that "U.S. Auto Sales retains sole responsibility for performing warranty and service obligations," and "[u]nless required by law to be remitted to the obligor [i.e. the purchaser of the vehicle], the [Trust's] servicer will deposit into the [Trust's] collection account any amounts received as a rebate due to cancellation of [a] [VSC] that was financed by a [Trust] receivable." *Id*. In short, U.S. Auto, through U.S. Auto Sales, was responsible for ensuring that the VSC obligations would be performed, including by paying the VSCs' administrator to put the VSCs, for which borrowers had already paid U.S. Auto, into effect. Further, if there were any rebates or refunds due from the VSC administrator, which typically arose if a borrower prepaid or defaulted on its loan, U.S. Auto, through USASF Servicing, was obligated to pay those rebates or refunds back to the Trust unless they were due by law to be paid back to the borrower. Because the VSCs would cost the

borrowers up to $3,000, rebates on the VSCs were a material portion of the collections expected to be received by the Trust. Rizkalla Decl. ¶ 25.

57. Yet, according to the administrator of the VSCs, U.S. Auto had, since September 2021, if not earlier, failed to pay the administrator its contractual fees for administering VSCs across U.S. Auto's portfolio. *DOWC* Complaint (defined below) ¶ 52.

58. This non-payment, on information and belief based on the claims of the VSC administrator, was significant in scale—as discussed below, the VSC administrator has since sued U.S. Auto for failure to pay approximately $18 million with respect to thousands of vehicle service contracts, meaning those contracts, including VSCs in the Trust's Receivables, were subject to cancellation or were never placed into force.

59. Accordingly, at the time the Offering Memorandum and Investor Presentation were sent to potential investors, U.S. Auto Sales had not paid for or rendered effective most, if not all, of the VSCs, meaning that borrowers would not receive the benefit of the warranty services for which they paid.

60. This non-payment also exposed the Trust and its Receivables to material, undisclosed additional risk. Used vehicle warranties, like the VSCs, are critically important to preserving the value of subprime auto loans, as they help to suppress default rates and preserve the value of the underlying vehicle. *See, e.g.*, Offering Memorandum at 51 ("In an effort to keep financed vehicles running properly and incentivize obligors to remain current on their installment payments, the terms of each receivable provide for a free, 30 day/1,000 mile limited warranty" and, if purchased by the borrower, an extended warranty).

61. With respect to default rates, used vehicle warranties help keep borrowers' vehicles in drivable condition by paying for repairs that borrowers might not otherwise be able to afford, allowing borrowers to regain the use of their vehicles more quickly. This, in turn, ensures that borrowers maintain transportation to and from their place of employment, allowing them to continue to earn the funds necessary to make timely monthly payments on their auto loans. Thus, the existence of in-force VSCs helps to suppress the risk that borrowers will default on their loan payments if their vehicles require repairs, particularly as used vehicles typically require more frequent repairs than new vehicles.

62. With respect to preservation of collateral value, because used vehicle warranties ensure that borrowers' vehicles remain in better condition by covering repairs, VSCs also tend to mitigate losses on the auto loans in the event of a default, by preserving the value of the collateral that can be recovered if repossession is necessary. Without a warranty, borrowers' vehicles are more likely to fall into disrepair and depreciate in value, thereby decreasing recovery rates.

63. In addition, where, as here, a subprime auto-loan borrower purchases a VSC, but the borrower is unable to obtain warranty services under that contract because it is canceled or never placed into force, the value of the loan is impaired. Namely, borrowers who are denied warranty coverage despite purchasing VSCs may strategically default on their entire auto loans, understandably refusing to pay further amounts where they are not receiving the services for which they paid and which are required to keep their vehicles

operational. *See* Rizkalla Decl. ¶ 21. Further, these borrowers would have additional defenses to any attempts to repossess their vehicles for non-payment of their auto loans, due to U.S. Auto Sales's breach of its contractual obligation to perform warranty and service obligations in respect to financed vehicles. *See* Offering Memorandum at 51. These defenses increase the cost, time, and risk associated with obtaining recoveries in the event borrowers default on their auto loans, further reducing cash flows to the Trust.

64. U.S. Auto Sales's failure to pay the VSCs' administrator also decreased the likelihood of the Trust receiving any of the rebate amounts to which it was entitled upon the default of the underlying auto loans, as the VSC administrator would be unlikely to remit such amounts to USASF Servicing when it was owed larger amounts by U.S. Auto on its remaining VSCs. Indeed, this exact undisclosed risk came to pass. By the time the Notes were offered to investors, DOWC had already stopped remitting any VSC rebates following borrower defaults due to U.S. Auto's failure to fund the VSCs in the first place, leading to a substantial impairment of the Trust's cashflows. Rizkalla Decl. ¶ 35.

65. In sum, U.S. Auto's failure to pay the VSC administrator caused substantial damage to the Notes and the Receivables backing those Notes and exposed those Notes and Receivables to higher risk, because, *inter alia*, it (1) increased the risk of default on the Receivables by diminishing the borrowers' ability to keep the vehicles in good repair and maintain transportation to their places of employment; (2) decreased the recovery value of the collateral because the collateral would be less likely to be kept in good working condition absent warranty repair services; (3) increased the risk that borrowers would strategically

default when they were denied warranty coverage on VSCs for which they paid; (4) gave rise to claims or defenses preventing repossession of the Receivables' collateral; and (5) prevented the Trust from receiving VSC rebates, and decreased the likelihood of the Trust receiving future VSC rebates, on auto loans that defaulted.

66. As it turned out, the problems caused to the Trust and its Receivables by U.S. Auto's underpayment were not limited to the above-enumerated items. To wit, U.S. Auto was in such dire financial condition that it was unable to cure its underpayment of the VSCs using its own funds. Instead, on information and belief (based on the conversations between Canyon and Westlake and the conversations between Canyon and DOWC, *see infra* ¶¶ 97–109), U.S. Auto began misappropriating Trust cashflows it had collected on the Receivables in its capacity as Servicer, and which it was duty bound to remit to the Trust.

**B. The Offering of the Notes Was Public Under the Securities Act**

67. Credit Suisse was the lead underwriter of USAF 2022-1. Rizkalla Decl. ¶ 8. The Offering Memorandum for USAF 2022-1 lists, on its cover page, "Credit Suisse and Wells Fargo Securities" as "INITIAL PURCHASERS AND JOINT BOOKRUNNERS." The Offering Memorandum also states that the Notes are being offered by Credit Suisse and Wells Fargo pursuant to SEC Rule 144A, 17 C.F.R. § 230.144A ("Rule 144A"). Offering Memorandum at 12–13.

68. Despite purporting to offer the Notes pursuant to Rule 144A, the facts and circumstances of the offering demonstrate that Credit Suisse and Wells

Fargo offered and sold the Notes as part of an initial public offering, and the Offering Memorandum is a prospectus, within the meaning of the Securities Act of 1933 (the "Securities Act").

69. Namely, the Offering Memorandum is a communication, notice, circular, advertisement, or letter describing an initial public offering of securities (the Notes) by an issuer or controlling shareholder. This is supported by at least the following facts and circumstances:

a. The Offering Memorandum was widely disseminated by Credit Suisse and Wells Fargo in an unsolicited manner to at least 50–100 members of the investing public, including Canyon, for the purpose of soliciting the purchase of the Notes;

b. The size of Credit Suisse and Wells Fargo's offering was large, totaling $232,886,000 in original principal amount, of which Plaintiffs purchased a relatively small amount ($30,289,000, or approximately 13%);

c. Those members of the investing public whom Credit Suisse and Wells Fargo solicited using the Offering Memorandum were not provided with, and did not have access to, all documents relevant to the investment, including all documents relevant to the Trust's formation, its collateral, and its sponsor/seller, nor did they have a pre-existing relationship with the issuer, the sponsor/seller, or any of its affiliated parties that would have enabled them to command access to such information. Nor did such offerees have access to the type of information that would have been included in a registration statement for the Notes. In

particular, offerees were not provided with relevant financial statements regarding the sponsor/seller or loan-level data for the Receivables, and Canyon did not have a pre-existing relationship with the issuer, the sponsor/seller, or any of its affiliates that would have enabled it to obtain such information. Rizkalla Decl. ¶ 12. Indeed, such offerees were prevented from conducting their own due diligence beyond the information provided to them by the Trust's underwriters, like Defendant, and were thus entirely reliant on such underwriters to duly investigate and faithfully represent all material facts about the Notes. Thus, those members of the investing public whom Credit Suisse and Wells Fargo solicited and to whom they sold the Notes, including Plaintiffs, were part of the class of members of the investing public who require the protection of the Securities Act;

d. Those members of the investing public whom Credit Suisse and Wells Fargo solicited were simply being asked to become passive investors in the Trust, which was an existing entity; they were not being offered the ability to partner in the formation of a new entity, take a position of control or authority over the Trust, or participate in the governance of the Trust;

e. Except for the lack of a filed registration statement with the SEC, the sale of the Notes was otherwise consistent with offerings made pursuant to filed registration statements. The Notes were traded, monitored, and rated by ratings agencies in the same manner as registered securities are typically traded, monitored, and rated. Rizkalla Decl. ¶ 16.

For example, the ratings agencies for the Notes, Kroll Bond Rating Agency and Moody's Investor Service, made their credit reports on the Notes publicly available on their websites before the Notes were offered for sale to the public, which is not typically done for private transactions. *Id.* A copy of the report from Kroll Bond Rating Agency regarding the Notes is attached hereto as **Exhibit 4** (the "Kroll Report"); and

f. The filing of a registration statement prior to the sale of the Notes would have been required if Credit Suisse had not purported to offer the Notes for sale under the auspices of Rule 144A, as the initial offering of any security must be made pursuant to a filed registration statement unless an exception applies, and the offering of the Notes would not have qualified for any exception in light of the above factors. Indeed, subprime auto-loan ABS securities of the same type as the Notes are regularly offered for sale by way of registration statements filed with the SEC, rather than pursuant to an exemption from those registration requirements. Rizkalla Decl. ¶ 15.

70. Pursuant to the factors listed *supra* in paragraph 69 above, USAF 2022-1 was a public offering, subjecting Credit Suisse to potential liability under Section 12(a)(2) of the Securities Act. To the extent that Credit Suisse and Wells Fargo purported to offer, solicited the purchase of, and/or designated the sale of, the Notes as pursuant to Rule 144A, this alone does not render the offering private with respect to the Securities Act or confirm that the Offering Memorandum was not a communication, notice, circular, advertisement, or letter describing an initial public offering of securities by an issuer. Indeed, pursuant to

the language of Rule 144A itself, even technical compliance with Rule 144A does not override the public nature of the Notes' offering. Preliminary Note 1 of Rule 144A provides that it "relates solely to the application of section 5 of the [Securities] Act and not to antifraud or other provisions of the federal securities laws." Preliminary Note 3 further provides that Rule 144A "is not available with respect to any transaction or series of transactions that, although in technical compliance with this section, is part of a plan or scheme to evade the registration provisions of the Act. In such cases, registration under the Act is required." In other words, Rule 144A only controls whether a security must be offered pursuant to a filed registration statement, not whether a security is ultimately exempt from liability under Section 12(a)(2) of the Securities Act and, in any event, merely labeling an offering as being made pursuant to Rule 144A is not conclusive.

71. Though Canyon is not required to establish that Credit Suisse offered the Notes as part of a plan or scheme to evade the registration provisions of the Securities Act in order to establish that the transaction was public, the factors listed *supra* in paragraph 69 above demonstrate that the offering was public and that Credit Suisse did not provide offerees with the type of information that investors would otherwise receive as part of a registration statement. On information and belief, based on Canyon's conversations with DOWC and Westlake (discussed below), Credit Suisse and Wells Fargo invoked Rule 144A in the Offering Memorandum despite the offering being public and not otherwise subject to an exemption from the Securities Act's registration requirements, in an effort to avoid those registration requirements, which they

could not have met. In particular, Defendant and Wells Fargo would have needed to provide accurate financial statements and loan-level data for the Receivables as part of any registration statement, which Defendant and Wells Fargo either could not or would not provide because, on information and belief per Canyon's discussions with Westlake (discussed below), such information would have revealed U.S. Auto's precarious financial situation and the rampant non-funding of the Trust's VSCs, among other issues. Based on the foregoing, the effort by Credit Suisse and Wells Fargo to label this offering as "private" pursuant to Rule 144A was, on information and belief, part of a plan or scheme to evade the Securities Act's registration requirements.

**C. Defendant's Materially False Marketing and Plaintiffs' Purchase of the Subject Notes**

72. As noted above, Canyon includes the investment managers for several investment funds, including all Plaintiffs.

73. Plaintiffs' investment managers make all investment decisions on behalf of the Plaintiffs; have the authority to cause Plaintiffs to enter into securities transactions; and caused Plaintiffs to purchase the Subject Notes.

74. On June 8, 2022, Known Individual Michael (Mike) Angelides, who was then, on information and belief, a Credit Suisse employee (and is now registered with FINRA as working for Apollo Global Securities, LLC[1]) had an in-person meeting with Canyon employee Adam Rizkalla in Los Angeles,

---

[1] MICHAEL PETER ANGELIDES, BrokerCheck by FINRA, https://brokercheck.finra.org/individual/summary/6098592 (last visited Oct. 21, 2024) (listing, under "Previous Registration(s)," for "9/21/2012 – 02/14/2023," "CREDIT SUISSE SECURITIES (USA) LLC" in "Los Angeles, CA."

California, during which Mr. Angelides first informed Mr. Rizkalla of the Trust and solicited Canyon's purchase of Notes to be issued by the Trust. Rizkalla Decl. ¶ 6. That same day, Mr. Angelides sent Mr. Rizkalla the Investor Presentation, and a preliminary version of the Offering Memorandum, via email. *Id.*

75. All representations from the Offering Memorandum that are discussed or otherwise identified in this Complaint are identical in this preliminary version and in the final, June 16, 2022, version of the Offering Memorandum that is included as Exhibit 2 to this Complaint.

76. On June 9, 2022, Credit Suisse, through Known Individuals Thomas Pai, Ryan Jok, and Mike Angelides, along with U.S. Auto Sales's CEO, Colin Bachinsky, and its CFO, Christian Rudolph, held a conference call with Adam Rizkalla to solicit Canyon's purchase of Notes and discuss U.S. Auto Sales's prior performance, current business health, the nature and risk of the Trust's collateral, and the Investor Presentation in detail. Rizkalla Decl. ¶ 7. On that call, Credit Suisse and U.S. Auto made numerous representations regarding the Trust, the Notes, the Receivables, and the deal parties, and answered Mr. Rizkalla's questions regarding these matters. Credit Suisse and U.S. Auto provided a glowing assessment of U.S. Auto Sales's business—echoing similar statements in the Investor Presentation. *Id.* Neither Credit Suisse nor U.S. Auto disclosed that U.S. Auto was in financial trouble, that it had not paid amounts due on the VSCs to put them in force, or that the Receivables were subject to increased credit risk and lower collateral recoveries due to servicing misconduct or the VSCs not being in effect or being subject to cancellation. *Id.*

77. During Canyon's evaluation of a potential investment in the Notes, Mr. Rizkalla also asked for and received information about the offering from Michael (Mike) Abamonte, an employee of Wells Fargo who, on information and belief based on Canyon's interactions with Mr. Abamonte, was working in the Los Angeles area during the Relevant Period. Rizkalla Decl. ¶ 9.

78. The statements made by Defendant in the Offering Memorandum and Investor Presentation, as well as in oral communications, were of critical importance to Canyon, since they provided the most detailed information available concerning the offering of the Notes. Had the information in the Offering Memorandum, Investor Presentation, and/or other communications disclosed the declining performance of U.S. Auto or its loans, the cancellation or ineffectiveness of the VSCs, or the additional risks associated with the transaction as a result of U.S. Auto's failure to pay its obligations when due, Canyon would not have caused Plaintiffs to purchase the Subject Notes, let alone at the prices they did. Rizkalla Decl. ¶ 10.

79. Instead, as detailed below, numerous representations made in the Offering Memorandum, in the Investor Presentation, and/or in other communications between Canyon and Defendant were materially false or misleading (including statements that were misleading because Defendant omitted to state material facts necessary to make such representations not misleading).

**D. Plaintiffs' Purchase of the Subject Notes**

80. On June 16, 2022, Plaintiffs purchased the following Subject Notes from Credit Suisse, which they continue to hold as of the date of this Complaint:

| **Plaintiff** | **CUSIP, Class and Maturity** | **Original Principal Amount of Note** | **Purchase Price** |
|---|---|---|---|
| River Canyon Total Return Bond Fund | 90355FAA6: Class A, due Apr. 15, 2025 | $5,000,000 | $4,951,540.50 |
| River Canyon Total Return Bond Fund | 90355FAE8: Class E, due June 15, 2029 | $5,000,000 | $4,632,145.00 |
| Canyon NZ-DOF Investing L.P. | 90355FAE8: Class E, due June 15, 2029 | $2,551,000 | $2,363,320.38 |
| Canyon Distressed TX (A) LLC | 90355FAE8: Class E, due June 15, 2029 | $1,041,000 | $964,412.59 |
| Canyon Distressed TX (B) LLC | 90355FAE8: Class E, due June 15, 2029 | $791,000 | $732,805.34 |
| Canyon-EDOF (Master) L.P. | 90355FAE8: Class E, due June 15, 2029 | $1,020,000 | $944,957.58 |
| Canyon Distressed Opportunity Master Fund III, L.P. | 90355FAE8: Class E, due June 15, 2029 | $14,886,000 | $13,790,822.09 |
| **TOTAL** | | **$30,289,000** | **$28,380,003.48** |

## E. U.S. Auto's Financial Issues Come to Light

### 1. The Collection Account Shortfall

81. Canyon's first indication of serious issues with respect to the Trust and U.S. Auto's financial condition appeared with the extraordinary disclosure by the Trust's Servicer, USASF Servicing, of a "shortfall" in available funds with respect to the Trust.

82. Under the terms of the Trust's governing agreements, the Servicer is required to provide a monthly "Servicer's Certificate" to various Trust parties and rating agencies in the form attached to the governing agreements.

83. In the Servicer's Certificate dated April 18, 2023, attached as **Exhibit 5** hereto, USASF Servicing reported a "Shortfall in Available Funds on deposit in Collection Account" in the amount of negative $2,238,093.07 (the "Shortfall"). Ex. 4 at 1. Namely, though USASF Servicing had collected $7.8 million from borrowers during that reporting period, it had made only $5.6 million available for distribution. *Id.* at 1–2. This disclosure was highly unusual in the auto loan ABS industry, and indicated issues, not with the performance of the underlying collateral, but with the performance and operations of the Trust's Servicer. Rizkalla Decl. ¶ 13.

84. In the weeks after the Shortfall was reported, media reports revealed that U.S. Auto was in severe financial trouble. On or about April 17, 2023, U.S. Auto Sales announced a temporary closure of its dealerships, which it ultimately extended indefinitely when it was unable to reach a deal with its private-equity owner and lenders to allow the dealerships to remain open.

**2. The Indenture Trustee's Notification of a Potential Event of Default and Servicer Replacement Event**

85. Around the same time, the Indenture Trustee notified noteholders of additional indicia of serious issues with U.S. Auto through notification of a potential Event of Default and Servicer Replacement Event. Under section 5.1(c) of the Trust's Indenture (one of the governing agreements for the Trust), an "Event of Default" occurs if the Trust fails to "duly observe or perform in any

respect any of its covenants or agreements made in [the] Indenture (other than a covenant or agreement, a default in the observance or performance of which is elsewhere in this section specifically dealt with), which failure materially and adversely affects the rights of the Noteholders," provided that sufficient time passes after notice is given by the Trust or by noteholders with a sufficiently large share of the "Note Balance of Outstanding Notes."

86. Under section 3.12 of the Indenture, the Trust, through the Administrator (U.S. Auto Finance, Inc.), is required to "promptly deliver to the Indenture Trustee, the Owner Trustee and each Rating Agency written notice … of (i) an Event of Default or any event which with the giving of notice, the lapse of time or both would become an Event of Default, its status and what action the [Trust] is taking or proposes to take with respect thereto and (ii) the occurrence of a Servicer Replacement Event or any event which with the giving of notice, the lapse of time or both would become a Servicer Replacement Event."

87. On April 26, 2023, Computershare, as Indenture Trustee, sent a notice to Trust Noteholders informing them that Computershare had received "a notice from the Servicer," USASF Servicing, "pursuant to Section 3.9(b) of the Sale and Servicing Agreement dated April 20, 2023" (another of the Trust's governing agreements, hereinafter referred to as the "SSA"), and a notice from the "Administrator," U.S. Auto Finance, "pursuant to Section 3.12 of the Indenture dated April 20, 2023" (emphasis removed). April 26, 2023 Notice to Trust Certificateholders from Computershare (the "April 26 Computershare Notice," a copy of which is attached as **Exhibit 6** hereto) at 385. The April 26

Computershare Notice attached copies of these referenced notices from USASF Servicing and U.S. Auto Finance. *Id.* at 388–393.

88. The notice from USASF Servicing disclosed that it "ha[d] failed to deposit all Collections received on the Receivables into the Collection Account within two Business Days after identification as required under Section 4.2 of the [SSA], which, following the applicable grace period, would constitute a Servicer Replacement Event." April 26 Computershare Notice, Ex. A at 1.

89. Similarly, the notice from U.S. Auto Finance, "as Administrator on behalf of" the Trust, disclosed that "(i) it ha[d] failed to cause [USASF Servicing] to deposit all Collections received on the Receivables into the Collection Account before the related Payment Date as required under Section 3.2 of the Indenture, which, with the giving of notice to the Issuer and following the applicable grace period, would constitute an Event of Default, and (ii) the Servicer's failure to deposit such Collections would, following the applicable grace period, constitute a Servicer Replacement Event." April 26 Computershare Notice, Ex. B at 1.

90. The notice from U.S. Auto Finance further indicated that it "ha[d] been informed that [USASF Servicing] ha[d] engaged financial advisors to formulate a plan to cure the failure by [USASF Servicing] to deposit Collections within two Business Days of Identification." *Id.*

**3. The May 25 Computershare Notice of Servicer Succession**

91. Following the Shortfall and April 26 Computershare Notice, Canyon, through counsel, requested on or about May 19, 2023, that Computershare disclose all information in its possession related to the Shortfall.

In response, on or about May 26, 2023, counsel for Computershare directed counsel for Canyon to a new notice, dated May 25, 2023, in which Computershare gave notice to Noteholders of an "Omnibus Amendment, Assignment, Assumption & Consent Agreement, dated as of May 22, 2023 (as amended, restated, supplemented or otherwise modified through the date hereof…)," pursuant to which "and at the direction of and with the consent of the Noteholders evidencing not less than a majority of the Note Balance of the Controlling Class…, [USASF Servicing] transferred and assigned to" Westlake "and [Westlake] accepted and assumed all rights and obligations of [USASF Servicing] as 'Servicer' under the [SSA] and any other Transaction Document as of May 22, 2023." May 25, 2023 Notice of Servicer Succession from Computershare (the "May 25 Computershare Notice," a copy of which is attached as **Exhibit 7** hereto) at 396.

92. The May 25 Computershare Notice attached a copy of the Omnibus Amendment, Assignment, Assumption & Consent Agreement referenced therein (the "Omnibus Amendment"). *Id.* at 398–411. In the Omnibus Amendment, the parties acknowledged that:

> *[USASF Servicing] has partially ceased operations and will be unable to continue servicing the motor vehicle receivables and the related property soon after the Effective Date* and therefore desires to transfer, and assign to [Westlake] and [Westlake] wishes to accept and assume all rights and obligations of [USASF Servicing] as "Servicer" under the [SSA, as amended by the Omnibus Amendment], and the

> Majority Noteholders and the Majority Certificateholders have determined that the assignment, assumption, and amendments provided for herein are necessary and desirable for the preservation of [the Trust's] Collateral.

*Id.* at 400 (emphasis added).

93. The Omnibus Agreement revealed that, at the time it was signed, U.S. Auto Receivables Financing LLC, the "Seller" under the Omnibus Agreement, *id.* at 399, continued to be the majority holder of the Certificates issued by the Grantor Trust, *id.* § 12.

94. The Omnibus Agreement also noted that, via majority Noteholder consent, "the assignment and assumption of the servicing obligations hereunder shall be deemed to cure any non-compliance by the [Trust] and [USASF Servicing] referenced in those certain notices dated April 20, 2023 from each of the [Trust] and [USASF Servicing]." *Id.* § 20.

95. On June 8, 2023, counsel for Computershare spoke with counsel for Canyon and Plaintiffs. During this call, counsel for Computershare confirmed the facts underlying the above-quoted recitation from the Omnibus Agreement, and conveyed that representatives from USASF Servicing had informed Computershare that USASF Servicing was failing and needed to have servicing transferred. Declaration of Isaac M. Gradman ¶¶ 4–5, attached as **Exhibit 8** hereto.

96. During that same phone call, counsel for Computershare confirmed to counsel for Canyon and Plaintiffs that, during the discussion between USASF Servicing and Computershare regarding the need to transfer servicing, USASF

Servicing informed Computershare that USASF Servicing's financial troubles had existed well before the Shortfall, and that USASF Servicing was in sufficiently poor financial health prior to the Shortfall that it could not make payroll. *Id.* ¶ 6.

**4. Westlake and DOWC Confirm U.S. Auto's Long-Running Nonpayment of VSCs in Communications with Canyon and in DOWC's Lawsuit Against U.S. Auto**

97. As detailed further below, statements made by Westlake and DOWC regarding U.S. Auto's non-payments, and the resulting failure to put VSCs into force, establish that several of the material statements made by Credit Suisse in the Offering Memorandum, Investor Presentation, or otherwise to Plaintiffs, were false at the time those statements were made.

98. In June 2023, Mr. Rizkalla from Canyon had conversations with a vice president of Westlake, Todd Laruffa, who informed Mr. Rizkalla that, upon taking over servicing for the Trust, Westlake had immediately been able to identify that U.S. Auto had not been funding the VSCs since well before the Trust closed, which Canyon understood to mean a period longer than three months. Rizkalla Decl. ¶ 23.

99. During this same call, Westlake stated that it believed that U.S. Auto was funding VSC rebates and funding the performance of the VSCs by DOWC with collections from the auto loans themselves. Rizkalla Decl. ¶ 26. This was highly unusual and improper in the auto-loan industry. *Id.*

100. On or about July 5 and July 11, 2023, Mr. Rizkalla from Canyon had conversations with the CEO, CFO, and Senior Counsel from DOWC, whose

affiliated entities contracted with U.S. Auto Sales to administer the VSCs, which role included making warranty repair payments under the VSCs. Rizkalla Decl. ¶ 28.

101. During these calls, DOWC confirmed to Canyon that U.S. Auto Sales had become delinquent on the payment to DOWC of the premiums associated with the VSCs starting no later than September 2021, approximately nine months before the Trust closed and the Notes were marketed and sold. DOWC further confirmed that this underpayment only increased over time. *Id.* ¶ 29.

102. DOWC also informed Canyon that by the time the Notes were offered for sale, DOWC had stopped paying any rebates on VSCs, in light of U.S. Auto's failure to fund VSCs. *Id.* ¶ 34.

103. DOWC also informed Canyon that despite U.S. Auto Sales failing to fund borrowers' extended warranty VSCs, the auto loans created and sold by U.S. Auto Sales to the Trust expressly itemized the amount borrowers paid to purchase those extended warranty VSCs. *Id.* ¶ 30.

104. Based on the foregoing, U.S. Auto Sales appears to have been charging borrowers itemized amounts for services that were not actually financed by U.S. Auto Sales, in violation of the Truth in Lending Act, *e.g.*, 12 C.F.R. § 1026.18(c)(iii), and other applicable federal and state lending laws. *See also infra* ¶¶ 135–37. On information and belief, these violations rendered the underlying auto loans, and not just the VSCs, defective and subject to claims and defenses to repayment from borrowers.

105. DOWC further confirmed to Canyon that while U.S. Auto Sales had stopped making payments to DOWC on the VSCs prior to the date the Trust closed, DOWC had continued administering certain of the VSCs based on promises from U.S. Auto Sales to make "catch-up" payments. Rizkalla Decl. ¶ 31. All of these issues placed the performance of the VSCs, the underlying auto loans, and the entire Trust at risk.

106. DOWC further confirmed to Canyon that U.S. Auto Sales had resumed making some partial payments on the VSCs after the Trust closed, but that the amount it owed DOWC was never fully paid. *Id.* ¶ 32. DOWC also informed Canyon that it believed U.S. Auto Sales had been making these partial or "catch-up" payments to DOWC on the VSCs by taking funds either from funds U.S. Auto received in connection with the securitization of the Receivables or from borrower payments on the Receivables. *Id.* ¶ 33. This information indicated that U.S. Auto was operating a form of pyramid or "Ponzi" scheme in which it was only able to pay its prior obligations by creating new obligations or misappropriating funds from same.

107. This type of scheme reveals that another representation in the Offering Memorandum was false, specifically that that "the sponsor has never taken any action out of the ordinary to prevent" a prior U.S. Auto-sponsored securitization from defaulting or experiencing an early amortization triggering event. Offering Memorandum at 45. The Trust was the sixth such securitization by U.S. Auto, *id.*, and the third in a three-year period, *see* Investor Presentation at 10. On information and belief (formed from DOWC's statements in the call with Canyon and in DOWC's court filings), VSCs were included in prior trusts'

collateral as well, and (1) failing to pay DOWC at the outset to place those VSCs "in force," (2) entering into delayed or installment payment plans with DOWC, and (3) funding those delayed or installment payment plans by creating new receivables or by using funds belonging to other receivables; were not "ordinary" actions consistent with industry customs and practices. Instead, U.S. Auto's failure to pay DOWC for VSCs, when due, and its subsequent efforts to cover up that failure, both of which had, on information and belief (based on the same call with DOWC and DOWC's court filings), occurred prior to the issuance of the Offering Memorandum, represented potential defaults or early amortization triggering events for U.S. Auto's prior securitizations and/or "action[s] out of the ordinary to prevent such an occurrence," constituting violations of this representation. *See* Offering Memorandum at 45; Rizkalla Decl. ¶ 35.

108. None of the statements made by either U.S. Auto Defendant, in the Offering Memorandum, Investor Presentation, or in any other communications, revealed or even suggested that U.S. Auto was operating this sort of Ponzi scheme or that there was a risk that Trust cash flows could be impacted or diverted as a result of U.S. Auto's prior failure to make payments to DOWC with respect to certain VSCs.

109. At the time of its July 2023 calls with Canyon, DOWC represented that U.S. Auto owed DOWC approximately $18 million on the VSCs. Rizkalla Decl. ¶ 34. DOWC also confirmed that it had, at some point, stopped honoring borrowers' VSCs in light of the lack of payment from U.S. Auto Sales. *Id.*

110. Later that month, on July 24, 2023, DOWC filed suit against U.S. Auto Sales, U.S. Auto Finance, Inc., and other parties in the United States

District Court for the District of New Jersey for breach of contract and other causes related to the failure to pay amounts owed on the VSCs. Verified Complaint and Jury Demand, *DOWC Provider Servs., LLC v. U.S. Auto Sales, Inc.*, No. 2:23-cv-03947 (D.N.J. July 24, 2023) (ECF No. 1) (the "*DOWC* Complaint"), *superseded by* First Amended Complaint & Jury Demand, *DOWC Provider Servs., LLC v. U.S. Auto Sales, Inc.*, No. 2:23-cv-03947 (D.N.J. Sept. 7, 2023) (ECF No. 10) (the "*DOWC* Amended Complaint").[2] Copies of the *DOWC* Complaint and the *DOWC* Amended Complaint are attached hereto as **Exhibits 9** and **10**, respectively.

111. The factual allegations in the *DOWC* Complaint (and those in the substantively-identical *DOWC* Amended Complaint) are subject to Federal Rule of Civil Procedure 11's requirement that they "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Accordingly, the allegations in the *DOWC* Complaint are sufficiently reliable to support those allegations in this Amended Complaint that are made on information and belief based, at least in part, on these allegations in the *DOWC* Complaint.

112. Confirming and expanding on the disclosures made to Mr. Rizkalla in his conversations with DOWC, DOWC alleged in the *DOWC* Complaint, which was verified by DOWC's Chief Executive Officer, Ex. 9 at ECF PageID 32, that "[b]eginning in or around September 2021, [U.S. Auto Sales and U.S.

---

[2] The *DOWC* Complaint and *DOWC* Amended Complaint have identical allegations, except that affiliates of Milestone Partners, LP were added as defendants in the *DOWC* Amended Complaint. *See DOWC* Amended Complaint ¶ 14.

Auto Finance] short paid the monthly invoices for DOWC Products sold, consumer claims and refunds, and other fees," *DOWC* Complaint ¶ 52. In other words, U.S. Auto had not been properly funding VSCs for approximately nine months before the Trust closed.

113. DOWC alleges that, based on this failure to pay its monthly invoices, U.S. Auto Sales was aware that it had collected funds for the sale of DOWC warranties but was not paying DOWC for those products. *Id.* ¶ 54. DOWC further alleges that, under its agreements with U.S. Auto, and per the plain terms of the consumer contracts for the DOWC warranties, the warranties were not "in effect" for the consumers until U.S. Auto Sales paid DOWC. *Id.* ¶ 55. Thus, at the time the Subject Notes were sold by Credit Suisse to Canyon, U.S. Auto Sales had not placed into effect numerous of its VSCs, including, on information and belief (based on the same allegations in the *DOWC* Complaint), VSCs sold to and securitized in the Trust, as set forth in further detail below.

114. DOWC alleges that, at some point after U.S. Auto Sales had started short funding invoices for the VSCs in September 2021, it, U.S. Auto Sales, and U.S. Auto Finance entered into an arrangement under which DOWC would receive a fixed weekly payment to satisfy consumer claims and pay for fees and reserves "associated with the administration of the claims," and then, "if a positive balance existed at the end of each month," "the funds would be used to put *a portion of the consumer contracts sold that month* in force." *Id.* ¶ 56 (emphasis added).

115. DOWC alleges that this arrangement continued through the fourth quarter of 2021, at which point DOWC informed U.S. Auto Sales that the

balance must be brought current. *Id.* ¶ 62. In response, DOWC alleges it was advised by U.S. Auto Sales that the balance would be brought current once U.S. Auto Sales completed the securitization of some of its auto loans into ABS. *Id.* ¶ 63.

116. U.S. Auto "represented to DOWC" that this ABS securitization would close in "the Spring of 2022," *id.* ¶ 74, but "the balance due continued to grow until the Summer of 2022 when [U.S. Auto Sales] made a larger than normal monthly payment," *id.* ¶ 76. Even then, U.S. Auto Sales "had a significant balance due." *Id.* ¶ 77. DOWC alleges that U.S. Auto Sales was aware at this time, even after making this larger than normal monthly payment, that it had not paid DOWC for the VSCs U.S. Auto Sales had sold over the past year, and thus these VSCs were not "in force." *See id.* ¶ 79. On information and belief, this would have included all or nearly all of the VSCs in the Trust, as, according to the Offering Memorandum, the weighted average seasoning of the loans securitized in the Trust (*i.e.* the amount of time since those loans were made), as of April 30, 2022, was four months. Offering Memorandum at 56. DOWC alleges that U.S. Auto Sales never fully paid its debts to DOWC, and by the time DOWC filed suit, U.S. Auto Sales allegedly caused $17,891,519.00 in damages to DOWC. *DOWC* Complaint ¶ 111.

117. Based on the timing of securitization described in the *DOWC* Complaint, Plaintiffs are informed and believe that the Trust is the ABS securitization referred to in the *DOWC* Complaint, as the Trust is, on information and belief, the only U.S. Auto securitization to have closed in mid-2022, and the last securitization completed by U.S. Auto before its collapse.

118. The disclosures in the *DOWC* Complaint thus reveal that U.S. Auto was relying on the sale to the Trust of new auto loans and VSCs to fund the administration of those VSCs and VSCs it had previously sold, despite having already received payment from consumers for all such VSCs. They also reveal that most, if not all, of the VSCs U.S. Auto Sales sold and securitized in the Trust were not actually in force at the time the Notes were offered, as most of these VSCs were not in effect even *after* the Trust securitization closed and U.S. Auto Sales made a large catch-up payment to DOWC.

119. Further, as noted above, the facts recited in the *DOWC* Complaint reveal that the Offering Memorandum's representation that "the sponsor has never taken any action out of the ordinary to prevent" a prior U.S. Auto-sponsored securitization from defaulting or experiencing an early amortization triggering event, Offering Memorandum at 45, were untrue at the time that representation was made. U.S. Auto had sponsored at least three securitizations of auto loans within the prior four years prior to the offering of the Notes, and the weighted average term on the loans included in those three securitizations was at least five years. Investor Presentation at 10. U.S. Auto Sales was responsible, not just for funding VSCs at origination, but also for paying monthly invoices on consumer claims related to those VSCs, which DOWC billed to U.S. Auto Sales monthly. *DOWC* Complaint ¶ 51. Yet U.S. Auto Sales failed to fully pay those monthly invoices to DOWC starting in or around September 2021. *Id.* ¶ 52. Accordingly, on information and belief (based on the Investor Presentation at 10 and the *DOWC* Complaint ¶¶ 51-52), U.S. Auto Sales's failure to pay DOWC for VSCs would have impacted loans in each of U.S. Auto's three prior

securitizations, whose loans remained active as of the offering of the Notes, and whose monthly invoices for consumer claims were not being timely or fully paid by U.S. Auto Sales starting in September 2021. This failure would have jeopardized the effectiveness of those VSCs, leading to a potential default or amortization trigger event in those prior securitizations, as U.S. Auto being unable to meet its obligations for those securitizations as they came due would mean U.S. Auto was arguably insolvent. *See also infra* ¶ 141 (discussion of actions "out of the ordinary to prevent" a default or amortization event). Further, the actions taken by U.S. Auto to pay DOWC over time and/or to pay DOWC by redirecting funds otherwise owed to these other ABS trusts or creditors, like the actions U.S. Auto took with respect to the Trust and its Receivables, constituted extraordinary actions to prevent the occurrence of potential defaults or amortization trigger events, in violation of this representation. *See id.*

120. Had Canyon been informed that U.S. Auto was operating this sort of pyramid scheme, it never would have had its managed funds invest in the Trust.

### F. The CFPB Suit Against USASF Servicing and the Bankruptcy of U.S. Auto

121. In the months following the servicing transition to Westlake, the full extent of U.S. Auto's legal and financial troubles became more apparent.

122. *First*, on August 2, 2023, the CFPB filed suit against USASF Servicing in the United States District Court for the Northern District of Georgia. Complaint, *Consumer Fin. Prot. Bureau v. USASF Servicing, LLC*, No. 1:23-cv-03433-VMC (N.D. Ga. Aug. 2, 2023) (the "*CFPB* Complaint," a copy of which is attached as **Exhibit 11** hereto).

123. The factual allegations in the *CFPB* Complaint are subject to Federal Rule of Civil Procedure 11's requirement that they "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Accordingly, the allegations in the *CFPB* Complaint are sufficiently reliable to support those allegations in this Amended Complaint that are made on information and belief based, at least in part, on these allegations in the *CFPB* Complaint.

124. The *CFPB* Complaint alleges that "[s]ince 2016, USASF [Servicing] acted unfairly by: wrongfully activating starter-interruption devices to disable consumers' vehicles and activate warning alerts; failing to provide millions of dollars in refunds of add-on premiums that consumers were entitled to; charging consumers twice for collateral-protection insurance each billing cycle, sometimes for over a year; misapplying consumer payments such that consumers accrued over $1,000,000 in additional interest and fees; and wrongfully repossessing dozens of consumers' vehicles." *CFPB* Complaint ¶ 3. Information regarding this misconduct would have been material to any reasonable investor in auto loan ABS that were being serviced by USASF Servicing, as the misconduct would materially adversely impact borrowers' ability and willingness to make payments on their auto loans, as well as give rise to claims and/or defenses against the enforcement of those same loans.

125. *Second,* on August 25, 2023, less than a month after the CFPB filed its suit, numerous U.S. Auto entities filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Delaware. Trust parties now subject to bankruptcy proceedings include:

a. U.S. Auto Sales, the Trust's Originator: *In re U.S. Auto Sales, Inc.*, No. 23-bk-11251 (Bankr. D. Del., filed Aug. 25, 2023);

b. U.S. Auto Finance, the Trust's Administrator/Sponsor/Seller: *In re U.S. Auto Finance, Inc.*, No. 23-bk-11252 (Bankr. D. Del., filed Aug. 25, 2023);

c. U.S. Auto Receivables, the Trust's Depositor: *In re U.S. Auto Receivables Financing, LLC*, No. 23-bk-11253 (Bankr. D. Del., filed Aug. 25, 2023); and

d. USASF Servicing, the Trust's original Servicer: *In re USASF Servicing, LLC*, No. 23-bk-11256 (Bankr. D. Del., filed Aug. 25, 2023).

126. In the schedules filed with the U.S. Auto entities' bankruptcy petitions, U.S. Auto Sales disclosed an unsecured claim of $10,247,835.54 owed to "Dealer Owned Warranty Company." Chapter 7 Cases Schedules and [Statements of Financial Affairs] Global Notes at ECF Page 27, *In re U.S. Auto Sales, Inc.*, No. 23-bk-11251 (Bankr. D. Del. Aug. 25, 2023) (ECF No. 3).

127. According to these schedules, DOWC was by far the largest unsecured creditor of U.S. Auto Sales.

## G. Defendant's Misrepresentations and Omissions

128. In summary, based on the foregoing allegations, at the time Credit Suisse sold the Subject Notes to Plaintiffs, the Offering Memorandum and Investor Presentation contained at least the below-detailed misrepresentations of material facts and/or omissions of material facts necessary to make such statements, in light of the circumstances in which they were made, not misleading.

129. Canyon expressly reserves the right to allege further misrepresentations and/or omissions if others are identified in the course of investigation and/or discovery, and Canyon expressly disclaims that the below-identified statements are an exhaustive list of all actionable misrepresentations or omissions giving rise to claims against Credit Suisse.

**1. Statements Related to the Status of the VSCs**

130. **Statement No. 1.** Regarding the statement that "U.S. Auto Sales retains sole responsibility for performing warranty and service obligations in respect to the related financed vehicle," Offering Memorandum at 51:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement was misleading when made because it is a half-truth that suggests that U.S. Auto had actually satisfied its responsibility for performing warranty and service obligations for the VSCs, and that those VSCs would actually be performed, while failing to disclose information to the contrary, as follows. On information and belief based on (1) the conversations between Canyon and DOWC, between Canyon and Westlake, and between Canyon and Computershare; and (2) DOWC's court filings, discussed *supra* at paragraphs 95–119:

i. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had failed to make the payments it owed to DOWC that were necessary to either make the VSCs for the Receivables enforceable or prevent their cancellation;

ii. Credit Suisse did not disclose that U.S. Auto had not been satisfying its responsibility of funding VSCs in full since at least September 2021, approximately nine months before the statement was made;

iii. Credit Suisse did not disclose that, at the time the statement was made, certain of the VSCs were not effective or "in force," and/or were voidable or unenforceable, due to U.S. Auto's failure to fund the administration or performance of the VSCs;

iv. Credit Suisse did not disclose that, in fact, the VSCs' administrator had stopped honoring certain borrowers' VSCs or paying rebates to U.S. Auto by the time this statement was made, in light of the lack of payment from U.S. Auto;

v. Credit Suisse did not disclose that numerous U.S. Auto entities were insolvent or on the verge of insolvency at the time the statement was made, and in fact had not been able to meet their financial obligations as they came due since at least September 2021, jeopardizing U.S. Auto's ability to continue to fund the performance of the VSCs and the payment to the Trust of rebates on those VSCs;

vi. Credit Suisse did not disclose that U.S. Auto was, at the time the statement was made, planning to, and/or promising DOWC, that it would fund the administration of certain VSCs for which U.S. Auto had already collected payment through the proceeds from its

sale to the Trust of new or more recent auto loans and VSCs, as part of an unlawful pyramid or Ponzi scheme; and

vii. Further, based on the conversations between Canyon and Westlake, discussed *supra* ¶¶ 97–99, Canyon is informed and believes that U.S. Auto's servicing records indicated that U.S. Auto was not funding the VSCs at the time the statement was made.

c. Thus, Defendant's statement that "U.S. Auto Sales retains sole responsibility for performing warranty and service obligations in respect to the related financed vehicle" was materially misleading when made because it suggested that warranty and service obligations would actually be performed on the VSCs. Due to the failure of Credit Suisse to disclose U.S. Auto's delegation of its VSC performance and service obligations to DOWC, and U.S. Auto's failure to pay DOWC to perform such services, the full truth was that the VSCs were not actually in force and there was a material risk that warranty and service obligations would not be performed at all.

131. **Statement No. 2**. Regarding the statement that the terms of each Receivable contained a VSC that provided at least a "30 day/1,000 mile limited warranty," Offering Memorandum at 51:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement was misleading when made because it suggests that the VSCs contained in each of the Receivables were

enforceable—that not only did the written terms of each Receivable include the VSC, but that such terms were enforceable and the VSC actually provided the limited warranty it purported to provide—while failing to disclose information to the contrary, as follows. On information and belief based on (1) the conversations between Canyon and DOWC, between Canyon and Westlake, and between Canyon and Computershare; and on (2) DOWC's court filings, discussed *supra* at paragraphs 95–119:

i. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had failed to make the payments it owed to DOWC that were necessary to either make the VSCs for the Receivables enforceable or prevent their cancellation;

ii. Credit Suisse did not disclose that U.S. Auto had not been satisfying its responsibility of funding VSCs in full since at least September 2021, approximately nine months before the statement was made;

iii. Credit Suisse did not disclose that, at the time the statement was made, certain of the VSCs, were not effective or "in force," and/or were voidable or unenforceable, due to U.S. Auto's failure to fund the administration or performance of the VSCs;

iv. Credit Suisse did not disclose that, in fact, the VSCs' administrator had stopped honoring certain borrowers' VSCs or paying rebates to U.S. Auto by the time this statement was made, in light of the lack of payment from U.S. Auto;

v. Credit Suisse did not disclose that numerous U.S. Auto entities were insolvent or on the verge of insolvency at the time the statement was made, and in fact had not been able to meet their financial obligations as they came due since at least September 2021, jeopardizing U.S. Auto's ability to continue to fund the performance of the VSCs and the payment to the Trust of rebates on those VSCs;

vi. Credit Suisse did not disclose that U.S. Auto was, at the time the statement was made, planning to, and/or promising DOWC, that it would fund the administration of VSCs for which U.S. Auto had already collected payment through the proceeds from its sale to the Trust of new or more recent auto loans and VSCs, as part of an unlawful pyramid or Ponzi scheme; and

vii. Further, based on the conversations between Canyon and Westlake, discussed *supra* ¶¶ 97–99,Canyon is informed and believes that U.S. Auto's servicing records indicated that U.S. Auto was not funding the VSCs at the time the statement was made.

c. Thus, Defendant's statement that that the terms of each Receivable contained a VSC with that provided at least a "30 day/1,000 mile limited warranty," Offering Memorandum at 51, was materially misleading when made because it suggested that warranty and service obligations would actually be provided and performed with respect to the VSCs. Due to the failure of Credit Suisse to disclose U.S. Auto's failure to pay DOWC to perform warranty and service obligations, the full truth was

that the VSCs were not in force and could not be used by borrowers as their terms provided.

132. **Statement No. 3**. Regarding the statement that "U.S. Auto Sales uses a third-party to manage all warranty obligations," Offering Memorandum at 51:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement was misleading when made because it is, at best, a half-truth that suggests that that U.S. Auto Sales actually used (i.e., paid) a third party to manage all warranty obligations and that VSC warranty obligations were actually being managed and performed by a third party, while failing to disclose information to the contrary, as follows. On information and belief based on (1) the conversations between Canyon and DOWC, between Canyon and Westlake, and between Canyon and Computershare; and on (2) DOWC's court filings, discussed *supra* at paragraphs 95–119:

i. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had failed to make the payments it owed to DOWC, the third-party administrator that Credit Suisse was representing U.S. Auto used to manage all warranty obligations;

ii. Credit Suisse did not disclose that U.S. Auto had not been satisfying its responsibility to DOWC of funding VSCs in full

since at least September 2021, approximately nine months before the statement was made;

iii. Credit Suisse did not disclose that, at the time the statement was made, the VSCs were not effective or "in force," and/or were voidable or unenforceable, due to U.S. Auto's failure to pay DOWC to fund the administration or performance of the VSCs;

iv. Credit Suisse did not disclose that, in fact, at the time the statement was made, the VSCs' third-party administrator had stopped honoring certain of the Trust's VSCs or paying any rebates to U.S. Auto in light of the lack of payment from U.S. Auto;

v. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had agreed to make "catch-up" payments to the VSCs' administrator based on its underfunding of the VSCs, that U.S. Auto was not immediately able to make good on these "catch-up" payments owed to the VSCs' administrator despite having already received payments from borrowers for such VSCs, and that U.S. Auto planned to use proceeds from the securitization of the Receivables in the Trust to make further "catch-up" payments on the Trust VSCs and other VSCs, indicating that U.S. Auto was not sufficiently capitalized to meet its obligations to the third party tasked with managing the VSCs;

vi. Credit Suisse did not disclose that numerous U.S. Auto entities were insolvent or on the verge of insolvency at the time the statement was made, and in fact had not been able to meet their

financial obligations as they came due since at least September 2021, jeopardizing U.S. Auto's ability to continue to fund the performance of the VSCs and the payment to the Trust of rebates on those VSCs; and

vii. Further, based on the conversations between Canyon and Westlake, discussed *supra* ¶¶ 97–99, Canyon is informed and believes that U.S. Auto's servicing records indicated that U.S. Auto was not funding the VSCs at the time the statement was made.

viii. Thus, Defendant's statement that "U.S. Auto Sales uses a third-party to manage all warranty obligations," was materially misleading when made because it suggested that a third party would actually manage and perform warranty obligations, when the full truth was that the third party U.S. Auto used to manage warranty obligations was not actually honoring the VSCs or performing its warranty obligations due to U.S. Auto's failure to pay for those services, that U.S. Auto was not able to meet its obligations to this third party as they came due and that, as a result, there was a material risk that warranty obligations would not be performed at all.

133. **Statement No. 4.** Regarding the statement that "[u]nless required by law to be remitted to the obligor," USASF Servicing would "deposit into the collection account any amounts received as a rebate due to cancellation of an extended service contract that was financed by a receivable," Offering Memorandum at 51:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement was misleading when made because it was a half-truth that indicated that U.S. Auto was still receiving rebates due to cancellation of extended service contracts financed by Receivables, without disclosing information to the contrary, as follows. On information and belief, based on (1) the conversations between Canyon and DOWC, between Canyon and Westlake, and between Canyon and Computershare; and (2) DOWC's court filings, discussed *supra* at paragraphs 95–119:

i. Credit Suisse did not disclose that U.S. Auto had failed to make the payments it owed to DOWC since at least September 2021, approximately nine months before the statement was made;

ii. Credit Suisse did not disclose that, at the time the statement was made, the VSCs were therefore not effective or "in force," and/or were voidable or unenforceable, due to U.S. Auto's failure to fund the administration or performance of the VSCs, and thus the cancellation of an extended service contract due to a borrower default would not result in the payment of a rebate to U.S. Auto or to the Trust;

iii. Credit Suisse did not disclose that, in fact, at the time the statement was made, the VSCs' third-party administrator had stopped paying any rebates to U.S. Auto in light of the lack of payment from U.S. Auto;

iv. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had agreed to make "catch-up" payments to the VSCs' administrator based on its underfunding of the VSCs, that U.S. Auto was not immediately able to make good on these "catch-up" payments owed to the VSCs' administrator despite having already received payments from borrowers for such VSCs, and that U.S. Auto planned to use proceeds from the securitization of the Receivables in the Trust to make further "catch-up" payments on the Trust VSCs and other VSCs, indicating that U.S. Auto was not sufficiently capitalized to meet its obligations to DOWC and induce DOWC to begin paying any rebates to U.S. Auto or meet its obligations to the Trust to deposit rebates;

v. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto was funding VSC rebates and funding the performance of VSCs by the VSC administrator with collections from the auto loans themselves; and

vi. Credit Suisse did not disclose that numerous U.S. Auto entities were insolvent or on the verge of insolvency at the time the statement was made, and in fact had not been able to meet their financial obligations as they came due since at least September 2021, jeopardizing U.S. Auto's ability to continue to fund the performance of the VSCs and the payment to the Trust of rebates on those VSCs, as well as jeopardizing U.S. Auto's ability to

pay any rebates that it did receive to the Trust, due to potential bankruptcy restrictions.

c. Thus, Defendant's statement that "[u]nless required by law to be remitted to the obligor," USASF Servicing would "deposit into the collection account any amounts received as a rebate due to cancellation of an extended service contract that was financed by a receivable," was materially misleading when made because it was a half-truth and failed to disclose that most, if not all, of the VSCs were not in force or had already been cancelled, that U.S. Auto would not be entitled to a rebate on these VSCs if a borrower defaulted, that U.S. Auto was no longer receiving any rebates on the VSCs from DOWC due to U.S. Auto's failure to pay for those third-party services, that U.S. Auto was not able to meet its obligations to this third party as they came due or that, as a result, there was a material risk that the Trust would receive no rebates at all.

134. **Statement No. 5.** Regarding the statement that "[i]f any payments on the receivables are paid to a segregated account of the servicer, the servicer will deposit (or cause to be deposited) an amount equal to all Collections … within two Business Days after identification," *id*. at 87, where "Collections" are defined to include "(i) any monthly payment by or on behalf of the obligors thereunder or any other amounts which, in accordance with the customary servicing practices, would customarily be applied to the payment of accrued interest or to reduce the principal balance of a receivable, [and] (ii) rebates of premiums with respect to the cancelation or termination of any insurance policy,

extended warranty or service contract that was financed by such Receivable," Offering Memorandum at 135:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement was misleading when made because it was a half-truth that indicated that U.S. Auto was expected to receive rebates of premiums when extended warranty or service contracts were canceled or terminated, without disclosing information to the contrary, as follows. Based on (1) the conversations between Canyon and DOWC, between Canyon and Westlake, and between Canyon and Computershare; and (2) DOWC's court filings, discussed *supra* at paragraphs 85–119:

i. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had failed to make the payments it owed to DOWC since at least September 2021, approximately nine months before the statement was made;

ii. Credit Suisse did not disclose that the VSCs were therefore not effective or "in force," and/or had been canceled or were unenforceable, at the time the statement was made, and thus the cancellation of an extended service contract due to a borrower default would not result in the payment of a rebate to U.S. Auto or to the Trust;

iii. Credit Suisse did not disclose that, in fact, at the time the statement was made, the VSCs' third-party administrator had

stopped paying any rebates to U.S. Auto in light of the lack of payment from U.S. Auto;

iv. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto had agreed to make "catch-up" payments to the VSCs' administrator based on its underfunding of the VSCs, that U.S. Auto was not immediately able to make good on these "catch-up" payments owed to the VSCs' administrator despite having already received payments from borrowers for such VSCs, and that U.S. Auto planned to use proceeds from the securitization of the Receivables in the Trust to make further "catch-up" payments on the Trust VSCs and other VSCs, indicating that U.S. Auto was not sufficiently capitalized to meet its obligations to DOWC and induce DOWC to begin paying any rebates to U.S. Auto or meet its obligations to the Trust to deposit Collections, including rebates;

v. Credit Suisse did not disclose that, at the time the statement was made, U.S. Auto was funding VSC rebates and funding the performance of VSCs by the VSC administrator with collections from the auto loans themselves;

vi. Credit Suisse did not disclose that numerous U.S. Auto entities were insolvent or on the verge of insolvency at the time the statement was made, and in fact had not been able to meet their financial obligations as they came due since at least September 2021, jeopardizing U.S. Auto's ability to continue to fund the performance of the VSCs and the payment to the Trust of

rebates on those VSCs, as well as jeopardizing U.S. Auto's ability to pay any rebates that it did receive to the Trust, due to potential bankruptcy restrictions; and

vii. Credit Suisse did not disclose that at the time of the statement, U.S. Auto had been misapplying consumer payments, which would have ordinarily reduced borrowers' principal and interest balances, contrary to this statement's representation about "customary servicing practices" and the customary application of these payments.

c. Thus, Defendant's statement that "[i]f any payments on the receivables are paid to a segregated account of the servicer, the servicer will deposit (or cause to be deposited) an amount equal to all Collections … within two Business Days after identification," was materially misleading when made because it failed to disclose that most, if not all, of the VSCs were not in force or had already been cancelled, that U.S. Auto would not be entitled to a rebate on these VSCs if a borrower defaulted, that U.S. Auto was no longer receiving any rebates on the VSCs from DOWC, which made up a material portion of the Trust's expected collections, that U.S. Auto was misapplying other collections, contrary to this representation regarding customary servicing practices, that U.S. Auto was not able to meet its obligations to this third party as they came due or that, as a result, there was a material risk that collections would be deposited as indicated and that the Trust would receive no rebates at all.

**2. Statements Related to Statutory Compliance and Enforceability of Receivables' Terms**

135. **Statement No. 6.** Regarding the statement that each Receivable "complied at the time it was originated or made in all material respects with all requirements of applicable federal, state and local laws, and regulations thereunder," Offering Memorandum at 83:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement was false and misleading when made because numerous Receivables were originated in violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, also discussed *supra* at paragraph 104, as follows.

i. TILA, which is applicable to the Receivables, requires that creditors make certain disclosures to borrowers at or before the time of origination, *e.g.*, 15 U.S.C. § 1638(b)(1), and empowers the Consumer Financial Protection Bureau to issue implementing regulations for the Act, 15 U.S.C. § 1604. Regulation Z under TILA, 12 C.F.R. part 1026, contains detailed disclosure requirements. Failure to comply with the disclosure requirements subjects the creditor to civil liabilities, including, among other things, actual or statutory damages for each violation. 15 U.S.C. § 1640(a)(1)–(2).

ii. U.S. Auto is a "creditor" under TILA, 15 U.S.C. § 1602(g), and the loans it makes and securitizes as Receivables are

therefore subject to TILA disclosure requirements for "consumer credit transaction[s]," 15 U.S.C. § 1631 (disclosure requirements generally), including amounts paid by U.S. Auto to the VSCs' administrator on behalf of the Receivables' borrowers, 12 C.F.R. § 1026.18(c)(iii) (specific requiring disclosure of "[a]ny amounts paid to other persons by the creditor on the consumer's behalf" and the recipient of such payments).

iii. On information and belief based on (1) the conversations between Canyon and DOWC and (2) DOWC's court filings, discussed *supra* at paragraphs 100–119, Defendant's statement regarding compliance with applicable law was false and misleading when made because, while the Receivables' TILA disclosures specified that the borrower had purchased a VSC and that U.S. Auto would be paying amounts to DOWC on the borrower's behalf, this disclosure was false because U.S. Auto had not been making those payments to DOWC and certain of the VSCs were therefore not enforceable or being performed by DOWC when those Truth in Lending Act disclosures were made at or before the time of origination, violating 12 C.F.R. § 1026.18(c)(iii) (if not other applicable federal and state lending laws).

iv. These violations rendered the underlying auto loans, and the VSCs, defective and subject to claims and/or defenses to repayment of the loan and/or defenses against repossession of the underlying collateral—including, potentially, unfair or deceptive

trade practices claims under the laws of the states in which the loans were originated, some of which entitle the borrower to nullify, rescind or cancel the outstanding loan. *E.g.*, *North Carolina ex rel. Easley v. Rich Food Servs., Inc.*, 139 N.C. App. 691, 699 (2000) ("If plaintiff is successful in the litigation, [North Carolina's Unfair and Deceptive Trade Practices Act] provides that the trial court may 'upon a final determination of the cause, order the restoration of any moneys or property and the cancellation of any contract obtained by any defendant as a result of such violation.'"). Defendant's statement suggested that claims like these would not impact the Receivables because they were purportedly originated in compliance with all applicable laws, which statement was false and misleading at the time it was made.

136. **Statement No. 7.** Regarding the statement that as of the Cut-off Date, each Receivable "contained customary and enforceable provisions (except as such enforceability may be limited by debtor relief laws and general principles of equity whether considered in a suit at law or in equity) such that the rights and remedies of the holder thereof are adequate for realization against the collateral of the benefits of the security," Offering Memorandum at 83:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. On information and belief, based on (1) the conversations between Canyon and DOWC and (2) DOWC's court filings, discussed

*supra* at paragraphs 100–119, this statement was false and misleading, as follows:

i. As set forth *supra* in the prior paragraph, the Receivables' TILA disclosures itemized each Receivable's VSC. But at the time the statement was made, DOWC, which had been contracted to administer and perform the VSCs, was refusing to honor certain VSCs and/or place those VSCs "in force" at the time of the Trust's closing due to U.S. Auto's failure to fund those VSCs. Thus, the VSCs were not enforceable or being performed at the time that this statement was made.

ii. In addition, as set forth *supra* in the prior paragraph, because the Truth in Lending Act disclosures were false (because U.S. Auto had charged borrowers itemized amounts for services that were not financed by U.S. Auto, despite representations that U.S. Auto was paying DOWC to fund those VSCs, in violation of 12 C.F.R. § 1026.18(c)(iii), if not other applicable federal and state lending laws)), these violations rendered the underlying auto loans, and the VSCs, defective and subject to claims and/or defenses to repayment of the loan and/or defenses against repossession of the underlying collateral at the time the statement was made—including, potentially, unfair or deceptive trade practices claims under the laws of the states in which the loans were originated, some of which entitle the borrower to nullify, rescind or cancel the outstanding loan. *E.g.*, *North Carolina ex rel. Easley v. Rich Food*

*Servs., Inc.*, 139 N.C. App. 691, 699 (2000) ("If plaintiff is successful in the litigation, [North Carolina's Unfair and Deceptive Trade Practices Act] provides that the trial court may 'upon a final determination of the cause, order the restoration of any moneys or property and the cancellation of any contract obtained by any defendant as a result of such violation.'"). Defendant's statement was thus false because the aforementioned TILA violations created defenses to enforcement of the Receivables, such that the rights and remedies of the holder thereof were inadequate for realization against the collateral of the benefits of the security.

iii. Defendant's statement was also misleading when made because it suggested that claims and/or defenses to repayment of the loan or repossession of the underlying collateral would not impact the Receivables because they "contained customary and enforceable provisions (except as such enforceability may be limited by debtor relief laws and general principles of equity whether considered in a suit at law or in equity) such that the rights and remedies of the holder thereof are adequate for realization against the collateral of the benefits of the security." In fact, the aforementioned TILA violations created defenses to enforcement of the Receivables, which violations impacted the Trust's rights and remedies with respect to the Receivables, including its ability to enforce its security interest in the collateral underlying the Receivables.

137. **Statement No. 8.** Regarding the statement that that for each Receivable, "the records of the servicer do not reflect any facts which would give rise to any right of rescission, offset, claim, counterclaim or defense with respect to such receivable or the same being asserted or threatened with respect to such receivable," Offering Memorandum at 84:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. Defendant's statement regarding the records of the servicer is false, on information and belief, based on (1) the conversations between Canyon and DOWC and between Canyon and Westlake and (2) DOWC's court filings, discussed *supra* at paragraphs 97–119, as follows:

i. As set forth *supra* in paragraph 135, the Receivables' TILA disclosures itemized each Receivable's VSC and the fact that U.S. Auto was paying a third party to fund the VSC. But at the time the Offering Memorandum's statement was made, DOWC, which had been contracted to administer and perform the VSCs, was refusing to honor certain VSCs and/or place those VSCs "in force" at the time of the Trust's closing due to U.S. Auto's failure to fund those VSCs. Thus, the VSCs were not enforceable or being performed at the time that this statement was made.

ii. In addition, as set forth *supra* in paragraph 135, because the Truth in Lending Act disclosures were false (because U.S. Auto had charged borrowers itemized amounts for services that

were not financed by U.S. Auto, despite representations that U.S. Auto was paying DOWC to fund those VSCs, in violation of 12 C.F.R. § 1026.18(c)(iii) (if not other applicable federal and state lending laws)), these violations rendered the underlying auto loans, and the VSCs, defective and subject to claims and/or defenses to repayment of the loan and/or defenses against repossession of the underlying collateral at the time the statement was made—including, potentially, unfair or deceptive trade practices claims under the laws of the states in which the loans were originated, some of which entitle the borrower to nullify, rescind or cancel the outstanding loan. *E.g.*, *North Carolina ex rel. Easley v. Rich Food Servs., Inc.*, 139 N.C. App. 691, 699 (2000) ("If plaintiff is successful in the litigation, [North Carolina's Unfair and Deceptive Trade Practices Act] provides that the trial court may 'upon a final determination of the cause, order the restoration of any moneys or property and the cancellation of any contract obtained by any defendant as a result of such violation.'"). Defendant's statement was thus false because the aforementioned TILA violations created defenses to enforcement of the Receivables, such that the rights and remedies of the holder thereof were inadequate for realization against the collateral of the benefits of the security.

iii. Defendant's statement was also misleading because it suggested that no right of rescission, offset, claim, counterclaim or defense with respect to any Receivable existed or could be asserted

or threatened, even though the servicer records, as discussed with Canyon by Westlake, clearly revealed the non-funding of the VSCs and that U.S. Auto was using other collections to cover refunds that were not paid as required, which actions could give rise to rights of rescission, offset, claims, counterclaims, and/or defenses.

**3. Statements Regarding Servicing Practices and the CFPB Investigation**

138. **Statement No. 9.** Regarding the statements that "USASF Servicing services all receivables that U.S. Auto Finance acquires in accordance with USASF Servicing's servicing policies as described [in the Offering Memorandum]," Offering Memorandum at 52, and the related description of USASF Servicing's servicing practices, *id.* at 53–55 (section titled "Servicing by USASF Servicing"), including, but not limited to the statement that "Consistent with the servicer's goal to keep obligors in their vehicles and bringing payments current, the servicer provides various options to assist obligors with temporary setbacks, subject to applicable federal regulatory and legal guidance," *id.* at 53:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. The statement that "USASF Servicing services all [R]eceivables … in accordance with USASF Servicing's servicing policies" was false and misleading when made based on the description of USASF Servicing's practices on pages 53–55 of the Offering

Memorandum, based on allegations made by the CFPB against U.S. Auto Servicing.

c. For example, on information and belief based on the *CFPB* Complaint, Credit Suisse did not disclose that "[s]ince 2016, USASF [Servicing] had," allegedly or in fact, "acted unfairly by: wrongfully activating starter-interruption devices to disable consumers' vehicles and activate warning alerts; failing to provide millions of dollars in refunds of add-on premiums to which consumers were entitled; charging consumers twice for collateral-protection insurance each billing cycle, sometimes for over a year; misapplying consumer payments such that consumers accrued over $1,000,000 in additional interest and fees; and wrongfully repossessing dozens of consumers' vehicles," *CFPB* Complaint ¶ 3. All these situations appear not to comport with customary servicing practices or the ordinary standards of care of an industry-regulated consumer-debt servicing company, and the Offering Memorandum describes U.S. Auto's servicing in ways shown to be misleading by the *CFPB* complaint:

i. The Offering Memorandum's discussion of payment handling is materially misleading because while it makes no mention of any misapplication of payments, despite the fact that "USASF admitted to the [CFPB] that it misapplied extra payments [from customers] at least 8,738 times over nearly five years, from November 1, 2016 to August 31, 2021." *Id.* ¶ 49. This misconduct also "caused consumers substantial injury. Consumers whose payments were misapplied were harmed because they paid

approximately $1.2 million in interest and fees that they would not have paid if USASF had correctly applied their payments." *CFPB* Complaint ¶ 50. Accordingly, the statement that "USASF Servicing services all receivables that U.S. Auto Finance acquires in accordance with USASF Servicing's servicing policies as described [in the Offering Memorandum]," Offering Memorandum at 52, presents a misleading impression at that time that U.S. Auto's servicing did not have extensive issues with payment misallocation or with customers being overcharged.

ii. As another example, the Offering Memorandum, when discussing the use of starter interrupt and GPS tracking devices, Offering Memorandum at 54, makes no reference to any alleged or actual incorrect use of such starter interruption or GPS tracking, which presented an impression that there were no such issues at that time. That impression was misleading because, as "USASF admitted to the [CFPB]," "USASF erroneously disabled vehicles at least 7,500 times." *CFPB* Complaint ¶ 15. Further, "USASF also admitted to the [CFPB] that, due to programming errors, system errors, and human error, USASF erroneously sent warning tones over 71,000 times to consumers who had made a payment or were not in default." *Id.* ¶ 17. The CFPB noted that this conduct "caused consumers substantial injury. Consumers whose SID activation disabled their vehicles were harmed by being deprived of the use of their vehicles. Those who received warning tones in error were

distressed, confused, and spent time contacting USASF or USASF's SID vendor to attempt to resolve the issue." *Id.* ¶ 19.

d. Credit Suisse's failure to disclose these extensive instances of servicer misconduct, which USASF Servicing thereafter admitted, or to even suggest that such conduct was being investigated, rendered the statement that "USASF Servicing services all receivables that U.S. Auto Finance acquires in accordance with USASF Servicing's servicing policies as described [in the Offering Memorandum]," Offering Memorandum at 52, misleading when made.

139. **Statement No. 10.** Relatedly, regarding the misleading statement in the Offering Memorandum characterizing the civil investigative demand that USASF had received from CFPB as simply one of a number of "periodic examinations of licensees" permitted under state licensing laws and part of the "extensive regulation at the state and federal level" to which U.S. Auto is subject as a "'larger participant' in the auto finance industry." Offering Memorandum at 31:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. On information and belief based on the *CFPB* Complaint, Credit Suisse's representation that the CFPB investigation was simply one of a number of "periodic examinations of licensees" to which U.S. Auto was subject due to its size was, at minimum, misleading when made, as follows:

i. Based on the allegations that were eventually included in the *CFPB* Complaint, covering at least a five-year period, the CFPB was investigating conduct going back to at least 2016 at the time the Notes were offered. This would have been apparent to U.S. Auto and Credit Suisse at the time of the offering of the Notes, due to the scope of the information and documents requested by the CFPB as part of its investigation, which the Offering Memorandum states had already been requested and provided at the time the Notes were offered. Offering Memorandum at 31. The five-year time period, at minimum, that was covered by these requests and the CFPB's investigation differentiated it from any "periodic" oversight or examination, which typically occurred annually or, at minimum, more frequently than every five years. Credit Suisse failed to disclose that the CFPB was investigating a five-year period, which would have materially altered the impression Credit Suisse's statement gave to investors—that this was a routine examination as part of typical regulatory oversight.

ii. Credit Suisse also failed to disclose at the time of the Offering Memorandum's statements that the scope of the CFPB's investigation exceeded the scope of the periodic examinations of licensees to which U.S. Auto and other participants in the auto finance industry were typically subjected, as it would have been clear at the time that the Notes were offered that the investigation covered numerous areas of potential servicing misconduct. Namely,

the Offering Memorandum disclosed that, at the time the Notes were offered, U.S. Auto had already received and responded to information and document requests from the CFPB, and that those requests covered many of the areas in which the *CFPB* Complaint ultimately alleged misconduct. Offering Memorandum at 31–32 ("on September 16, 2021, the servicer received a civil investigative demand from the CFPB seeking information related to various servicing activities, including the billing and application of payments and fees, the application of add-on product refunds, the management of starter interrupt technology, and repossessions. The servicer provided the requested documents and has been cooperating with any requests for information."). Credit Suisse failed to disclose that this scope of practices that the CFPB was investigating exceeded the scope associated with periodic regulatory oversight of licensees by their regulators.

iii. The *CFPB* Complaint contains numerous references to USASF Servicing having admitted misconduct to the CFPB during its investigation. *See, e.g., CFPB* Complaint ¶¶ 15, 17, 49, 70–71. Since the Offering Memorandum indicates that USASF Servicing had already "provided the requested documents" and had been cooperating with additional requests for information at the time of the Offering Memorandum's statements, Offering Memorandum at 32, USASF Servicing would have been aware at that time of the statement that it had engaged in servicing misconduct and that it,

and potentially its parents or affiliates, was likely to face litigation or penalties for this misconduct. Credit Suisse failed to disclose at the time it made this statement in the Offering Memorandum that USASF Servicing had admitted to engaging in widespread servicing misconduct or that it was likely to face litigation or penalties associated with the same.

iv. Accordingly, Credit Suisse's characterization of the CFPB investigation was misleading when made because it failed to disclose the extensive time-period of the investigation, the fact that the servicing misconduct being investigated exceeded the scope of typical periodic examinations, the fact that USASF Servicing employees had admitted to engaging in servicing misconduct, or that U.S. Auto could face litigation and/or penalties associated with this misconduct. The omission of these material facts, along with the statements discussed in this paragraph downplaying the severity of the investigation, gave investors the misleading impression that the CFPB's investigation was purely routine and simply part of ordinary regulatory oversight.

140. **Statement No. 11.** Relatedly, regarding the misleading statement in the Investor Presentation that USASF Servicing had received a civil investigative demand from CFPB for certain information about "various servicing activities," Investor Presentation at 45:

a. This statement was made in the printed slides of the Investor Presentation, dated June 2022, that (based on the document's metadata)

were prepared by Credit Suisse as part of the marketing of the Notes, and which was provided to Canyon by Credit Suisse on June 8, 2022. *See supra* ¶ 41.

b. As noted *supra* in the immediately prior paragraph, Defendant represented that this investigation was one of a number of "periodic examinations of licensees" permitted under state licensing laws and part of the "extensive regulation at the state and federal level" to which U.S. Auto is subject as a "'larger participant' in the auto finance industry." Offering Memorandum at 31.

c. As set forth in further detail *supra* in the immediately prior paragraph, at no point did Defendant disclose that (i) the scope of the investigation extended at least five years, exceeding the typical regulatory examination period, (ii) that the scope of the investigation exceeded the scope of typical periodic examinations, covering numerous areas of potential servicing misconduct, (iii) that USASF Servicing had admitted to engaging in extensive servicing misconduct as part of that investigation, or (iv) that USASF Servicing and its affiliates faced potential litigation and/or penalties in connection with such misconduct.

d. Instead, the Investor Presentation minimized the investigation as part of U.S. Auto's business as usual, preceding its disclosure about the CFPB investigation with the statements that U.S. Auto's "business practices are designed to comply in all respects" with "federal, state and local motor vehicle regulations and laws," that U.S. Auto's "finance company" and "service company" were both "subject to direct supervision

and exam" by the CFPB. Investor Presentation at 45. After disclosing the investigation, and that USASF Servicing "provided the requested documents and has been cooperating with any requests for information," the Investor Presentation stated, "U.S. Auto is keenly focused on regulatory compliance, dedicating significant efforts to compliance matters and processes daily." *Id.*

e. As with the statements in the Offering Memorandum discussed in the immediately previous paragraph, Credit Suisse created a misleading impression with its statements regarding the CFPB investigation in the Investor Presentation by touting U.S. Auto's focus on regulatory compliance and framing the investigation as an ordinary part of the CFPB's supervision and exam of U.S. Auto, rather than disclosing that the scope of that investigation and the admissions that had been turned over to the CFPB at the time of the offering of the Notes. Those disclosures revealed evidence of significant servicing misconduct that was likely to lead to litigation and/or penalties—facts that, had they been disclosed, would have materially altered the total mix of information available to investors and the impression that investors were provided about U.S. Auto's legal and regulatory compliance.

**4. Other Statements**

141. **Statement No. 12.** Regarding the statement that "[a]s of the date of this offering memorandum, no asset-backed securities transaction sponsored by U.S. Auto Finance has defaulted or experienced an early amortization triggering

event. The sponsor has never taken any action out of the ordinary to prevent such an occurrence," Offering Memorandum at 45:

a. This statement was made by Defendant in the Offering Memorandum (both in the preliminary version sent to Canyon on June 8, 2022, and in the final version, dated June 16, 2022).

b. This statement's representation that "the sponsor has never taken any action out of the ordinary to prevent such an occurrence" was false when made because, on information and belief based on (1) the conversation between Canyon and DOWC, between Canyon and Westlake, and between Canyon and Computershare; and (2) DOWC's court filings, detailed *supra* ¶¶ 95–119, U.S. Auto had taken the "out of the ordinary" actions of failing to pay for VSCs, and sending piecemeal, incomplete payments for VSCs, as follows.

i. Taking action to prop up the unfunded VSCs would be an action to avoid the defaults described in the Offering Memorandum, including, most clearly, an "Event of Default" consisting of "the occurrence of certain events (which, if involuntary, remain unstayed for 60 days) of bankruptcy, insolvency, receivership or liquidating of the issuing entity," Offering Memorandum at 101. Had the VSCs been revealed to be worthless or unenforceable, or had the inability of U.S. Auto to meet its obligations as they came due been revealed, they would have revealed that U.S. Auto was potentially insolvent, jeopardizing the solvency of the Trust. Indeed, several U.S. Auto entities, including

the Depositor, did ultimately file bankruptcy approximately one year after the Trust closed, *see supra* ¶¶ 125–27.

ii. As the Offering Memorandum made clear, "If the sponsor and the servicer fail to maintain sufficient capital to fund their operations as well as those of their affiliates… the ability of the servicer to perform its collection activities with respect to the receivables owned by the issuing entity could be impaired and you could experience delays in payments or losses on your notes." Offering Memorandum at 30. Similarly, the Offering Memorandum notes that "if the originator, the sponsor, the servicer or the depositor becomes the subject of an insolvency proceeding, competing claims to ownership or security interests in the receivables could arise," which could result in losses, delays in payments to investors, or "an acceleration of the repayment of the notes." *Id.* at 32.

iii. Thus, the solvency of U.S. Auto was clearly material to the solvency of the Trust and the performance of the Notes, and U.S. Auto's actions to conceal its insolvency, including by taking funds from the sale of later receivables to fund its obligations on prior receivables, *e.g.*, *supra* ¶¶ 97–99 (discussing conversation with Westlake); Rizkalla Decl. ¶ 26 (same), was an action out of the ordinary to prevent such insolvency from triggering a default, *id.*¶ 27. This rendered the subject representation false when made. At minimum, Defendant's failure to disclose U.S. Auto's lack of funding of the VSCs and inability to meet its obligations when they

came due, while also making the at-issue representation, misled investors about the true state of affairs material to their investment, constituting material and actionable omissions.

iv. In addition, concealing the TILA violation described *supra* in paragraphs 135–137 was also an unusual action taken to avoid a "Event of Default," most clearly one caused by:

> any representation or warranty of the issuing entity made in the indenture prov[ing] to have been incorrect in any respect when made, which failure materially and adversely affects the rights of the noteholders, and which failure continued for [30 or 60 days, depending on the circumstances] after written notice specifying such failure and requiring it to be remedied and stating that such notice is a "notice of default" has been given to the issuing entity….

Offering Memorandum at 101. Because the TILA violations, discussed *supra* in paragraphs 135–137, created statutory claims that would affect the rights of noteholders to receive full payment of the full amounts of the Receivables, exposing the U.S. Auto or potentially the Trust to damages for the violation, U.S. Auto's actions to conceal the fact that it had accepted payment for the purchase of VSCs without actually funding the performance of those VSCs was an action out of the ordinary to prevent such disclosure

from triggering a default. Rizkalla Decl. ¶ 27. This rendered the subject representation false when made. At minimum, Defendant's failure to disclose U.S. Auto's lack of funding of the VSCs, while also making the at-issue representation, misled investors about the true state of affairs material to their investment, constituting material and actionable omissions.

142. **Statement No. 13.** Regarding the statement that U.S. Auto had "industry-leading customer satisfaction," Investor Presentation at 14:

a. This statement was made in the printed slides of the Investor Presentation, dated June 2022, that (based on the document's metadata) were prepared by Credit Suisse as part of the marketing of the Notes, and which was provided to Canyon by Credit Suisse on June 8, 2022. *See supra* ¶ 41.

b. This statement is false because, on information and belief based on the allegations in the *CFPB* Complaint (discussed *supra* ¶¶ 122–24) and the disclosures about the state of the CFPB investigation at the time the Notes were offered (Offering Memorandum at 31–32), at the time this statement was made, USASF Servicing had already admitted to extensive servicing misconduct that caused customers substantial injury and distress as part of the CFPB's investigation into U.S. Auto:

i. For example, "USASF admitted to the [CFPB] that, due to programming errors, system miscommunication, and human error, USASF erroneously disabled vehicles at least 7,500 times." *CFPB* Complaint ¶ 15. Further, "USASF also admitted to the

[CFPB] that, due to programming errors, system errors, and human error, USASF erroneously sent warning tones over 71,000 times to consumers who had made a payment or were not in default." *Id.* ¶ 17. The CFPB noted that this conduct, "caused consumers substantial injury. Consumers whose SID activation disabled their vehicles were harmed by being deprived of the use of their vehicles. Those who received warning tones in error were distressed, confused, and spent time contacting USASF or USASF's SID vendor to attempt to resolve the issue." *Id.* ¶ 19.

ii. As a second example, "USASF admitted to the [CFPB] that it misapplied extra payments [from customers] at least 8,738 times over nearly five years, from November 1, 2016 to August 31, 2021." *Id.* ¶ 49. This misconduct also "caused consumers substantial injury. Consumers whose payments were misapplied were harmed because they paid approximately $1.2 million in interest and fees that they would not have paid if USASF had correctly applied their payments." *Id.* ¶ 50.

iii. As a third example, "USASF admitted to the [CFPB] that it wrongfully repossessed vehicles 78 times." *Id.* ¶ 70. "USASF's wrongful repossessions of consumers' vehicles caused consumers substantial injury. Some consumers' vehicles were sold by USASF. When USASF returned the wrongfully repossessed vehicles to consumers, as opposed to selling them, consumers were

harmed by not being able to use their vehicles for up to 17 days." *Id.* ¶ 72.

c. Credit Suisse failed to disclose these extensive instances of servicing misconduct, admitted by USASF Servicing, which revealed its statement about U.S. Auto's industry-leading customer satisfaction to be, at best, misleading when made. The CFPB's decision to bring the *CFPB* Complaint, based on conduct occurring prior to the offering of the Notes, further indicates that U.S. Auto did not have, in the view of its primary regulator, "industry-leading customer satisfaction," as the CFPB sued USASF Servicing for the extensive harm, distress, and dissatisfaction it had caused consumers. Credit Suisse's failure to disclose these material facts misled investors about the true state of affairs material to their investment, constituting material and actionable omissions.

d. This statement was also false when made because, in J.D. Power's 2022 U.S. Dealer Financing Satisfaction Study, released in August 2022, which is the industry's most authoritative source on customer satisfaction among subprime auto finance companies, U.S. Auto did not even place in J.D. Power's top 10 companies.[3] Thus, this statement was objectively false when made, as U.S. Auto did not have "industry-leading customer satisfaction" by any objectively verifiable metrics.

---

[3] *Ally Tops J.D. Power Dealer Financing Satisfaction Charts in Subprime for Second Straight Year*, SubPrime Auto Finance News (Aug. 11, 2022, 2:14 PM), https://www.autoremarketing.com/subprime/ally-tops-jd-power-dealer-financing-satisfaction-charts-subprime-second-straight-year/ (last accessed Oct. 21, 2024).

**H. Defendant Made the Enumerated Misrepresentations and Omissions with Scienter**

143. On information and belief, each of the Known Individuals, as well other individuals not known to Plaintiffs but within the knowledge of Defendant, was aware of or recklessly disregarded the fact that false and misleading statements were being issued by Credit Suisse concerning the Trust, the Notes, and/or U.S. Auto, and approved, ratified, or permitted the issuance of these misrepresentations or omissions, in violation of federal and state law. On information and belief, each of the Known Individuals, as well as other individuals not known to Plaintiffs but within the knowledge of Defendant, also:

a. directly participated in the management of Credit Suisse;

b. was directly involved in the day-to-day operations of Credit Suisse at its highest levels;

c. was privy to books, records, and confidential information concerning U.S. Auto and its business and operations, auto loans and VSCs originated by U.S. Auto, and the securities issued by U.S. Auto, including the Notes;

d. was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

e. had authority from Credit Suisse to act and make representations on its behalf, as alleged herein; and/or

f. was directly or indirectly involved in the oversight or implementation of Credit Suisse's internal controls, including Credit

Suisse's due diligence prior to selling a newly-issued security.

144. Credit Suisse is liable for the acts of the Known Individuals, and those of its other officers, employees, and other agents, under the doctrine of *respondeat superior* and under common law principles of agency, as they were officers, employees, or other agents of Credit Suisse during the Relevant Period, and all of their wrongful acts complained of herein were carried out within their respective scopes of employment or agency.

145. The scienter of Known Individuals, and that of Defendant's officers, employees, and other agents, is similarly imputed to Credit Suisse under *respondeat superior* and agency principles.

146. As further discussed herein, the actions of the Known Individuals, as well as other officers, employees, or other agents of Defendant not known to Plaintiffs, were undertaken for the purpose of inducing Plaintiffs, their investment managers, and other prospective investors to purchase the Notes issued by the Trust.

147. In its role as lead underwriter for the Trust, Credit Suisse personnel were obligated, pursuant to industry custom and practice and the standards of ordinary care, to conduct extensive due diligence regarding U.S. Auto, the Trust, the Receivables, the Notes, the Offering Memorandum, and other marketing materials provided to prospective investors. Rizkalla Decl. ¶ 13. ABS Industry custom and practice and standards of ordinary care also required Credit Suisse, as part of its due diligence as underwriter of the transaction, to review U.S. Auto's general books and records and loan-level files related to the Trust's Receivables, including at least several months of the Trust's loan servicing files

from the time period prior to the delivery of the Offering Memorandum to investors, as well as speak directly with the Trust's servicer and important third-party service providers, such as DOWC, to make sure the deal was likely to perform as represented. Rizkalla Decl. ¶ 14.

148. On information and belief, based on Canyon's conversations with DOWC, even the most cursory of conversations between Credit Suisse and DOWC would have immediately revealed U.S. Auto's financial problems and the non-funding of the VSCs, and any failure by Credit Suisse to have such a conversation would have been an extreme departure from the standards of ordinary care and a highly unreasonable omission.

149. Credit Suisse in fact reviewed extensive loan-level data related to the Trust's Receivables prior to offering the Notes for sale, information that either revealed to Credit Suisse U.S. Auto's deteriorating financial condition and failure to fund the VSCs or was consciously or recklessly disregarded by Credit Suisse. For example, in or around May 2022, Deloitte & Touche LLP ("Deloitte") prepared for Credit Suisse's benefit, as part of Credit Suisse's due diligence, a report based on Deloitte's review of loan-level data, including servicing files, for a selection of U.S. Auto's auto loan portfolio, including the Receivables, as of April 30, 2022, "in connection with the proposed offering of U.S. Auto Funding Trust 2022-1." A copy of Deloitte's report to Credit Suisse is attached hereto as **Exhibit 12**. Credit Suisse actively participated in developing and agreeing to Deloitte's procedures for the Deloitte Report, as the Deloitte Report specifically states that Credit Suisse "has agreed to the procedures and acknowledged that the procedures performed are appropriate for their purposes."

Deloitte Report at 1. The Deloitte Report further states that it was "intended solely for the information and use of the Specified Parties," which included Credit Suisse, and that it "may not be suitable for any other purpose," indicating that Credit Suisse intended to have a specific use for, and be informed by, the Deloitte Report. *Id.* 1, 5. Accordingly, Credit Suisse must have necessarily reviewed and discussed Deloitte's procedures internally, at least at some point, in order to reach a conclusion on what procedures would be appropriate for Deloitte to follow and instruct Deloitte accordingly.

150. Indeed, the preparation of the Deloitte Report required Deloitte to be provided with files and data with respect to 48,076 U.S. Auto automobile receivables and to review a sample of same, showing that Credit Suisse commanded extensive access to U.S. Auto's systems and documentation, which information it provided to Deloitte. *Id.* at 1. The Deloitte Report shows that, for those 48,076 receivables, Deloitte was provided with a "Statistical Data File," Installment Sales Contracts and/or Modification Agreements, credit reports, credit applications, "Model Score Quer[ies]," title documents, TILA disclosure statements, and numerous other borrower insurance documents (collectively referred to as "Agreement[s] to Provide Insurance"). *Id.* at 3. On information and belief, based on Canyon's communications with DOWC, the Installment Sales Contracts and Modification Agreements clearly disclosed and itemized where borrowers had purchased extended VSCs.

151. Crucially, the Deloitte Report shows Deloitte had access to, and reviewed at least a portion of, U.S. Auto's *entire servicing system*. *Id.* (noting that Deloitte compared "Characteristics 1. through 10. to the corresponding

information set forth on or derived from … [U.S. Auto's] servicing system (the 'Servicing System')"). On information and belief, based on Canyon's communications with Westlake, the information contained in U.S. Auto's servicing files and servicing system (which were transferred to Westlake in or around May 2023) clearly disclosed that U.S. Auto had failed to pay DOWC to put VSCs for the Receivables in force since at least March 2022. *See* Rizkalla Decl. ¶ 23. In fact, on information and belief based on Canyon's communications with DOWC and the allegations made in the *DOWC* Complaint (*see DOWC* Complaint ¶¶ 52–55), U.S. Auto had not been funding VSCs across its entire loan portfolio since at least September 2021, which also would have been readily apparent from any review of the U.S. Auto servicing files and servicing system available to and actually reviewed by Deloitte. *See* Rizkalla Decl. ¶ 24.

152. The only way that Credit Suisse could evaluate, revise, and ultimately agree that Deloitte's procedures for reviewing this extensive amount of information would be "appropriate to meet the intended purpose of evaluating the accuracy of certain information set forth in the Statistical Data File" would be by having already reviewed at least some of this information internally and being aware of its contents. Unless Credit Suisse was deliberately or recklessly making this representation in the Deloitte Report without having reviewed any information in U.S. Auto's servicing files or servicing system, Credit Suisse could not have evaluated and agreed on the procedures for Deloitte to follow or confirmed that those procedures were appropriate for the purposes of the Deloitte Report without having reviewed data in U.S. Auto's servicing files and servicing system.

153. Loan servicing files, like those contained in U.S. Auto's servicing system, are prepared on a month-by-month basis, and any loan servicing file for a particular month, and the data contained within it, would remain the same, no matter when it was reviewed. Rizkalla Decl. ¶ 24. Thus, for example, a servicing file reviewed by Deloitte for the month of March 2022 would contain the same information and data if the March 2022 servicing file was reviewed again at a later date by Deloitte, Westlake, or anyone else.

154. Shortly after the servicing of the Trust's loans was transferred from USASF to Westlake, Adam Rizkalla had a phone call with Todd Laruffa, a Vice President and head of servicing at Westlake, wherein Mr. Laruffa informed Mr. Rizkalla that, upon taking over servicing, Westlake had been immediately able to identify from its review of U.S. Auto's servicing files and/or servicing system that U.S. Auto had not been funding the VSCs since well before the Trust closed. Rizkalla Decl. ¶ 23. This is because servicing files and/or a servicer's servicing system would clearly disclose both the existence of a VSC for any particular loan and whether the VSC had been funded or put in force. *Id.*

155. On information and belief, based on Mr. Rizkalla's conversation with Mr. Laruffa and the Deloitte Report, to make the determination that U.S. Auto had not been funding the VSCs since well before the Trust closed, Westlake would have had to review at least some of the same U.S. Auto servicing files and/or servicing systems that Deloitte reviewed and/or had access to when it created the Deloitte Report. Namely, for Westlake to be able to determine that U.S. Auto had not been funding the VSCs since well before the Trust closed, which Canyon understood to mean at least three months prior, it would have had

to review U.S. Auto's servicing files and/or servicing system for the pre-April 2022 period, which are the same files and data to which Deloitte was provided access by Credit Suisse for purposes of completing the Deloitte Report.

156. Thus, Credit Suisse had access to, and reviewed information and data before the issuance of the Offering Memorandum that revealed U.S. Auto had not been funding the VSCs since well before the offering of the Notes to Plaintiffs. Further, Defendant must have reviewed and discussed this information as part of its development of the Deloitte Report. As shown by the Deloitte Report at 1, Credit Suisse actively participated in developing the review of this data. Namely, as set forth above, Credit Suisse "agreed to the procedures [applied by Deloitte] and acknowledged that the procedures performed are appropriate for their purposes." Deloitte Report at 1. This would have required at least some review of the servicing files and servicing systems by Credit Suisse, and discussion internally at Credit Suisse, for Credit Suisse to determine and confirm to Deloitte that its procedures were appropriate for their intended purpose. Indeed, the Deloitte report was prepared specifically for Credit Suisse's information and use, as demonstrated by the statement in the Deloitte report that, "This report is intended solely for the information and use of the Specified Parties identified above and is not intended to be and should not be used by anyone other than these Specified Parties." Deloitte Report at 4; *see also* Deloitte Report at 1 (defining "Specified Parties" as including Credit Suisse Securities (USA) LLC). Thus, Credit Suisse necessarily reviewed and discussed internally U.S. Auto's servicing systems and the servicing files covered by the Deloitte Report to confirm that Deloitte's review procedures would be appropriate for the

purposes of the Deloitte Report, which was being prepared expressly for the purposes of Credit Suisse's information and use.

157. On information and belief, based on the Rizkalla Declaration and Canyon's discussions with Westlake, the non-funding of the VSCs was apparent from these servicing files, such that Credit Suisse either knew or consciously or recklessly disregarded that U.S. Auto had not paid DOWC to put a significant number of the VSCs in force before the delivery of the Offering Memorandum to Canyon.

158. That U.S. Auto owed significant funds to DOWC for VSCs for which it had already been paid by borrowers would have raised red flags for any reasonable underwriter. These revelations would be an undeniable sign that U.S. Auto was in serious financial trouble and that a substantial portion of the Trust's collateral may be worthless, in addition to other issues as explained *supra* in Factual Allegations section G.

159. Further, Credit Suisse (and/or its affiliated entities) had an extensive warehouse lending relationship with U.S. Auto for years prior to the offering of the Notes. This relationship included underwriting U.S. Auto's auto loan receivables, like the ones that collateralized the Trust, and conducting due diligence associated with extending credit to U.S. Auto. In such a relationship, as with any creditor/debtor relationship, Defendant, like any lender or underwriter, would have required U.S. Auto to turn over extensive documentation and information regarding U.S. Auto's operations and financial condition as a condition for extending credit to U.S. Auto, as Credit Suisse would not want to extend credit to U.S. Auto without confidence in U.S. Auto's financial stability.

Rizkalla Decl. ¶ 36. As a result of this relationship, Credit Suisse personnel, including the Known Individuals, possessed, had access to, and reviewed, extensive information regarding U.S. Auto's financial condition and operations that was not available to prospective investors in the Trust, such as Canyon, prior to the delivery of the Offering Memorandum to investors. To the extent there was any failure by Credit Suisse to review such information and learn what it contained, that would have been an extreme departure from the standards of ordinary care for an underwriter and a highly unreasonable omission. *Id.* ¶ 37.

160. Credit Suisse's lending relationship with U.S. Auto continued until November 2021, months after U.S. Auto had begun "short-funding" the VSCs in September 2021 and falling behind on its payment obligations to DOWC, jeopardizing the enforceability and performance of the VSCs. Kroll Report at 9, 11.

161. It is no coincidence, then, that Credit Suisse's lending relationship with U.S. Auto ended just after U.S. Auto became delinquent on its payments to DOWC: the information obtained and reviewed by Credit Suisse pursuant to its lending relationship would have revealed that U.S. Auto was failing to pay its legal obligations as they came due, and any lender would have been reluctant to continue to lend money to an entity that was failing to pay its vendors or other creditors in a timely manner. Credit Suisse's decision to nevertheless continue to market and sell U.S. Auto's ABS, like the Notes, without disclosing the information of which it was already aware from its prior lending relationship regarding U.S. Auto's financial condition, or investigating to determine whether this delinquency in payment had been cured in the interim (it had not), was thus

in extreme departure of the standards of ordinary care, presenting a danger of misleading investors that was either known to Defendant or so obvious that Defendant must have been aware of it.

162. As demonstrated by the Offering Memorandum, Defendant was also aware of the civil investigation being conducted by the CFPB, which related to, among other things, how U.S. Auto was billing for and applying payments, fees and add-on product refunds, such as refunds from VSCs. Offering Memorandum at 31–32. Credit Suisse disclosed that it was also aware that the CFPB was specifically investigating the sale of extended warranties in connection with automobile lending and servicing. Offering Memorandum at 111 ("the CFPB has … been conducting investigations concerning certain other automobile lending and servicing practices, including the repossession of motor vehicles and the ***sale of extended warranties***" (emphasis added)). ABS industry custom and practice, as well as standards of ordinary care, required Credit Suisse to perform due diligence on U.S. Auto's servicing practices, which it confirmed could materially impact the performance of the Notes. *See* Offering Memorandum at 34 ("the manner in which the servicer exercises its servicing discretion or changes its customary practices could have an impact on the amount and timing of collections on the receivables, which may impact the amount and timing of funds available to make payments on the notes."); *see also id.* at 111 (if CFPB finds any servicing practices are "unfair, deceptive or abusive practices or to violate the Equal Credit Opportunity Act or other laws" any relief granted with respect to a sponsor or issuing entity, "could potentially adversely affect the issuing entity."). This due diligence would have included investigating the truth of the

matters being investigated by the CFPB, including U.S. Auto's sale and performance of the VSCs. Yet, while Defendant had access to nonpublic information about U.S. Auto's business, servicing practices, and the Receivables that would have revealed servicing misconduct and failure to fund VSCs by U.S. Auto, Defendant downplayed the CFPB investigation in the Offering Memorandum and Investor Presentation as merely part of ordinary oversight by U.S. Auto's regulators, and never disclosed to prospective investors that such investigation related to any misconduct by U.S. Auto or could result in liability to U.S. Auto in connection with these activities. Defendant's knowledge of the CFPB investigation and its access to this information gained in the course of its due diligence—information to which prospective investors lacked access—informed Defendant of, or at minimum should have led Defendant to investigate further and uncover evidence of, U.S. Auto's improper practices, failure to fund the VSCs, and cover-up of its deteriorating financial condition.

163. Indeed, as discussed *supra* in paragraphs 138-140, Credit Suisse would have been aware that the CFPB's investigation into U.S. Auto was not routine or "periodic," and thus investigated further, due to the scope of the information and documents requested by the CFPB as part of the investigation. Additionally, Credit Suisse must have been aware of the documentary evidence and admissions of wrongdoing U.S. Auto had already turned over to the CFPB prior to offering the Notes for sale to Canyon, and thus was aware that U.S. Auto was likely to face litigation or penalties from the CFPB as a result.

164. Finally, Credit Suisse had a clear motive, beyond simply ordinary profit motive, to market the Notes in such a way as to entice investors, like

Plaintiffs, to purchase them. Namely, Credit Suisse had the incentive to sell the Notes, not just to earn a profit, but also to transfer the inordinate undisclosed risks of the Notes off of its balance sheet, as Credit Suisse was an Initial Purchaser who was first required to acquire ownership of the Notes before selling them. That is, Credit Suisse did not simply earn a fee for assisting U.S. Auto in selling the Notes—it actually acquired the Notes along with the inordinate undisclosed risks of the Notes performing poorly if Credit Suisse was unable to offload the Notes to other investors.

165. Credit Suisse's risk-mitigation incentive was much stronger here than in other sales of securities, given that Credit Suisse either knew or must have learned, but for its recklessly insufficient due diligence, that the Notes were of higher risk and lower value than represented, as any cursory review of the documents and information within Credit Suisse's access or possession would have shown. In particular, both the information that Credit Suisse obtained as part of its Trust due diligence related to U.S. Auto, the Trust, and the Receivables, and the information Credit Suisse obtained through its lending relationship with U.S. Auto would have clearly revealed U.S. Auto's precarious financial condition, its failure to fund the VSCs, and its significant servicing misconduct, and that the Notes were at risk of material impairment as a result of the same. Thus, Credit Suisse had a motive to mislead investors, including through its numerous material misrepresentations and omissions (*see supra* Factual Allegations section G), so that investors would purchase the Notes and ensure that Credit Suisse would no longer bear the risk of loss associated with this transaction.

166. In addition to avoiding the risk of loss, Credit Suisse had the motive to mislead investors into purchasing the Notes because Credit Suisse had a strong incentive to achieve a fully subscribed securitization, in which all Notes offered for sale were able to be sold. Beyond simply garnering larger fees, a fully subscribed securitization provided reputational benefits to Credit Suisse's underwriting business in that it improved Credit Suisse's ability to underwrite, market, and sell future securitizations.

## I. Defendant's Misrepresentations and Omissions Caused Plaintiffs' Loss

167. As a result of Defendant's wrongful conduct alleged herein, Plaintiffs have suffered losses in an amount to be established at trial. Canyon's Class E Notes are the first Notes to incur losses from the negative performance of the Trust, and the material facts omitted or misrepresented by Credit Suisse led to the impairment of Trust cash flows, and thus Subject Note losses, in several respects.

168. In early 2023, shortly before the disclosure of the Shortfall, the market value of Plaintiffs' Class E Notes was marked at 92% of those Notes' original principal value, or nearly the same amount as the purchase price Plaintiffs paid for such Notes. Rizkalla Decl. ¶ 18. However, shortly after the disclosure of the Shortfall and U.S. Auto's associated financial issues, revealing the false and misleading nature of the representations made by Defendant (*see supra* Factual Allegations section G), Plaintiffs' Class E Notes became impaired and their market value started declining substantially. Rizkalla Decl. ¶ 19. By October 2023, the coupon or interest payment for the Class E Notes was no longer being paid, and the market value of Plaintiffs' Class E Notes was marked

down to zero. Rizkalla Decl. ¶ 20. The principal balance of Plaintiffs' Class E Notes has since been written down to zero due to losses suffered by the Notes, virtually ensuring that these Notes will never receive any of their principal back or any additional cashflows, and rendering Plaintiffs' Class E Notes functionally worthless. *Id.*

169. These write-downs and the drop in market value are primarily the result of U.S. Auto's undisclosed financial issues and failure to fund the VSCs. *Id.* ¶ 21. The unfunded VSCs have increased borrower default rates for the Receivables far beyond any reasonable level for various reasons, including because borrowers are more likely to strategically default on their auto loans and less likely to be able to drive to work to continue paying their auto loans when their VSC is not being honored, as set forth in detail herein (*supra* paragraphs 60–65).

170. The Trust and the Subject Notes also suffered losses as a result of U.S. Auto's undisclosed abysmal customer satisfaction, as confirmed by U.S. Auto's admissions in the *CFPB* Complaint of tens of thousands of instances of servicing misconduct that harmed and caused distress to customers. *See supra* ¶ 142. Poor customer satisfaction contributes to poorer-than-expected performance of the Receivables because borrowers who receive poor service or are the victims of servicing misconduct are less likely to be able or willing to satisfy their loan obligations, and often will strategically default when they are not receiving the full benefit of their loan agreement, in a similar manner as borrowers whose VSCs are not being honored.

171. U.S. Auto's failure to fund the VSCs has also caused the Subject

Notes' write-downs by impairing the cashflows the Trust is meant to receive whenever a borrower defaults on a loan during the term of a VSC. Rizkalla Decl. ¶ 22. VSCs are considered refundable products that provide cashflow to the Trust in the form of a rebate when a borrower defaults, as there is no need to keep a VSC in force following a default in the underlying Receivable. *Id.* The Trust has not received these rebates because U.S. Auto never funded the Trust's VSCs, causing DOWC to refuse to provide any rebates, and leading to further write-downs of the Trust's Notes. *Id.*

172. The Trust also suffered losses as a result of the Shortfall, which cost the Trust $2,238,093.07. The Shortfall was a direct result of U.S. Auto's deteriorating financial condition, and its effort to stave off bankruptcy by "robbing Peter to pay Paul"—funding its operations or obligations by misappropriating Trust Collections that it was contractually required to turn over to the Trust. Credit Suisse's material misrepresentations and omissions concealed U.S. Auto's true financial condition, which ultimately caused losses to the Trust and to Canyon's Class E Notes.

173. Further, as set forth in greater detail herein (*supra* paragraphs 85–90), the breach of U.S. Auto's servicing obligations associated with the Shortfall triggered an Event of Default and Servicer Replacement Event. Ultimately, Computershare informed Canyon that representatives from USASF Servicing had confirmed that USASF Servicing was failing, that USASF Servicing's financial troubles had existed well before the Shortfall, and that servicing would have to be transferred as a result. *See supra* ¶¶ 91–96. This servicing transfer, which was the natural result of U.S. Auto's failing financial condition, caused

additional losses to the Trust and to Canyon's Class E Notes because of the costs and delays associated with getting data and servicing activities transferred to the new servicer, and having that new servicer get up to speed and resume collection activities.

174. Had Credit Suisse not misrepresented and failed to disclose the true facts regarding U.S. Auto's misconduct, including the failure to fund VSCs, and U.S. Auto's deteriorating financial condition at the time it offered the Notes for sale, Canyon would not have purchased the Subject Notes. Instead, these concealed issues directly caused losses to the Trust and Canyon's Class E Notes. Credit Suisse's misrepresentations and omissions thus directly caused Canyon's losses.

**J. Plaintiffs Tender the Subject Notes for Rescission**

175. In light of the above-discussed misrepresentations and omissions, on March 13, 2024, Plaintiffs' counsel, on behalf of Plaintiffs' investment managers, contacted Credit Suisse to tender the Subject Notes. Therein, Plaintiffs' counsel requested that Credit Suisse reverse the sales of the Subject Notes, refunding their purchase price, with interest thereon, less those amounts Plaintiffs had received from the Subject Notes, in exchange for retaking each of the Subject Notes.

176. On May 9, 2024, Credit Suisse rejected the rescission request via letter correspondence.

177. As of the date of this Complaint, Credit Suisse has not repurchased, nor made any offer to repurchase, any of the Subject Notes.

## CAUSES OF ACTION

### First Cause of Action

### (Securities Act of 1933 § 12(a)(2), 15 U.S.C. § 77l(a)(2))

### (By All Plaintiffs)

178. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–139, 141, and 175–177.

179. This claim is brought by Plaintiffs against Credit Suisse pursuant to section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), as Plaintiffs purchased Notes in the Trust from Credit Suisse pursuant to the Offering Memorandum.

180. As discussed *supra* at paragraph 67–71, the Offering Memorandum is a prospectus within the meaning of the Securities Act of 1933 because, *inter alia*:

a. the Offering Memorandum is a communication, notice, circular, advertisement, or letter describing a large initial public offering of securities by an issuer or controlling shareholder;

b. the members of the public solicited by the Offering Memorandum were not provided with, and did not have access to, all documents relevant to the investment, nor did they have a pre-existing relationship with the issuer, the sponsor/seller, or any of its affiliated parties that would have enabled them to command access to such information;

c. the members of the public solicited by the Offering Memorandum were simply asked to become passive investors in the Trust,

not take a position of control or authority or participate in the governance of the Trust;

d. the sale of the Notes was consistent with offerings made pursuant to filed registration statements;

e. the filing of a registration statement prior to the sale of the Notes would have been required if Credit Suisse had not purported to offer the Notes for sale under the auspices of Rule 144A; and

f. Credit Suisse and Wells Fargo's labeling of the Notes' offering as "private" pursuant to Rule 144A was part of a plan or scheme to evade the Securities Act's registration requirements and otherwise does not override the public nature of the offering.

181. Additionally, as detailed *supra* in paragraphs 130–139 and 141, the Offering Memorandum contained material misrepresentations and omissions.

182. Credit Suisse offered the Notes for sale, sold such Notes, and distributed such Notes by the use of means or instruments of transportation and communication in interstate commerce, as Credit Suisse offered, solicited the sale of, sold, and distributed such Notes by means of the internet and electronic communications, among other methods.

183. Credit Suisse reviewed, participated in the drafting of, and approved, the Offering Memorandum; is prominently identified in the Offering Memorandum; and is one of the issuers of the Offering Memorandum.

184. Credit Suisse solicited Plaintiffs' purchase of the Notes generally, and the Subject Notes in particular, by means of the Offering Memorandum. On information and belief, Credit Suisse obtained substantial commissions, markup,

and/or profit from its sale of the Notes, including from the sale of the Subject Notes to Plaintiffs.

185. Credit Suisse participated in the preparation of the Offering Memorandum; distributed the Offering Memorandum; offered the Notes to members of the public by way of the Offering Memorandum; and actively solicited the sale of the Notes, all for Credit Suisse's own benefit.

186. On information and belief, Credit Suisse earned an underwriting fee and other substantial fees and benefits from the sale of any Notes, and earned even larger benefits from achieving a fully subscribed securitization, in which all Notes offered for sale were able to be sold. In addition to garnering larger fees, a fully subscribed securitization also benefited Credit Suisse by eliminating the risk of holding Notes on its balance sheet and improving its ability to underwrite, market, and sell future securitizations.

187. Plaintiffs' claim is predicated on, *inter alia*, the Offering Memorandum's material misrepresentations and omissions as of the date of the Offering Memorandum and the date of Plaintiffs' purchase, and Defendant's negligence, recklessness, and/or willful misconduct with respect to these facts. Credit Suisse engaged in negligence, recklessness and/or willful misconduct with respect to these facts. In particular, the Offering Memorandum contained untrue statements of material fact and omitted to state material facts necessary to make those statements, in light of the circumstances which they were made, not misleading, including those misrepresentations and omissions enumerated *supra* in Factual Allegations section G.

188. The facts misrepresented in, and omitted from, the Offering Memorandum would have been material to any reasonable investor reviewing the Offering Memorandum and deciding whether to purchase the Notes. A reasonable investor would have attached importance to knowing the facts misrepresented and misleadingly omitted in the Offering Memorandum in determining whether or not to purchase the Notes. The materiality of the facts misrepresented and omitted is evidenced, for example, by the fact that the value of the Subject Notes and that of several other Classes of Notes in the Trust were eviscerated once the true facts were revealed to investors.

189. Credit Suisse owed Canyon, as well as all others who Credit Suisse solicited or to whom they sold Notes, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Memorandum, to ensure that such statements were true, and to ensure that there was no omission of material fact required to be stated in order to make its statements not misleading. Credit Suisse failed to exercise such reasonable care. Credit Suisse, in the exercise of reasonable care, would have or should have known that the Offering Memorandum contained misrepresentations of material fact and omissions of material fact as of the date it issued the Offering Memorandum and/or made such statements to the investing public.

190. Canyon did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Memorandum at the time Plaintiffs purchased the Subject Notes. If Canyon had known of the misrepresentations and omissions contained in the Offering Memorandum, Plaintiffs would not have purchased the Subject Notes,

let alone purchased them at the price it did. Canyon could not have known the misrepresentations and omissions contained in the Offering Memorandum until, at the earliest, on or about April 18, 2023, when the Trust's remittance report revealed the Shortfall. Even then, no explanation was provided by U.S. Auto or Defendant about the cause of the Shortfall, and it was not until months later that Canyon learned about U.S. Auto's dire financial condition and its non-payment of the VSCs.

191. Plaintiffs purchased the Subject Notes directly from Credit Suisse during Defendant's initial offering of the Notes to the public. Canyon had no communications with Credit Suisse regarding the Trust or the Notes, nor had Canyon previously solicited any such information from Credit Suisse, before Credit Suisse solicited Plaintiffs' purchase of Notes in the Trust by delivering the Offering Memorandum and Investor Presentation to Canyon.

192. While Plaintiffs purchased the Subject Notes as part of the initial offering of the Notes to the public, the Notes in general are still actively traded on the secondary market.

193. Plaintiffs sustained substantial damages in connection with its purchase of the Subject Notes and has the right to rescind its purchase and recover the consideration paid for the Subject Notes, with interest thereon.

194. Plaintiffs timely bring this action less than one year after discovery of the misrepresentations and omissions in the Offering Memorandum, or after such discovery could have been made by the exercise of reasonable diligence, and less than three years after Plaintiffs' purchase of the Subject Notes.

195. By reason of the foregoing, Credit Suisse has violated section 12(a)(2) of the Securities Act of 1933 and is liable to Plaintiffs for rescission of Plaintiffs' purchase of the Subject Notes.

**Second Cause of Action**

**(Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5)**

**(By All Plaintiffs)**

196. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66 and 72–177.

197. This claim is brought by Plaintiffs pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the Securities and Exchange Commission.

198. Defendant directly and indirectly made, disseminated, and approved the misrepresentations and omissions of material fact specified in this Complaint.

199. Defendant, through its employees, officers, and other agents, including the Known Individuals, as applicable, specifically knew the misrepresentations and omissions of material fact specified in this Complaint were false or misleading, in that, in the course of conducting due diligence regarding the Trust or Notes and/or in offering the Notes for sale, it was aware or became aware of the misrepresentations of material fact in the Offering Memorandum, the Investor Presentation, and its communications with investors, and/or of the failure of these documents and communications to disclose the

material facts necessary to make its statements, in light of the circumstances under which they were made, not misleading.

200. Defendant was furthermore in possession of, and, through its employees, officers, and other agents, including the Known Individuals, reviewed in the course of ordinary due diligence, information indicative of the misrepresentations and omissions of material fact specified in this Complaint, and chose to approve the Offering Memorandum and Investor Presentation, issue both documents, make communications to investors, and sell the Notes pursuant to those documents and communications, in reckless indifference to the truthfulness of the statements contained therein.

201. Defendant violated section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5, in that it:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with its purchase of the Subject Notes.

202. As covered *supra* in paragraphs 143–166, Defendant acted with scienter in that it knew that the statements disseminated in the name of Credit Suisse, as specified in this Complaint, including those enumerated in Factual Allegations section G, *supra*, were materially false and misleading and/or the danger of misleading buyers was so obvious that Defendant knew of it or must

have been aware of it. Nevertheless, Defendant recklessly or willfully ignored that danger in an extreme departure from the standards of care. Defendant further knew that such statements would be disseminated to investing members of the public and it knowingly and/or recklessly substantially participated in the issuance and dissemination of such misrepresentations and omissions, in violation of section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5.

203. Defendant participated in the fraudulent scheme alleged herein by virtue of: (1) Defendant's receipt and review of information reflecting the true facts regarding U.S. Auto, the Trust, the Notes, and the Receivables including the VSCs, and/or the other material misrepresentations or omissions in the Offering Memorandum and Defendant's communications with the public; (2) Defendant's control over, and/or receipt of, and/or modification of, the material misrepresentations and omissions in the Offering Memorandum and its communications with the public; (3) Defendant's control over, and/or receipt of, and/or modification of, the material misrepresentations and omissions in the Investor Presentation; and/or (4) Defendant's associations with U.S. Auto, which made it privy to confidential proprietary information concerning U.S. Auto, the Trust, the Notes, the VSCs, and/or the other material misrepresentations or omissions specified in this Complaint.

204. On information and belief, Defendant, through the knowledge of the Known Individuals and other of its employees, officers, and other agents, had actual knowledge of the material misrepresentations and omissions set forth in this Complaint, and intended to deceive Plaintiffs and other investors; or, in the

alternative, Defendant acted with reckless disregard for the truth when each Known Individual, and other of Defendant's employees, officers, and other agents, failed to disclose the true facts to investors, including Canyon, in the Offering Memorandum, the Investor Presentation, or in its other communications with Canyon, in an extreme departure from the standards of ordinary care.

205. Furthermore, the material misrepresentations and omissions disseminated by Credit Suisse in the Offering Memorandum, the Investor Presentation, and Defendant's other communications are so important and dramatically false that at least some corporate officials and/or directors must have known of, or recklessly disregarded, their falsity upon publication.

206. On information and belief, Credit Suisse personnel, including the Known Individuals and other of Defendant's agents, received and reviewed U.S. Auto's servicing files and other documents as part of its due diligence prior to approving the Offering Memorandum, which information clearly disclosed the material misrepresentations and omissions in the Offering Memorandum, Investor Presentation, and Defendant's other communications with investors. According to ABS industry custom and practice and standards of ordinary care, an ABS underwriter is expected to review such information as part of its due diligence in ABS transactions, particularly where no registration statement has been provided to investors, as investors have limited to no access to a given transaction's underlying financial information and are reliant on underwriters to investigate and verify that the information provided is complete, accurate, and does not omit to state any material facts. *See* Rizkalla Decl. ¶ 12.

207. In particular, on information and belief (based on (1) the conversations between Canyon and DOWC and between Canyon and Westlake; and on (2) DOWC's court filings, *supra* ¶¶ 97–119), this information disclosed that U.S. Auto had not funded the VSCs and, thus, a material percentage of the Receivables was voidable or subject to cancellation, and that the performance of U.S. Auto Sales' loans was worse than represented in the Investor Presentation, among other material issues covered in this Complaint. This information also, on information and belief (based on the same sources), contained indications that U.S. Auto had not been funding VSCs for months prior to the date of the Offering Memorandum, as well as other indications of serious financial and/or solvency issues at U.S. Auto.

208. As such, at least some of Credit Suisse's corporate officials and/or directors, in addition to the employees or other agents initially responsible for due diligence related to the Trust, must have been sufficiently knowledgeable about the financial issues of U.S. Auto and/or the enforceability issues with the Receivables to know that the Offering Memorandum, the Investor Presentation, and/or Defendant's other communications to investors contained material misrepresentations of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, prior to Credit Suisse approving of, issuing, and selling Notes pursuant to, the Offering Memorandum, the Investor Presentation, and other communications.

209. As a result of the foregoing, the market price of the Subject Notes was artificially inflated when the Subject Notes were sold to Plaintiffs. In

ignorance of the falsity of the Defendant's statements, Canyon relied on the Offering Memorandum, Investor Presentation, and Defendant's other communications in purchasing the Subject Notes at prices that were artificially inflated as a result of Defendant's misrepresentations and omissions.

210. Had Canyon been aware that the market price of the Subject Notes had been artificially and falsely inflated by the Defendant's material misrepresentations and omissions, Canyon would not have caused Plaintiffs to purchase the Subject Notes at the artificially inflated prices that they did, or at all.

211. As a result of the wrongful conduct alleged herein, Plaintiffs has suffered damages in an amount to be established at trial.

212. By reason of the foregoing, Defendant violated section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder, and is liable to Plaintiffs for rescission or, in the alternative, substantial damages, which Plaintiffs suffered in connection with its purchase of the Subject Notes.

**Third Cause of Action**

**(California Corporations Code §§ 25401, 25501)**

**(By All Plaintiffs)**

213. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66, 72–142, and 175–177.

214. Under the California Corporate Securities Law of 1968, "[i]t is unlawful for any person to offer or sell a security in [California] … by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in

the light of the circumstances under which the statements were made, not misleading." Cal. Corp. Code § 25401.

215. The Subject Notes were offered and sold in California because the offer to purchase them was made in and received in California, and because the offer to purchase the Subject Notes was accepted in California. Credit Suisse's main salesperson, specifically Michael Angelides, was working in Los Angeles at the time the Notes were marketed and sold; Canyon's main decisionmaker on the purchase of the Subject Notes, Adam Rizkalla, was working in Los Angeles at the time of the sale, as well; and Mr. Rizkalla also communicated with Wells Fargo employee, Michael Abamonte, who was also working in Los Angeles during this same time period.

216. The Subject Notes were sold to Plaintiffs by means of a written Offering Memorandum, by means of the Investor Presentation, and by means of other written and oral statements made by Credit Suisse.

217. The statements and omissions identified in this Complaint, including *supra* in Factual Allegations section G, are material misrepresentations and omissions because disclosure of the true facts underlying these matters would have affected Canyon's decision as to whether to cause Plaintiffs to purchase the Subject Notes and/or the price at which to purchase the Subject Notes.

218. Under section 25501 of the California Corporations Code:

> Any person who violates Section 25401 [of the California Corporations Code] shall be liable to the person who purchases a security from … that person, who may sue … for

> rescission. … Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security.

219. As discussed in this Complaint, Credit Suisse made untrue statements of material fact in the Offering Memorandum, Investor Presentation, in oral communications, or otherwise, and omitted from the Offering Memorandum, Investor Presentation, and other communications, material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading. These misrepresentations and omissions include, but are not limited to, the untrue statements and omissions listed *supra* in Factual Allegations section G.

220. Plaintiffs still own the Subject Notes.

221. Credit Suisse must therefore repay to Plaintiffs the consideration paid for the Subject Notes, plus interest, in exchange for retaking the Subject Notes, less the amount of income Plaintiffs have received on the Subject Notes at the time of that rescission.

222. Credit Suisse must also pay Plaintiffs' reasonable attorney's fees and costs. Cal. Corp. Code § 25501.

**Fourth Cause of Action**

**(Texas Government Code § 4008.052)**

**(By All Plaintiffs)**

223. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66, 72–142 and 175–177.

224. Under the Texas Securities Act, "[e]xcept as provided by [Tex. Gov. Code § 4008.052(c)], a person who offers or sells a security and from whom another person buys the security is liable to the buyer of the security, … if the person offers or sells the security by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Tex. Gov. Code § 4008.052(a).

225. As discussed in this Complaint, Credit Suisse made untrue statements of material fact to Canyon, including to Plaintiffs' investment managers, in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, and omitted from the Offering Memorandum, Investor Presentation, and other communications, material facts necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading. These misrepresentations and omissions include, but are not limited to, the misrepresentations and omissions listed *supra* in Factual Allegations section G.

226. Plaintiffs still own the Subject Notes, all of which Plaintiffs purchased from Credit Suisse.

227. Plaintiffs have not received any rescission offer meeting the requirements of Texas Government Code section 4008.058.

228. Credit Suisse must therefore repay to Plaintiffs the consideration paid for the Subject Notes, plus interest, in exchange for retaking the Subject Notes, less the amount of income Plaintiffs have received on the Subject Notes at the time of that rescission. Tex. Gov. Code § 4008.056.

229. Credit Suisse must also pay Plaintiffs' costs, and, if the Court finds recovery to be equitable under the circumstances, Plaintiffs' reasonable attorney's fees. Tex. Gov. Code § 4008.060.

230. Credit Suisse is also liable to Plaintiffs for exemplary damages, as Plaintiffs' harm for which they seek recovery resulted from Credit Suisse's fraud, malice, and/or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003.

**Fifth Cause of Action**

**(Deceit by Intentional Misrepresentation,**

**California Civil Code §§ 1709, 1710(1), 1710(3))**

**(By All Plaintiffs)**

231. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66 and 72–177.

232. Under California law, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709.

233. Such a "deceit" under section 1709 includes "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true." Cal. Civ. Code § 1710(1).

234. Such a "deceit" under section 1709 also includes "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3).

235. Credit Suisse, by marketing the Notes to Plaintiffs, intended to induce Plaintiffs to purchase the Subject Notes, at Plaintiffs' sole economic risk that the Notes would perform poorly.

236. On information and belief, Credit Suisse earned an underwriting fee and other substantial fees and benefits from the sale of any Notes, and earned even larger benefits from achieving a fully subscribed securitization, in which all Notes offered for sale were able to be sold. In addition to garnering larger fees, a fully subscribed securitization also benefited Credit Suisse by eliminating the risk of holding Notes on its balance sheet and improving its ability to underwrite, market, and sell future securitizations.

237. As discussed in this Complaint, Credit Suisse, through its agents, made material misrepresentations of material fact in the Offering Memorandum, Investor Presentation, and/or in other communications, and omitted from the Offering Memorandum, Investor Presentation, and other communications, facts that were likely to mislead for want of communication of those facts. These misrepresentations and omissions include, but are not necessarily limited to, the misrepresentations and omissions listed *supra* in Factual Allegations section G.

238. Credit Suisse, through its due diligence for the Trust and its other business relationships with U.S. Auto, was aware of the true facts and thus did not believe the misrepresentations set forth in this Complaint to be true. Defendant also suppressed facts that it was bound to disclose in the Offering Memorandum, Investor Presentation, or other communications, and gave information of other facts in the Offering Memorandum and Investor

Presentation that were likely to mislead for want of communication of the suppressed facts, including those material omissions set forth in this Complaint.

239. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

240. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, and otherwise by Credit Suisse.

241. Credit Suisse is therefore liable to Plaintiffs for their damages suffered as a result of Defendant's deceit.

242. Credit Suisse is also liable to Plaintiffs for exemplary damages, as this cause of action does not arise from an obligation arising from contract, and Credit Suisse's conduct constitutes "oppression, fraud, or malice" to Plaintiffs. Cal. Civ. Code. § 3294.

**Sixth Cause of Action**

**(Deceit by Negligent Misrepresentation,**

**California Civil Code §§ 1709, 1710(2))**

**(By All Plaintiffs)**

243. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66, 72–142, and 167–177.

244. Under California law, as set forth above, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709.

245. Such a "deceit" under section 1709 includes "[t]he assertion, as a fact, that which is not true, by one who has no reasonable ground for believing it to be true." Cal. Civ. Code § 1710(2).

246. In other words, under California law, "[n]egligent misrepresentation is a separate and distinct tort, a species of the tort of deceit. 'Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, [the defendant] may be liable for negligent misrepresentation, a form of deceit.'" *Bly v. Arthur Young & Co.*, 3 Cal. 4th 370, 407–08 (1992) (quoting 5 B.E. Witkin *et al.*, Summary of Cal. Law § 720 (9th ed. 1988), and citing, *inter alia*, Cal. Civ. Code § 1710(2)); *accord* 5 B.E. Witkin *et al.*, Summary of Cal. Law § 941 (11th ed. 2023) ("By statutory definition, negligent misrepresentation is a form of deceit.").

247. Though the statutory tort of deceit requires that a defendant have "willfully deceiv[ed]" the plaintiff, Cal Civ. Code § 1709, a claim for deceit by negligent misrepresentation under California law "does not require scienter or intent to defraud," *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173 (2003).

248. As discussed in this Complaint, Credit Suisse made misrepresentations and omissions of material fact in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, including, but not limited to, the misrepresentations and omissions listed *supra* in Factual Allegations section G.

249. Credit Suisse made these statements with the intent that investors, including Plaintiffs, would purchase Notes based, at least in part, on those statements.

250. Credit Suisse, based on its due diligence for the Trust and its other business relationships with U.S. Auto, had no reasonable ground for believing these statements to be true or not misleading.

251. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

252. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, and other communications by Credit Suisse.

253. Credit Suisse is therefore liable to Plaintiffs for their damages suffered as a result of Plaintiffs' deceit by negligent misrepresentation.

**Seventh Cause of Action**

**(Fraud Under Texas Common Law)**

**(By All Plaintiffs)**

254. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66 and 72–177.

255. Under Texas law, to state a claim for fraud, a plaintiff must show that "(1) the defendant made a false, material representation; (2) the defendant 'knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;' (3) 'the defendant intended to induce the plaintiff to act upon the representation;' and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019) (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018)).

256. As discussed in this Complaint, Credit Suisse, through its employees, officers, and/or other agents, made misrepresentations of material fact in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, and omitted from the Offering Memorandum, Investor Presentation, and other communications, facts that were likely to mislead for want of communication of those facts. These misrepresentations and omissions include, but are not necessarily limited to, the untrue statements and omissions listed *supra* in Factual Allegations section G.

257. Credit Suisse, as discussed in this Complaint, either knew of these material untrue facts and materially misleading omissions, or recklessly did not learn these facts.

258. Credit Suisse intended to induce Plaintiffs to act upon these misrepresentations or omissions.

259. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

260. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, oral communications, or otherwise by Credit Suisse.

261. Through Canyon's reliance on Credit Suisse's statements, Plaintiffs were harmed by purchasing Notes that were much riskier than advertised, and suffered losses when those risks came to pass and the Subject Notes lost value.

262. Credit Suisse is therefore liable to Plaintiffs for compensatory damages caused by their purchase of the Subject Notes.

263. Credit Suisse is also liable to Plaintiffs for exemplary damages, as Plaintiffs' harm for which they seek recovery resulted from Credit Suisse's fraud, malice, and/or gross negligence. Tex. Civ. Prac. & Rem. § 41.003.

**Eighth Cause of Action**

**(Negligent Misrepresentation Under Texas Common Law)**

**(By All Plaintiffs)**

264. Plaintiffs reallege and incorporate by reference herein the allegations *supra* in paragraphs 1–66 and 72–177.

265. Under Texas law, to state a claim for negligent misrepresentation, "the plaintiff must establish (1) the representation is made by a defendant in the course of his business; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the misrepresentation." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)). "The 'false information' supplied must be a misrepresentation of a 'material fact.'" *Morris*, 236 F.3d at 1061 (citing *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999)).

266. Credit Suisse made the statements in the Offering Memorandum, Investor Presentation, oral communications, or otherwise, as discussed in this Complaint, and supplied the Offering Memorandum and Investor Presentation to Canyon, as manager for Plaintiffs, in the course of Credit Suisse's business in selling and soliciting the sale of Notes, as Credit Suisse regularly participates in

the underwriting, solicitation, and sale of securities, including auto loan asset-backed securities.

267. Further, these statements were made in the course of Defendant's business because, on information and belief, Credit Suisse earned an underwriting fee and other substantial fees and benefits from the sale of any Notes, and earned even larger benefits from achieving a fully subscribed securitization, in which all Notes offered for sale were able to be sold. In addition to garnering larger fees, a fully subscribed securitization also benefited Credit Suisse by eliminating the risk of holding Notes on its balance sheet and improving its ability to underwrite, market, and sell future securitizations.

268. As discussed in this Complaint, Credit Suisse made misrepresentations and omissions of material fact in the Offering Memorandum, Investor Presentation, in oral communications, or otherwise, including, but not limited to, the misrepresentations and omissions listed *supra* in Factual Allegations section G.

269. Credit Suisse did not exercise reasonable care or competence in obtaining or communicating this information, the untruth of which would have been revealed by Defendant's due diligence, its other business relationships with U.S. Auto, and/or the other information in its possession.

270. Plaintiffs relied on these statements to evaluate the risks and qualities of investing in the Notes.

271. Plaintiffs were justified in relying on the detailed statements made in the Offering Memorandum, Investor Presentation, and other communications made by Credit Suisse.

272. Credit Suisse is therefore liable to Plaintiffs for compensatory damages caused by their purchase of the Subject Notes.

273. Credit Suisse is also liable to Plaintiffs for exemplary damages, as Plaintiffs' harm for which they seek recovery resulted from Credit Suisse's fraud, malice, and/or gross negligence. Tex. Civ. Prac. & Rem. § 41.003.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an Order:

a. granting judgment in favor of Plaintiffs on all causes of action; and

b. in the alternative, either

  i. ordering Defendant to retake the Subject Notes from Plaintiffs and to refund the purchase price for each Subject Note (plus statutory and pre- and post-judgment interest), minus the amounts already distributed to each Plaintiff under each Subject Note; or

  ii. ordering Defendant to pay Plaintiffs damages in an amount to be determined by the Court; and

c. ordering Defendant to pay Plaintiffs exemplary damages in an amount to be determined by the Court based on Defendant's fraud, oppression, malice, and/or gross negligence in marketing the Notes; and

d. awarding pre- and post-judgment interest on all applicable damages; and

e. awarding Plaintiffs their reasonable attorney's fees and costs; and

f. granting all other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all claims so triable, including, but not limited to, questions of compensatory and exemplary damages.

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ, LLP

October 21, 2024

By: */s/ Isaac M. Gradman*
Isaac M. Gradman
E. Page Allinson
Michael E. Tracht
Alexander A. Wiegel

*Attorneys for Plaintiffs*
*River Canyon Total Return Bond Fund,*
*Canyon NZ-DOF Investing L.P.,*
*Canyon Distressed TX (A) LLC,*
*Canyon Distressed TX (B) LLC,*
*Canyon-EDOF (Master) L.P., and*
*Canyon Distressed Opportunity Master Fund III, L.P.*